UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| OSHONYA SPENCER, CHARLES STRICKLAND, and DOUGLAS McDUFFIE on behalf of themselves and all others similarly situated, | : : : : | |
| Plaintiffs, | : : | |
| | : : | NO. 3:05CV1681 (JCH) |
| THE HARTFORD FINANCIAL SERVICES GROUP, INC., HARTFORD LIFE, INC., HARTFORD LIFE INSURANCE COMPANY, HARTFORD ACCIDENT AND INDEMNITY COMPANY, HARTFORD CASUALTY INSURANCE COMPANY, HARTFORD INSURANCE COMPANY OF THE MIDWEST and HARTFORD FIRE INSURANCE COMPANY | : : : : : : : : : | |
| Defendants. | : | MAY 1, 2006 |

## AMENDED COMPLAINT

### INTRODUCTION

Plaintiffs Oshonya Spencer, Charles Strickland and Douglas McDuffie bring this action

on behalf of themselves and all other similarly-situated individuals who entered into settlements

of personal injury litigation with subsidiaries of defendant The Hartford Financial Services

Group, Inc. ["Hartford"] in which the settlement included the use of a structured settlement

funded with an annuity.  During the period at issue in this litigation, defendant created and,

through its defendant subsidiaries, engaged in a pattern and practice of uniformly short-changing

settlement claimants of the value of their damage recoveries, by deducting four percent (4%)

from the specific cash portion of the settlement which was previously agreed between the settling

parties to be allocated to fund future annuity payments, and retaining that 4% to pay undisclosed commissions to cooperating defense brokers.  By their practice of secretly misappropriating and diverting settlement money to pay for their own brokers, defendant Hartford and its defendant subsidiaries were able to simultaneously avoid the cost of this defense expense and significantly limit the total amount of damages dollars they were required to pay on behalf of their liability insureds.

I.    **JURISDICTION**

1.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and as a diversity of citizenship claim under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005.

2.    The matter in controversy exceeds the value of $5,000,000, exclusive of interest and costs, and is a class action involving substantially more than 100 class members, of which fewer than one-third are citizens of Connecticut (the state in which the action is being filed).

II.   **PARTIES AND PARTICIPANTS IN THE RICO ENTERPRISE**

A.    **The Named Plaintiffs**

3.    On or about November 29, 2004, plaintiff Oshonya Spencer, a resident of Ohio, entered into an agreement with defendant Hartford Insurance Company of the Midwest ["Hartford Midwest"] to settle all claims arising out of a personal injury action brought by plaintiff Spencer against an insured of Hartford Midwest.  This agreement was memorialized in a collection of documents which included an agreement to release all claims, an agreement on a lump sum payment to be made to plaintiff Spencer, an agreement that defendant Hartford Midwest would make a cash payment in a specified amount to fund a structured settlement

2

annuity and an agreement on the terms of future structured settlement payments [hereinafter "Claim Settlement Agreements"].

4.      On or about December 10, 2003, plaintiff Charles T. Strickland, a resident of Pennsylvania, entered into an agreement with defendant Hartford Casualty Insurance Company ["Hartford Casualty"] to settle all claims arising out of a personal injury action brought by plaintiff Strickland against an insured of Hartford Casualty.  This agreement was memorialized in a collection of documents which included an agreement to release all claims, an agreement on a lump sum payment to be made to plaintiff Strickland, an agreement that defendant Hartford Casualty would make a cash payment in a specified amount to fund a structured settlement annuity and an agreement on the terms of future structured settlement payments [hereinafter "Claim Settlement Agreements"].

5.      On or about February 12, 2002, plaintiff Douglas Ean McDuffie, a resident of Oklahoma and minor at the time, through his guardian ad litem and represented by legal counsel, with court approval, entered into an agreement defendant Hartford Accident and Indemnity Company ["Hartford Accident"] to settle all claims arising out of a personal injury action brought by on behalf of plaintiff McDuffie against an insured of Hartford Accident.  This agreement was memorialized in a collection of documents which included an agreement to release all claims, an agreement on a lump sum payment to be made to plaintiff McDuffie, an agreement that defendant Hartford Accident would make a cash payment in a specified amount to fund a structured settlement annuity and an agreement on the terms of future structured settlement payments [hereinafter "Claim Settlement Agreements"].  Douglas McDuffie is now of majority and still a legal resident of Oklahoma, pursuant to provisions of the Service Members Civil Relief Act of 2003 (formerly the Soldiers and Sailors Civil Relief Act of 1940, as

amended), although he lives elsewhere while serving on active duty in the United States Marine Corps.

     **B.**    <u>**Defendants**</u>

     6.     Defendant The Hartford Financial Services Group, Inc. ["Hartford"] is a Delaware corporation with its principal place of business in Hartford, Connecticut.

     7.     Defendant Hartford is organized into two major insurance operations: life and property and casualty.  Hartford conducts its life operations through its ownership and control of Hartford Life, Inc. and its affiliates, which offer individual and group life insurance, annuities, and many other investment products.  Hartford conducts its property and casualty operations through a host of subsidiaries that it owns and controls, which offer property and casualty insurance coverage to thousands of individuals and businesses.  Defendant Hartford carries on its various business activities throughout the United States through both of these operational divisions.

     8.     Defendant Hartford Life, Inc. ["Hartford Life"] is a Delaware corporation with its principal place of business in Connecticut. Defendant Hartford Life is authorized to sell life, accident and health insurance, annuities and other products in various states through the following entities: Hartford Life and Accident Insurance Company; Hartford Life and Annuity Insurance Company; Hartford Life Group Insurance Company; Hartford Life Insurance Company; Hartford International Life Reassurance Corporation; International Corporate Marketing Group, LLC; The Hartford Mutual Funds, Inc.; PLANCO Financial Services, Inc.; and Woodbury Financial Services, Inc.  Most, but not necessarily all, of these individual companies are domiciled in Connecticut.  Thomas M. Marra ["Mr. Marra"], who is the President and Chief Operating Officer of Hartford Life and the president of the life insurance subsidiaries

of Hartford Life, is also a member of the Board of Directors and the Office of the Chairman of the Hartford and an Executive Vice President of Hartford.  Further, Ramani Ayer ["Mr. Ayer"], who is the Chariman and Chief Executive Officer of Hartford, is also the Chairman of Hartford Life.

9.      Defendant Hartford Life Insurance Company ["Hartford Life Insurance"] is a Connecticut corporation with its principal place of business in Connecticut.  Hartford Life Insurance is licensed and authorized to sell life, accident and health insurance, annuities and other products in various states .

10.     Defendant Hartford Accident and Indemnity Company ["Hartford Accident"] is a Connecticut corporation with its principal place of business in Connecticut.  Hartford Accident is licensed and authorized to sell property and casualty insurance in various states.

11.     Defendant Hartford Casualty Insurance Company ["Hartford Casualty"] is an Indiana corporation with its principal place of business in Connecticut.  Hartford Casualty is licensed and authorized to sell property and casualty insurance in various states.

12.     Defendant Hartford Insurance Company of the Midwest ["Hartford Midwest"]  is an Indiana corporation with its principal place of business in Connecticut.  Hartford Midwest is licensed and authorized to sell property and casualty insurance in various states.

13.     Defendant Hartford Fire Insurance Company ["Hartford Fire"] is a Connecticut corporation with its principal place of business in Connecticut.  Hartford Fire is licensed and authorized to sell property and casualty insurance in various states, and is Hartford's principal property and casualty subsidiary.  Mr. Ayer is the Chairman and Chief Executive Officer of Hartford Fire.  David K. Zwiener ["Mr. Zwiener"], who is a member of the Board of Directors as well as an Executive Vice President of Hartford, is the President of Hartford Fire.  John N.

5

Giamalis ["Mr. Giamalis"], who is a Senior Vice President and the Treasurer of Hartford, holds the offices of Treasurer and Vice President with, and is a member of the Board of Directors of, Hartford Fire.  Neal S. Wolin ["Mr. Wolin"], who is an Executive Vice President, General Counsel and Chief Compliance Officer of Hartford as well as a member of the Office of the Chairman (i.e., Mr. Ayer), is a Vice President and member of the Board of Directors of Hartford Fire.  (Mr. Wolin is also a member of the Board of Directors of Hartford Accident.)  David M. Znamierowski ["Mr. Znamierowski"], who is an Executive Vice President and the Chief Investment Officer of the Hartford, is also a Vice President and member of the Board of Directors of Hartford Fire.  Mr. Marra likewise is a member of the Board of Directors of Hartford Fire.  In total, Hartford Fire has 6 officers and 8 directors that overlap with officers and/or directors of Hartford.

14.	Defendants Hartford Accident, Hartford Casualty, Hartford Midwest and Hartford Fire [hereinafter "the defendant Hartford Property & Casualty affiliates"] are part of defendant Hartford's property & casualty operational division.  In addition to these entities, Hartford's property & casualty operational division is licensed and authorized to sell property and casualty insurance in various states as the following entities: Hartford Insurance Company of Illinois; Hartford Insurance Company of the Southeast; Hartford Lloyd's Insurance Company; Hartford Underwriters Insurance Company; Property and Casualty Insurance Company of Hartford; Omni Indemnity Company; Omni Insurance Company; Trumbull Insurance Company; Nutmeg Insurance Company; Sentinel Insurance Company, Ltd.; Twin City Fire Insurance Company; and Pacific Insurance Company, Ltd.  Mr. Zwiener is the President and Chief Operating Officer of Hartford's property and casualty operations.  Most, but not necessarily all, of these individual companies are domiciled in Connecticut.

6

15.     Additionally, defendant Hartford owns and controls Hartford Comprehensive Employee Benefits Service Company ["Hartford CEBSCO"], a service company created to assume periodic payment obligations made by Hartford's property & casualty companies in some of their structured settlement cases and to assume periodic payment obligations of unaffiliated self-insured corporations and unaffiliated liability insurance companies. To fund such obligations, Hartford CEBSCO is paid a sum in consideration for its acceptance of the periodic payment obligation, which Hartford CEBSCO then uses to purchase an annuity from Hartford Life. This transaction is known as a "qualified assignment" within the meaning of 26 U.S.C. § 130.

16.     Defendant Hartford created and, at all relevant times, has operated a Structured Settlement Program which was run from within defendant Hartford Fire.  During this period of time, all purchases and assignments of annuities for use in structured settlement cases involving personal injury claims insured by a Hartford Property & Casualty  company were controlled by the employees of defendant Hartford Fire.

17.     Defendant Hartford Fire appointed and approved a limited number of outside brokers to find and place structured settlement annuities, which were used to fund structured settlement contracts to settle claims against policyholders insured by Hartford Property & Casualty  companies.  These outside approved brokers are unknown by name to plaintiffs, but are hereinafter referred to collectively as the "Hartford Fire Outside Approved Doe Brokers" described below.  Defendant Hartford Fire uses the Hartford Fire Outside Approved Doe Brokers to handle the structured settlement segment of its casualty operations in order to build its broker referral network and thereby increase the sales of Hartford's other products (including regular

annuities).  Many of the Hartford Fire Outside Approved Doe Brokers have been used by
defendant Hartford Fire since the inception of the Structured Settlement Program.

18.     In addition to the Hartford Fire Outside Approved Doe Brokers, defendant
Hartford Fire, in some situations, also uses Hartford's so-called in-house brokers (hereinafter
collectively referred to as the "In-House Brokers") to find and place structured settlement
annuities which are used to fund structured settlement contracts to settle claims against
policyholders.

19.     At some time during 1998, defendant Hartford Life entered into an agreement
with defendant Hartford Fire to handle a portion of defendant Hartford's Structured Settlement
Program.  This division of labor was implemented by defendant Hartford to increase the use of
Hartford Life's own annuity products to fund structured settlements involving Hartford-affiliated
property and casualty insurers.

20.     Defendant Hartford Life appointed and approved six structured settlement
brokerage firms to act as the exclusive brokers for structured settlement cases assigned to
Hartford Life.  Those brokerage companies included EPS Settlements Group, Inc.; Ringler
Associates, Inc.; Structured Financial Associates; Cambridge Galaher Settlements and Insurance
Services, Inc.; Brant Hickey & Associates; and The Pension Company, all of whom are
collectively referred to herein as the "Hartford Life Outside Approved Brokers."  These Hartford
Life Outside Approved Brokers were not only used to increase Hartford's own structured
settlement business, but to also build its broker referral network in order to increase the sale of
Hartford's other products (including its regular annuities).

21.     Hartford Life reported sales of annuities of $16.5 billion, $11.6 billion, and $10.0
billion in 2003, 2002, and 2001, respectively.  While, as previously stated, not all of Hartford

Life's annuities are issued to fund structured settlements promised by Hartford on behalf of Hartford insureds, a significant portion are sold and used in this precise manner.  Hartford Life represents on Hartford's website that it alone is a "top provider in the structured settlement market," having issued more than 16,500 structured settlement annuities over the decade ending 12/31/2000 through its various issuing companies.

22.    Apart from the segment of Hartford's structured settlement business, which has been administered since 1998 through defendant Hartford Life, defendant Hartford Fire continues to handle the remainder of Hartford's overall Structured Settlement Program. Information concerning the dollar amount of Hartford Fire annuity sales is not readily available to the public.

23.    Unless stated otherwise, the term "Approved Brokers" as used in this Complaint shall mean and include both the Hartford Fire Outside Approved Doe Brokers and the Hartford Life Outside Approved Brokers that Hartford utilized, through Hartford Fire and Hartford Life, to carry out Hartford's Structured Settlement Program.

### C.    The Hartford Life Outside Approved Brokers

24.    EPS Settlements Group, Inc. ("EPS"), Joseph M. Costello, President, is believed to be a Colorado domiciled company with its principal place of business located at 7100 E. Belleview Ave., #300, Greenwood Village, CO 80111.  EPS is a general insurance agency comprised of licensed life insurance agents who are appointed by various life insurance companies, including Hartford Life, to sell their structured settlement annuity products and arrange at times for the assumption of these structured settlements' payment obligations under "qualified assignments" within the meaning of 26 U.S.C. § 130.  EPS is a Hartford Life Outside Approved Broker and, in the person of James M. Adams (a/k/a Jamie M. Adams), was engaged

9

by Hartford through Hartford Life to present structured settlement proposals to Plaintiff Douglas McDuffie, with Hartford Life as the primary annuity issuer.

25.     Ringler Associates, Inc. ("Ringler"), Robert J. Blattenberg, President, is believed to be a California domiciled company with its principal place of business located at 27422 Aliso Creek Road, Suite 200, Aliso Viejo, CA 92656.  Ringler is a general insurance agency comprised of licensed life insurance agents who are appointed by various life insurance companies, including Hartford Life, to sell their structured settlement annuity products and arrange at times for the assumption of these structured settlements' payment obligations under "qualified assignments" within the meaning of 26 U.S.C. § 130.  Ringler is a Hartford Life Outside Approved Broker and, in the person of Christie Gonzalez Hoadley, was engaged by Hartford through Hartford Life to present structured settlement proposals to Plaintiff Oshonya Spencer and, in the person of Ken Clemmens, was engaged by Hartford through Hartford Life to present structured settlement proposals to plaintiff Charles Strickland, each with Hartford Life as the primary annuity issuer.

26.     Structured Financial Associates ("SFA"), Alfred W. Bodi, President, is believed to be a Maryland domiciled company with its principal place of business located at 330 N. Charles Street, Suite 400, Baltimore, MD 21201.  SFA is a general insurance agency comprised of licensed life insurance agents who are appointed by various life insurance companies, including Hartford Life, to sell their structured settlement annuity products and arrange at times for the assumption of these structured settlements' payment obligations under "qualified assignments" within the meaning of 26 U.S.C. § 130.  SFA is a Hartford Life Outside Approved Broker.

27.     Cambridge Galaher Settlements and Insurance Services, Inc. ("Cambridge Galaher"), David L. Hays, Executive Vice President, is believed to be a Massachusetts domiciled company with its principal place of business located at One Tech Drive, Suite 112, Andover, MA 01810.  Cambridge Galaher is a general insurance agency comprised of licensed life insurance agents who are appointed by various life insurance companies, including Hartford Life, to sell their structured settlement annuity products and arrange at times for the assumption of these structured settlements' payment obligations under "qualified assignments" within the meaning of 26 U.S.C. § 130.  Cambridge Galaher is a Hartford Life Outside Approved Broker.

28.     Brant Hickey & Associates ("Brant Hickey"), Gary L. Brant, President, and David J. Hickey, CEO, is believed to be a Pennsylvania domiciled company with its principal place of business located at 1810 Mt. Nebo Road, Sewickley, PA 15143.  Brant Hickey is a general insurance agency comprised of licensed life insurance agents who are appointed by various life insurance companies, including Hartford Life, to sell their structured settlement annuity products and arrange at times for the assumption of these structured settlements' payment obligations under "qualified assignments" within the meaning of 26 U.S.C. § 130. Brant Hickey is a Hartford Life Outside Approved Broker.

29.     The Pension Company ("Pension"), Frank A. Pension, Principal, is believed to be a Pennsylvania domiciled company with its principal place of business located at 101 West Elm Street, Suite 230, Conshohocken, PA 19428.  Pension is a general insurance agency comprised of licensed life insurance agents who are appointed by various life insurance companies, including Hartford Life, to sell their structured settlement annuity products and arrange at times for the assumption of these structured settlements' payment obligations under "qualified

11

assignments" within the meaning of 26 U.S.C. § 130.  Pension is a Hartford Life Outside Approved Broker.

### D.     The Hartford Fire Outside Approved Doe Brokers (Does 1 through 100)

30.     Does 1 through 100 are various brokerages and/or individual licensed life insurance agents throughout the United States not already named above, who were and are engaged and appointed by Hartford Fire, on behalf of itself and Hartford, to sell their structured settlement annuity products to fund structured settlement contracts to settle claims against policyholders insured by Hartford affiliates, and arrange at times for the assumption of these structured settlements' payment obligations under "qualified assignments" within meaning of 26 U.S.C. § 130.

31.     Plaintiffs are unaware of the true names and capacities, whether corporate, associate, individual, or otherwise, of the Hartford Fire Outside Approved Doe Brokers named as Does 1 through 100 inclusive, but will seek leave of Court to amend this Complaint to state their true names and capacities when they have been ascertained and to state appropriate charging allegations.

### III.    NATURE OF THE CLAIMS

### A.     Structured Settlement Arrangements

32.     A structured settlement arrangement generally provides for periodic payments as damages in cases involving personal physical injuries or physical sickness, 26 U.S.C. § 104(a)(2), or for amounts received under workmen's compensation acts for personal injuries or sickness, 26 U.S.C. § 104(a)(1).

33.     The Periodic Payment Settlement Tax Act of 1982 ("Settlement Act") provides tax-favored treatment for these payments under structured settlement arrangements.  The Settlement Act, by amending Section 104, allows an injury claimant to exclude from gross income future "periodic payments," as long as the injury claimant does not take actual or constructive receipt of or have economic benefit of the cash, annuity or U.S. obligation funding the payments.  The exclusion from gross income is provided generally for the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness.

34.     The periodic payments under a structured settlement may be self-funded by the liability insurer from the insurer's own cash flow, or by the purchase of an asset, usually an annuity, which remains an asset of the liability insurer.  Alternatively, the liability insurer may pay a lump sum consideration to a third-party assignee (who is usually a third-party entity affiliated with the life insurance company that will issue the annuity) to assume the periodic payment liability to the claimant ("qualified assignment").  A qualified assignment is defined and authorized under the provisions of 26 U.S.C. § 130 ("Section 130"), as created by the Settlement Act.

35.     In cases where the liability insurer assigns the annuity to another entity, the Settlement Act provides to the third-party assignee an exclusion from gross income for amounts received for agreeing to a "qualified assignment," but only to the extent that the amount received does not exceed the aggregate cost of the annuity.  In addition, the liability insurer that makes the "qualified assignment" is allowed a current year tax deduction for the whole amount it paid for the settlement, including any cash at the time of the settlement and the annuity's purchase price

(or cost).  (The periodic payment obligations owed to Plaintiffs Oshonya Spencer and Charles Strickland were assigned to Hartford CEBSCO.  The periodic payment obligation owed to Plaintiff McDuffie in this case was not assigned, but was retained by the annuity's owner, defendant Hartford Accident).  In a structured settlement transaction, it is either the self-insured defendant, the liability carrier of the defendant, or the third-party assignee (who assumes their obligation) who is the annuity purchaser, and not the personal injury claimant.

36.     These structured settlement transactions, particularly those utilizing qualified assignments, confer substantial benefits upon Hartford and its subsidiary insurers.  First, with respect to Hartford's property and casualty insurer, the transaction enables and permits it: (1) to remove the entire liability to the injury claimant from its books, thereby relieving the liability insurer of the obligation to fund its reserves for that claim; and (2) to take a tax deduction for the cost of the annuity (in addition to the deduction it is permitted to take for the lump sum portion of the total settlement amount paid to the injury claimant).  Second, with respect to the Hartford life insurer affiliate that issues the annuity, it realizes an increase in earned premium, i.e., the premium paid to it by the liability insurer to purchase the annuity.  And, though the ultimate obligation to fund the annuity through future payments to the injury claimant rests with the Hartford life insurer because the third-party assignee in the qualified assignment (e.g., CEBSCO) is merely a pass through entity for tax purposes, the Hartford Life insurer benefits from the immediate use of the funds that it received in the annuity transaction to invest, which is fundamental to an insurer's business operations.  The result is that the Hartford life insurer profits from the "spread" between its investment income and the payments it must make to the injury claimant under the annuity.  Third, Hartford benefits because the financial condition of each of its insurer subsidiaries (which are nothing more than assets of Hartford) is improved,

14

thereby enhancing Hartford's consolidated financial statements, which, in turn, increases its share price, giving Hartford greater access to, and gain from, capital and equity markets.  Further, by utilizing a select group of brokers to operate the structured settlement program – each of which earns sizable commissions from Hartford – Hartford increases the sale of all of its products, including, without limitation, the sale of its regular annuities, which, again, is how Hartford maximizes its earned premium and realizes profits on investment income.  Hartford is able to increase the sale of its structured settlement annuity product, in particular, because it can reward brokers for "steering" annuity business from non-Hartford property and casualty insurers by offering additional Hartford affiliate insurer cases to the broker (and, specifically, cases that confer substantial commissions).

### B.    The Prevalence of Structured Settlements

37.    Structured settlements have become a popular device offered and arranged by defendants and their liability insurers to resolve personal injury and, to a lesser extent, workers' compensation claims.

38.    Structured settlements first began to take root in or about the mid-1970's, when annuities began to be brokered to liability insurers as a means for them to reserve large sums of money to make settlement payments, to pay out over time more than they reserved, and to avoid the administrative task of sending out settlement checks.

39.    By 1991, structured settlement annuity sales had peaked at about $4 billion and remained substantially level at $4 billion until 1999 when, over the next two-year period, annual sales jumped to approximately $6 billion, a level where annual sales currently remain.

15

C.    **The Structured Settlement Market**

40.    Today, fewer than twenty-five life insurance companies offer structured settlement annuities to liability insurers and self-insured corporations to indemnify physical injury accident victims and workers' compensation claimants.  In addition, many of these life insurance companies have affiliated property and casualty companies for which they sell annuities to help settle their sister carrier's liability claims through structured settlements (like Hartford).

41.    These life insurance companies generally do not restrict their products from being sold based on whether the brokerage was engaged by the defense or the claimant.  Such is the case with Hartford Life.

42.    However, most of the insurance companies who do operate jointly affiliated liability and life companies (like Hartford) do restrict access to their own claims settlement annuity sales opportunities to a select list of approved outside defense brokers or in-house brokers (like Hartford).

43.    These brokers are paid a standard sales commission of four percent (4%) of the annuity's cost for their services.  These services typically include working with the liability insurer's claims adjusters, preparing form structured settlement documents and relaying information to the claimant on behalf of the defense insurer about the annuity's cost.

44.    Thus, structured settlements are ostensibly a device offered and arranged by the defendant's liability carrier on behalf of the defense, and the liability insurer and broker operate in tandem to deliberately erect an information barrier to protect the defense interests.  For example, liability carriers typically do not reveal to injury claimants (or their attorneys) any information about the commission agreements they have with their appointed brokers.

16

45.     A significant percentage of structured settlements involve only small claims in which the claimant is typically unknowledgeable about these sophisticated transactions and is frequently not represented by an attorney.  Moreover, the vast majority of structured settlements occur without a claimant ever retaining his or her own broker.

**D.     Hartford's Structured Settlement Process: Reducing the Value of Claimants' Settlements Through Hidden Payment of Hartford's Own Defense Brokerage Fees**

46.     Defendants and the Approved Brokers (and In-House Brokers), however, have gone much further than merely keeping confidential certain fee and other strategic information as a means to preserve the structured settlement concept as a defense tool.  Rather, defendants and the Approved Brokers (and In-House Brokers) have colluded to submit falsely inflated cost information to unwitting injury claimants (and their attorneys when retained) about the true amount of money which the particular Hartford Property & Casualty affiliate invests to purchase the funding annuity.

47.     As occurred with plaintiffs, it is the practice of defendants and the Approved Brokers (and In-House Brokers) not to disclose to injury claimants that the brokerage fee, which is owed by the Hartford Property & Casualty affiliate, is reclaimed by Hartford and its affiliates from the injury claimant's own previously agreed-upon settlement proceeds by secretly bundling the broker's four percent (4%) commission into the represented annuity cost.  Further, defendants conceal the fact that, in many instances, the Hartford liability insurer does not pay the standard four percent (4%) commission to the Approved Broker because there are standing discount agreements with Approved Brokers whereby either Hartford Life, Hartford Life Insurance or Hartford Fire retains one percent (1%) of the commission amount, and only three percent (3%) is paid to the Approved Broker.  Upon information and belief, in instances where an In-House

Broker is utilized, defendants conceal the fact that they retain the entire four percent (4%) commission, "paying" the commission to themselves.  In both scenarios, defendants not only are relieved of having to pay the expense of the four percent (4%) brokerage commission on top of, and in addition to, the full amount of the agreed upon settlement proceeds that are supposed to be used to purchase the annuity to fund the payments to the injury claimant, but defendants also then realize an unlawful windfall by keeping for themselves all or a portion of the purported commission.  Prior to the time that Hartford Life assumed a portion of Hartford's Structured Settlement Program in 1998, Hartford Fire was the beneficiary of being able to retain all or a portion of the commission that was paid in connection with the purchase of the annuity, reaping an additional windfall at the expense of unwitting claimants.  Upon information and belief, when Hartford Life entered the Structured Settlement Program in 1998, Hartford Life paid Hartford Fire in excess of $3 million to "compensate" Hartford Fire, in part, for the loss of this additional revenue from ceding part of the Structured Settlement Program and, further, agreed to make future payments to Hartford Fire based on the commission revenue that Hartford Life receives in the Structured Settlement Program ("the Hartford Life-Hartford Fire Sharing Agreement").

48.     Defendants cause injury claimants to assume the costs of the annuity brokerage commission by failing to disclose and, in fact, by affirmatively concealing, the exact amount that is subsequently invested to purchase the annuity which the settling parties agreed should be acquired.  Furthermore, defendant Hartford and the defendant Hartford Property & Casualty affiliates use a structured settlement annuity software and quoting system that is represented by them and the Approved Brokers (and In-House Brokers) as illustrating future projected payments based on the amount of funds previously agreed between the settling parties to be invested in the annuity.  This representation, however, is not true.

18

49.     Contrary to the defendant Hartford Property & Casualty affiliates' representations to injury claimants and their attorneys, the structured settlement annuity and quoting system utilized by defendant Hartford, the defendant Hartford Property & Casualty affiliates and the Approved Brokers and In-House Brokers, has been intentionally designed to include the broker's commission as a part of the premium charge for the annuity.  Since this defense-owed cost is "bundled in," injury claimants (and their attorneys when retained) are typically unaware that the defendant Hartford Property & Casualty affiliates actually fail to remit to them, and in fact divert, this portion of their agreed-upon settlement proceeds to pay the broker's commission instead of investing it in funding the annuity.

50.     This annuity software and quoting system is used by Hartford, the defendant Hartford Property & Casualty affiliates and the Approved Brokers or In-House Brokers with injury claimants (and their attorneys when retained) in connection with each settlement transaction.

51.     It is defendants' practice (and the practice of its Approved Brokers or In-House Brokers) not to disclose (and to affirmatively conceal) that the annuity illustrations which are presented for acceptance to injury claimants (and their attorneys when retained) do not reflect the true value of the investment in these annuities because of defendants' undisclosed "built-in" commission amounts which are diverted by the defendant Hartford Property & Casualty affiliates to the Approved Brokers as cost avoidance, thus reducing the amount of the annuity investment.

52.     In fact, Hartford trains its affiliates and employees in the Structured Settlement Program, as well as its Approved Brokers and In-House Brokers, not to disclose to claimants (or their attorneys when retained) the fact that the broker's fee is bundled into the represented

19

annuity investment cost, because the annuity quoting software program intentionally and affirmatively omits any reference to the fact that the annuity premium amount includes a 4% commission, which is not reflected in the payment amounts shown in the annuity quote or illustration.  Hartford employees and employees of the defendant Hartford Property & Casualty affiliates and the Approved Brokers and In-House Brokers are also trained to conceal this scheme, in the event of claimant inquiries about the payment of commissions, by falsely responding that any sharing of information by Hartford or its affiliates with the claimant – except the (misrepresented) annuity cost and the future income stream to be generated from the annuity – would be tantamount to "constructive receipt" by the claimant of the annuity product which would destroy its tax advantages.

53.     And, again, in many instances, Hartford Life, Hartford Life Insurance or Hartford Fire retains a portion of the diverted commission; or all if an In-House Broker handles the transaction.  Whether the four percent (4%) commission is paid to the Approved Broker, or retained in whole or in part by Hartford Life, Hartford Life Insurance Company or Hartford Fire, however, the "net" injury to the claimant is the same in each and every transaction: the funds that the defendant Hartford Property & Casualty affiliates agreed – pursuant to the settlement agreements entered into with injury claimants – to use to purchase the annuity are improperly (and surreptitiously) reduced by four percent (4%), thereby reducing the value of the annuity by four percent (4%).

E.     **The Named Plaintiffs' Settlements**

54.     OSHONYA SPENCER

a.      On or about April 2, 2003, plaintiff Oshonya Spencer, an adult resident of Ohio, was involved in a motor vehicle accident in Huntington, West Virginia, in which the vehicle she was driving was struck by a vehicle driven by Jerrine L. Fox, who was insured by defendant Hartford Midwest.  Plaintiff Spencer sustained serious injuries and asserted a claim against Hartford Midwest.

b.      On or about November 29, 2004, plaintiff Spencer entered into Claim Settlement Agreements with Hartford Midwest, the terms of which had been negotiated by her attorney, Scott Stapleton, with Catherine Gleasen on behalf of Hartford Midwest.

c.      During settlement negotiations, Hartford Midwest had represented to plaintiff Spencer, through Attorney Stapleton, that Hartford Midwest would be spending a total of $100,000.00 for the benefit of plaintiff Spencer in exchange for her release of Jerrine L. Fox, the insured, Hartford Midwest, and others.  Pursuant to the settlement offer, Hartford Midwest agreed to pay $48,000.00 to include all of the costs and expenses in connection with the claim and the settlement, then invest the remaining balance of $52,000.00 to fund an annuity which was represented to plaintiff Spencer to pay 120 monthly payments of $494.58, beginning on January 1, 2005.

d.      Attorney Stapleton, who had a contingent fee contract with his client, plaintiff Spencer, that called for one-third of the total present value of the recovery for damages, collected an attorney fee of $33,333.33 from his client, out of the $48,000.00 cash portion, which was based on plaintiff Spencer's understanding that the total present value of her damage recovery was $100,000.00.

21

e.      The parties agreed and understood that the remaining balance of $52,000.00 was to be fully allocated by Hartford Midwest toward the investment in an annuity that would be issued by Hartford Life Insurance Company, an affiliate of defendant Hartford Life.  The annuity was to be purchased and owned by Hartford CEBSCO, under a "qualified assignment" of Hartford Midwest's liability to make the periodic payments, within the meaning of 26 U.S.C. § 130.

f.      At no time did Hartford Midwest nor any other Hartford-affiliated entity disclose to plaintiff Spencer or her attorney that any part of the remaining cash balance of the settlement was ever going to be spent on anything other than the actual cost of the annuity. Neither the Hartford representatives nor the Hartford Life Outside Approved Brokers with whom plaintiff Spencer (through her attorney) dealt in consummating the settlement ever disclose that (a) there was a broker's cost which Hartford Midwest would have to incur, or, (b) that the broker's cost was going to be charged to plaintiff Spencer by Hartford Midwest out of the remaining cash balance of her settlement proceeds which was supposed to be invested by Hartford Midwest in purchasing an annuity of present value equal to $52,000.00.

g.      Pursuant to the Claims Settlement Agreements, Hartford CEBSCO purchased the annuity from Hartford Life Insurance Company on behalf of Hartford Midwest, using Ringler, in the person of Christie Gonzalez Hoadley, as the Hartford Life Outside Approved Broker.

h.      At the time the Claims Settlement Agreements were reached, Hartford Midwest and Ringler represented to plaintiff Spencer, through her attorney, that the 120 future monthly payments of $494.58 each were the entire income stream that could be generated from an annuity costing $52,000.00.

22

i.     In exchange for the cash payments to reimburse her health care providers and the promise of those future periodic payments based on an annuity investment of $52,000, representations on which plaintiff Spencer relied, she entered into a settlement with Hartford Midwest and subsequently granted Hartford Midwest and its insured a release.

j.     Since the settlement, plaintiff Spencer has discovered that Hartford paid its defense brokerage fees by secretly bundling that cost into the represented investment value of the annuity portion of the parties' agreement, thereby reducing the annuity's value by four percent (4%).  On information and belief, Hartford Life Insurance Company retained a portion of the commission and also paid a portion of the commission to defendant Hartford Fire pursuant to the the Hartford Life-Hartford Fire Sharing Agreement.

k.     Hartford Midwest spent only $49,920.00 to fund the annuity purchased for plaintiff Spencer's benefit as part of the settlement, instead of the $52,000.00 that defendant represented would be spent.  If Hartford Midwest had applied the full amount originally represented to Plaintiff Spencer as part of the Claims Settlement Agreements, the sum of her future payments would have been 4.1667 percent (4.1667%) higher (100 divided by 96 equals 1.041667).  Instead of being $494.58, each of the 120 future monthly payments would have been $515.19; and, instead of totaling $59,349.60, the sum of the future payments would have been $61,822.80. Thus, plaintiff Spencer has been directly damaged in the amount of $2,473.20 as a result of defendant's short-changing scheme.

l.     Subsequent to the consummation of the Claims Settlement Agreements, Hartford Midwest issued a structured settlement contract copy to plaintiff Spencer, Annuity Number CCX0533761, which reflected only that a "Single Premium" had been "Paid in Full," an

intentionally deceptive act.  This act concealed that Hartford Midwest had not fully invested $52,000.00 in a funding annuity as previously represented.

      55.   <u>CHARLES STRICKLAND</u>

      a.   On or about March 18, 1999, plaintiff Charles Strickland, an adult resident of Pennsylvania, was involved in a motor vehicle accident in Baltimore, Maryland, in which his vehicle was struck in the rear by a vehicle driven by Robert Scott Ward, an agent, servant or employee of Kitchen Saver of Baltimore, Inc.  Plaintiff Strickland sustained serious injuries. Through his attorney, Charles R. Spigelman, plaintiff Strickland brought action in the Circuit Court for Baltimore City, Maryland, Civil No.: 24-C-02-001235, styled as *Charles T. Strickland, Plaintiff, v. Robert Scott Ward, Kitchen Saver of Baltimore, Inc., and Allstate Leasing, Inc.*, *Defendants*.  Defendant Hartford Casualty insured defendant Kitchen Saver of Baltimore.

      b.   On or about December 10, 2003, plaintiff Strickland entered into a General Release with Hartford Casualty ["Claims Settlement Agreements"] to settle plaintiff Strickland's underlying tort claim, which states in pertinent part: "in consideration of a cash sum of Two Hundred Twenty Nine Thousand, Nine Hundred and Twenty Nine ($229,929.00) Dollars to be paid upon execution of the Release, receipt of which is hereby acknowledged, and future periodic payments, under the terms and conditions set forth below, having a present value of Fifty Thousand, Seventy One ($50,071.00) Dollars, such cash sum and future periodic payments having a total settlement present value of Two Hundred Eighty Thousand ($280,000.00) Dollars ...."  The settlement agreement was signed on behalf of Hartford Casualty by Julie Dengler, representing "Hartford Insurance Group," causing plaintiff Strickland to rely on Ms.

Dengler's actual or apparent authority to act, not only on behalf of Hartford Casualty, but also, as an agent for Hartford Financial Services Group, Inc.

      c.    Pursuant to the Claims Settlement Agreements, Hartford Casualty agreed to invest the future periodic payments amount of $50,071.00 in an annuity to be issued by Hartford Life Insurance Company, which was represented to plaintiff Strickland to pay $250.00 per month, 15 years guaranteed (180 payments), beginning January 17, 2004.  In addition, plaintiff Strickland would receive $4,000.00 on December 17, 2008; $10,000.00 on December 17, 2013; and $15,000.00 on December 17, 2018, according to the Claims Settlement Agreement.

      d.    The annuity was to be purchased and owned by Hartford CEBSCO under a "qualified assignment" of the periodic payments obligation of Hartford Casualty, within the meaning of 26 U.S.C. § 130.

      e.    The parties agreed and understood that the specified amount of $50,071.00 (the remaining cash balance) was to be fully allocated by Hartford Casualty toward the investment in an annuity.

      f.    At no time did Hartford Casualty disclose to plaintiff Strickland or his attorney that any part of the remaining cash balance of the settlement was ever going to be spent on anything other than the actual cost of the annuity.  The Hartford Casualty representatives with whom plaintiff Strickland dealt in consummating the settlement never disclosed (a) that there was a broker's cost which Hartford would have to incur as a defense cost, or, (b) that the broker's cost was going to be charged to plaintiff Strickland by Hartford out of the remaining cash balance of his settlement proceeds which was supposed to be invested by Hartford in purchasing an annuity of present value equal to $50,071.00.

25

g.      Pursuant to the Claims Settlement Agreements, Hartford Underwriters Insurance Company purchased the annuity from Hartford Life Insurance Company on behalf of Hartford Casualty, using Ringler, in the person of Ken Clemmens, as the Hartford Life Outside Approved Broker.  Hartford Life Insurance issued to plaintiff Strickland an "Evidence of Guarantee," a certificate signed by Steven T. Joyce, its senior vice president, Investment Products Division, guaranteeing "the structured settlement liability obligations assigned to and assumed by" Hartford CEBSCO.  Hartford Life also issued to plaintiff Strickland an "Evidence of Guarantee," a certificate signed by Lizabeth H. Zlatkus, its executive vice president, chief financial officer and treasurer, likewise guaranteeing "the structured settlement liability obligations assigned to and assumed by" Hartford CEBSCO.

h.      At the time the Claims Settlement Agreements were reached, Hartford Casualty and Ringler represented to plaintiff Strickland that the sum of the 180 monthly payments and three additional lump sums, totaling $80,480.00, were the entire income stream that could be generated from an annuity costing $50,071.00.

i.      In exchange for the cash payment of $229,929.00 and the promise of those future periodic payments based on an annuity investment of $50,071.00, representations on which he relied, plaintiff Strickland entered into a settlement with Hartford Casualty and subsequently granted Hartford Casualty and its insured a release and dismissal with prejudice from the lawsuit.

j.      Since the settlement, plaintiff Strickland has discovered that Hartford Casualty paid its defense brokerage fees by secretly bundling that cost into the represented investment value of the annuity portion of the parties' agreement, thereby reducing the annuity's value by four percent (4%).  On information and belief, Hartford Life Insurance Company

26

retained a portion of the commission and also paid a portion of the commission to defendant Hartford Fire pursuant to the the Hartford Life-Hartford Fire Sharing Agreement.

k.     Hartford Casualty spent only $48,068.16 to fund the annuity purchased for plaintiff Strickland's benefit as part of the settlement, instead of the $50,071.00 that defendant represented would be spent.  If Hartford Casualty had applied the full amount originally represented to plaintiff Strickland as part of the Claims Settlement Agreements, the sum of his future payments would have been 4.1667 percent (4.1667%) higher (100 divided by 96 equals 1.041667).  Instead of being $250, each of the 180 future monthly payments would have been $260.42; and, instead of totaling $45,000.00, the sum of the future payments would have been $46,875.60. Instead of being $4,000.00, the lump sum payment due in 2008 would be $4,166.67; the $10,000.00 lump sum payment due in 2013 would be $10,416.67; and the $15,000.00 lump sum payment due in 2018 would be $15,625.01. Instead of being $75,000.00, the total of all payments would have been $77,083.95. Thus, plaintiff Strickland has been directly damaged in the amount of $2,083.95 as a result of defendant's short-changing scheme.

l.     Subsequent to the consummation of the Claims Settlement Agreements consummation, Hartford Casualty issued a structured settlement contract copy to plaintiff Strickland which reflected only that a "Single Premium" had been "Paid in Full," an intentionally deceptive act.  This act concealed how Hartford had not fully invested $50,071.00 in a funding annuity as previously represented.

56.     DOUGLAS McDUFFIE

a.     On or about August 6, 2001, plaintiff Douglas McDuffie, who was born on August 23, 1984 and was sixteen years old, was involved in a motor vehicle accident in rural Osage County, Oklahoma, in which his mother, Marilyn McDuffie, was driving a pickup truck.

27

Marilyn McDuffie was killed in the accident and plaintiff McDuffie, who was a passenger in the truck she was driving, sustained serious injuries.  Through his guardian ad litem, plaintiff McDuffie asserted a claim against Hartford Accident, the insurer for the vehicle driven by Marilyn McDuffie and owned by her parents, Brice and Dorotha Jean Vermillion, the insureds and defendants in the underlying action.

   b.  On September 7, 2001 Hartford Accident offered to settle plaintiff McDuffie's underlying tort claim by paying its policy limits of $50,000 (comprised of $25,000 for liability coverage and $25,000 for underinsured motorist coverage) in a letter sent from Hartford Claim Consultant Tami Wolfe to Mr. Tommy Vermillion, "next friend" of plaintiff McDuffie.

   c.  Pursuant to the Claims Settlement Agreement, which was finally reached on February 12, 2002, Hartford Accident agreed to pay $13,231.18 to plaintiff McDuffie's health care providers as reimbursement for his incurred medical expenses and to then invest the remaining balance of $36,768.82 to fund an annuity (which was represented to plaintiff McDuffie to pay five annual lump sum payments of $12,193.28, beginning on August 23, 2009).

   d.  The parties agreed and understood that the remaining balance of $36,768.82 was to be fully allocated by Hartford Accident toward the investment in an annuity.

   e.  At no time did Hartford  Accident or the Hartford Life Outside Approved Broker disclose to plaintiff McDuffie or his attorney that any part of the remaining cash balance of the settlement was ever going to be spent on anything other than the actual cost of the annuity. The Hartford Accident representatives with whom plaintiff McDuffie dealt in consummating the settlement never disclosed that (a) there was a broker's cost which Hartford would have to incur, or, (b) that the broker's cost was going to be charged to plaintiff McDuffie by Hartford Accident

out of the remaining cash balance of his settlement proceeds which was supposed to be invested by Hartford Accident on purchasing an annuity of present value equal to $36,768.82.

       f.      Pursuant to the Claims Settlement Agreements, Hartford Underwriters Insurance Company purchased the annuity from Hartford Life Insurance Company on behalf of Hartford Accident, using EPS, in the person of James "Jamie" Adams, as the Hartford Life Outside Approved Broker.

       g.      At the time the Claims Settlement Agreements were reached, Hartford Accident and EPS represented to plaintiff McDuffie that the five future lump sum payments of $12,193.28 each were the entire income stream that could be generated from an annuity costing $36,768.82.

       h.      In exchange for the case payments to reimburse his health care providers and the promise of those future periodic payments based on an annuity investment of $36,768.82, plaintiff McDuffie entered into a settlement with Hartford Accident and subsequently granted Hartford Accident and its insured a release.

       i.      The terms of this settlement were approved, pursuant to Title 12, Okl. Stat. § 83 (1981), in the District Court in and for Tulsa County, State of Oklahoma, on February 12, 2002, Case No. CJ 2002 00811.

       j.      Since the settlement, plaintiff McDuffie (as well as his attorneys) have discovered that Hartford paid its defense brokerage fees by secretly bundling that cost into the represented investment value of the annuity portion of the parties' agreement, thereby reducing the annuity's value by four percent (4%).  On information and belief, Hartford Life Insurance Company retained a portion of the commission and also paid a portion of the commission to defendant Hartford Fire pursuant to the the Hartford Life-Hartford Fire Sharing Agreement.

29

k.      Hartford Accident spent only $35,298.06 to fund the annuity purchased for plaintiff McDuffie's benefit as part of the settlement, instead of the $36,768.82 that defendant represented would be spent.  If Hartford Accident had applied the full amount originally represented to plaintiff McDuffie as part of the Claims Settlement Agreement, the sum of his future payments would have been 4.1667 percent (4.1667%) higher (100 divided by 96 equals 1.041667).   Instead of being $12,193.28, each of the five future annual payments would have been $12,701.34; and, instead of totaling $60,966.40, the sum of the future payments would have been $63,506.70. Thus, plaintiff McDuffie has been directly damaged in the amount of $2,540.30 as a result of defendant's short-changing scheme.

l.      Subsequent to the consummation of the Claims Settlement Agreements, Hartford Accident issued a structured settlement contract copy to plaintiff McDuffie which reflected only that a "Single Premium" had been "Paid in Full," an intentionally deceptive act. This act concealed how Hartford had not fully invested $36,768.82 in a funding annuity as previously represented.

### F.      Common Course of Conduct and Injury Allegations

57.      Each of the structured settlements between the defendant Hartford Property & Casualty affiliate and the Named Plaintiffs and the other members of the Class was entered into under materially false and misleading circumstances, and each settlement agreement was breached by the defendant Hartford Property & Casualty affiliate in an identical manner pursuant to the Hartford's Structured Settlement Program and defendants' overarching scheme to short-change personal injury claimants' settlement recoveries.

58.      Each of defendants' structured settlements with the Named Plaintiffs and the other members of the Class, included a cash payment which the settling parties agreed, and the

30

defendant Hartford Property & Casualty affiliate specifically represented, would be the full amount it would invest to purchase and fund an annuity.  In other words, defendants adopted and followed a uniform practice of representing, through the particular defendant Hartford Property & Casualty affiliate involved, that the cost or present value of the annuity to be purchased would equal the specific sum allocated under the settlement to pay for future period payments.

59.    In conjunction with this standard representation made to all personal injury claimants, it was defendants' practice to fail to disclose to plaintiffs and other members of the Class numerous material facts concerning how Hartford conducted its Structured Settlement Program including, among other things, that:

a.    Defendants participated in a short-changing scheme designed to allow them to recover the cost of their own structured settlement brokers, by deducting the brokers' fees from that portion of the settlement that the settling parties had previously agreed would be one hundred percent (100%) invested in an annuity;

b.    Defendants accomplished this "short-change" by bundling the amount of the broker's commission (namely, four percent (4%)) into the illustrated annuity cost;

c.    Even when the broker's fee was not four percent (4%), Hartford-affiliated companies would keep for themselves whatever portion of the commission was not paid to the broker; and,

d.    As a result of the scheme undertaken by defendants, the actual financial value of the settlement was materially lower than the value represented to injury claimants since four percent (4%) of the full amount of cash to be invested in annuity was, in fact, diverted by the defendant Hartford Property & Casualty affiliates to pay for the Approved Brokers and In-House Brokers.

31

60.     Because it was defendants' practice to fail to disclose that four percent (4%) of the annuity investment amount was being subtracted by the defendant Hartford Property & Casualty affiliates to pay for their brokerage costs (or to be kept by one or more of defendants Hartford Fire, Hartford Life or Hartford Life Insurance when not paid to the broker), defendants' uniform representation of the actual monetary value of each settlement – a single number represented to the claimant – was materially false, misleading, and deceptive.  In addition, because the annuity software and quoting system includes the broker's commission as part of the premium charge, defendants' uniform representation that the illustrated payments are reflective of the true monetary value of the settlement agreement is also false, misleading and deceptive.

61.     The defendant Hartford Property & Casualty affiliates' conduct as set forth herein, in concealing the four percent (4%) brokerage cost, was intended and had the effect of preventing plaintiffs and other claimants with whom the defendant Hartford Property & Casualty affiliates were settling from learning of defendants' wrongful conduct and of the causes of action against defendants for such wrongful conduct.

62.     To date, defendants have persisted in carrying out their wrongful (short-change) scheme, and as a result, they continue to reap millions of dollars in unlawful profits.

63.     At all relevant times, other Hartford Property and Casualty affiliates not named as defendants herein, entered into structured settlements with members of the Class.  Each of these structured settlements between these non-defendant Hartford Property & Casualty affiliates and Class members was entered into under materially false and misleading circumstances, and each settlement agreement was breached by the non-defendant Hartford Property & Casualty affiliate in an identical manner pursuant to the Hartford's Structured Settlement Program and the overarching scheme designed and implemented by defendants Hartford, Hartford Life, Hartford

32

Life Insurance and Hartford Fire to short-change personal injury claimants' settlement recoveries.

64.     Each of non-defendant Hartford Property & Casualty affiliates' structured settlements with members of the Class, included a cash payment which the settling parties agreed, and the non-defendant Hartford Property & Casualty affiliate specifically represented, would be the full amount it would invest to purchase and fund an annuity.  In other words, defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire adopted and followed a uniform practice of representing, through the particular non-defendant Hartford Property & Casualty affiliate involved, that the cost or present value of the annuity to be purchased would equal the specific sum allocated under the settlement to pay for future period payments.

65.     In conjunction with this standard representation made to all personal injury claimants, it was the practice of defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire to cause the non-defendant Hartford Property & Casualty affiliate to fail to disclose to members of the Class numerous material facts concerning how Hartford conducted its Structured Settlement Program including, among other things, that:

a.      Defendants participated in a short-changing scheme designed to allow them to recover the cost of their own structured settlement brokers, by deducting the brokers' fees from that portion of the settlement that the settling parties had previously agreed would be one hundred percent (100%) invested in an annuity;

b.      Defendants accomplished this "short-change" by bundling the amount of the broker's commission (namely, four percent (4%)) into the illustrated annuity cost;

      c.     Even when the broker's fee was not four percent (4%), Hartford-affiliated companies would keep for themselves whatever portion of the commission was not paid to the broker; and,

      d.     As a result of the scheme undertaken by defendants, the actual financial value of the settlement was materially lower than the value represented to injury claimants since four percent (4%) of the full amount of cash to be invested in annuity was, in fact, diverted by the non-defendant Hartford Property & Casualty affiliates to pay for the Approved Brokers and In-House Brokers.

66.     Because it was the practice of defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire to cause the non-defendant Hartford Property & Casualty affiliates to fail to disclose that four percent (4%) of the annuity investment amount was being subtracted to pay for their brokerage costs (or to be kept by one or more of defendants Hartford Fire, Hartford Life or Hartford Life Insurance when not paid to the broker), the uniform representation of the actual monetary value of each settlement – a single number represented to the claimant -- was materially false, misleading, and deceptive.  In addition, because the annuity software and quoting system includes the broker's commission as part of the premium charge, the non-defendant Hartford Property & Casualty affiliates' uniform representation that the illustrated payments are reflective of the true monetary value of the settlement agreement is also false, misleading and deceptive.

67.     The conduct of defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire as set forth herein in causing the non-defendant Hartford Property & Casualty affiliates to conceal the four percent (4%) brokerage cost, was intended and had the effect of

preventing claimants with whom such affiliates were settling from learning of defendants' wrongful conduct and of the causes of action against defendants for such wrongful conduct.

68.     To date, defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire have persisted in carrying out their wrongful (short-change) scheme, and as a result, they continue to reap millions of dollars in unlawful profits.

## IV.    CLASS ACTION ALLEGATIONS

69.     Pursuant to Federal Rules of Civil Procedure (Fed.R.Civ.P.) Rule 23, the Named Plaintiffs bring this action on behalf of themselves and as the representatives of the following proposed Class:

     a.     Sub-Class A:

 All persons (whether or not insured by Hartford) who entered into Claim Settlement Agreements with Hartford Accident, Hartford Casualty or Hartford Midwest ["the settling defendant Hartford Property & Casualty affiliates"] – including their predecessors, subsidiaries, affiliates, successors, and assigns  in which: (1) the settling defendant Hartford Property & Casualty affiliate agreed to make a cash payment in a specified amount to fund a structured settlement annuity; (2) the amount which the settling defendant Hartford Property & Casualty affiliate or agent or representative of said affiliate was to invest towards purchasing a funding annuity was represented by the settling defendant Hartford Property & Casualty affiliate in writing to the claimant; (3) the purchased annuity was brokered by one of Hartford's Approved Brokers or In-House Brokers; (4) no independent broker was retained by the claimant to  represent his or her interest in transacting the settlement with the settling defendant Hartford Property & Casualty affiliate; and (5) an undisclosed four percent (4%) was deducted from the specified cash amount to be used to fund the structured settlement annuity.  Excluded from the Class is defendant, each of its corporate parents, subsidiaries, and affiliates; any person controlled by any excluded persons; and the legal representatives, heirs, successors, and assigns of any excluded person.

     b.     Sub-Class B:

 All persons (whether or not insured by Hartford) who entered into Claim Settlement Agreements with Hartford Fire, Hartford Insurance Company

of Illinois, Hartford Insurance Company of the Southeast; Hartford
Lloyd's Insurance Company; Hartford Underwriters Insurance Company;
Property and Casualty Insurance Company of Hartford; Omni Indemnity
Company; Omni Insurance Company; Trumbull Insurance Company;
Nutmeg Insurance Company; Sentinel Insurance Company, Ltd.; Twin
City Fire Insurance Company; and Pacific Insurance Company, Ltd. ["the
non-defendant Hartford Property & Casualty affiliates"] – including their
predecessors, subsidiaries, affiliates, successors, and assigns  in which: (1)
the non-defendant Hartford Property & Casualty affiliate agreed to make a
cash payment in a specified amount to fund a structured settlement
annuity; (2) the amount which the non-defendant Hartford Property &
Casualty affiliate or agent or representative of said affiliate was to invest
towards purchasing a funding annuity was represented by the non-
defendant Hartford Property & Casualty affiliate in writing to the
claimant; (3) the purchased annuity was brokered by one of Hartford's
Approved Brokers or In-House Brokers; (4) no independent broker was
retained by the claimant to represent his or her interest in transacting the
settlement with the non-defendant Hartford Property & Casualty affiliate;
and (5) an undisclosed four percent (4%) was deducted from the specified
cash amount to be used to fund the structured settlement annuity.
Excluded from the Class is defendant, each of its corporate parents,
subsidiaries, and affiliates; any person controlled by any excluded persons;
and the legal representatives, heirs, successors, and assigns of any
excluded person.

70.    This action meets all of the requirements of Fed.R.Civ.P. Rule 23 in that:

a.    Although plaintiffs do not presently know the exact size of the Class, since

such information is in the exclusive control of defendants, based on the nature of the activities

alleged herein, plaintiffs believe that the members of the Class number at least in the thousands,

are geographically dispersed throughout Connecticut and elsewhere, and are so numerous that

joinder of all members is impracticable;

b.    Plaintiffs can and will fairly and adequately represent and protect the

interests of the Class and have no interests which conflict with, or are antagonistic to, the

interests of other Class members;

c.    Plaintiffs are represented by counsel experienced in class actions and

complex civil litigation so as to ensure the adequate representation of absent Class members;

36

d.      Plaintiffs' claims are typical of those of all members of the Class in that, among other things, plaintiffs and all members of the Class were similarly harmed by defendants' misconduct;

e.      Questions of law and fact arising out of defendants' conduct are common to all members of the Class, and such common issues of law and fact predominate over any questions affecting only individual members of the Class;

f.      A class action is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted herein;

g.      This class action is maintainable under FRCP Rule 23(b) because the prerequisites of subdivision (a) are satisfied and, although only one of the following need apply in order for a class action to be maintainable, all of the following apply in this case:

(1)      The prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants;

(2)      The prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(3)      The defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

(4)      Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, making a class action superior to other available methods for the fair and efficient adjudication of the controversy.

37

71.     The predominance requirement is satisfied for all causes of action because the issues in common to the members of the proposed Class are not overshadowed by individualized issues.

## V.     CLAIMS FOR RELIEF

A.     **FIRST CLAIM FOR RELIEF**        (Breach of Contract on behalf of Sub-Class A as to Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company and Hartford Insurance Company of the Midwest)

1.-71.    Plaintiffs incorporate paragraphs 1 - 71 of this Complaint as paragraphs 1 - 71 of this First Claim for Relief.

72.     Defendant Hartford Insurance Company of the Midwest entered into settlement agreements with Oshonya Spencer and other members of the Class, pursuant to which Hartford Midwest agreed to invest a specific sum in order to allow for the purchase of an annuity of equal present value.

73.     Defendant Hartford Casualty Insurance Company entered into settlement agreements with Charles Strickland and other members of the Class, pursuant to which Hartford Casualty agreed to invest a specific sum in order to allow for the purchase of an annuity of equal present value.

74.     Defendant Hartford Accident and Indemnity Company entered into settlement agreements with Douglas McDuffie and other members of the Class, pursuant to which Hartford Accident agreed to invest a specific sum in order to allow for the purchase of an annuity of equal present value.

75.     Defendants breached the terms of the settlements entered into with plaintiffs and the other members of the Class by failing to pay the agreed-upon amounts which were to be used by defendants to purchase an annuity of equal present value.

76.     As a result of the foregoing breaches, the Named Plaintiffs and other members of the Class have sustained economic loss.

77.     Defendant's actions as aforesaid were undertaken intentionally, in deliberate disregard of plaintiffs' rights, wantonly and willfully, entitling plaintiffs to an award of punitive damages.

       **B.**       <u>**SECOND CLAIM FOR RELIEF**</u>   (Violation of RICO on behalf of Sub-Class A and Sub-Class B as to defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire)

1. - 77.     Plaintiffs incorporate paragraphs 1 - 77 of the First Claim for Relief as paragraphs 1 - 77 of this Second Claim for Relief.

       1.       <u>Violation of 18 U.S.C. § 1962(c)</u>

       a.  <u>Nature of the Claim</u>

78.     As set forth above, defendant Hartford – a public company – conducts its operations through two divisions, life and property & casualty, which are comprised of direct and indirect subsidiaries that, upon information and belief and which appears from Hartford's public filings, Hartford owns and controls financially and operationally.  Further, as set forth above, there is an overlapping managerial framework between Hartford and its subsidiaries, in that the executive officers and directors of Hartford hold similar positions within each of Hartford's operating divisions and its subsidiaries.  For example, Mr. Ayer is the Chairman and CEO of both Hartford and Hartford Fire, as well as the Chairman of Hartford Life.  Mr. Marra is an

Executive Vice President and member of the Board of Directors and Office of the Chairman of,

Hartford, while simultaneously holding the position of President and COO of Hartford Life and

President of **all** of the life insurance subsidiaries of Hartford Life.  Mr. Zwiener, who is an

Executive Vice President and member of the Board of Directors of Hartford, is the President of

Hartford Fire.  Mr. Giamalis, who is a Senior Vice President and the Treasurer of Hartford, holds

the offices of Treasurer and Vice President and is a member of the Board of Directors of,

Hartford Fire.  Mr. Wolin, who is an Executive Vice President, General Counsel and Chief

Compliance Officer of Hartford as well as a member of the Office of the Chairman (i.e., Mr.

Ayer), is a Vice President and member of the Board of Directors of Hartford Fire.  (Mr. Wolin is

also a member of the Board of Directors of defendant Hartford Accident.)  Mr. Znamierowski,

who is an Executive Vice President and the Chief Investment Officer of the Hartford, is also a

Vice President and member of the Board of Directors of Hartford Fire.  Mr. Marra likewise is a

member of the Board of Directors of Hartford Fire.  Thus, three members of Hartford's Board of

Directors – including the Chairman – which Board sets corporate policy for Hartford and its

operating divisions and subsidiaries, all of whom are high-ranking officers within Hartford,

together with Hartford's general counsel and other high-ranking officers, not only hold high-

ranking executive positions within Hartford, but also hold and control the executive management

positions within Hartford's operating divisions and subsidiaries, including, without limitation,

Hartford Life and Hartford Life Insurance, and Hartford Fire, Hartford's principal property and

casualty insurer.

79.     Upon information and belief, the Structured Settlement Program, which was run

by Hartford solely through Hartford Fire until 1998 and, since 1998, through Hartford Life,

Hartford Life Insurance and Hartford Fire, was designed and implemented under the direction of

the common management and control of these defendant entities because, as set forth above (*see, e.g.,* ¶ 36), defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire all derive significant benefit from the Structured Settlement Program, with the ultimate beneficiary being defendant Hartford by virtue of the fact that its consolidated financials were and are greatly enhanced through the increased sale of annuities through settlements with claimants injured by Hartford insureds when the settling Hartford property & casualty insurers would otherwise have to pay the full amount of the settlement up front.  Specifically, through the Structured Settlement Program conducted with exclusive outside brokers (and in-house brokers), these defendant entities were and are able to: (1) re-capture settlement payouts by transforming them into premium dollars through the sale of their own annuity products; and, (2) augment the sale of regular Hartford products by building their outside broker referral network; and (3) accelerate and enhance their investment income earnings.  That the Structured Settlement Program is directed and controlled by Hartford and the Hartford affiliates that, in turn, control Hartford's individual life and liability insurers is evidenced not only by the fact that significant benefits that inure to the Hartford parent companies, but also by the fact that guarantees are extended to the settling injury claimants that the annuities are backed by the financial strength of all the Hartford parent companies.

80.     To entice outside brokers to continuously handle this segment of Hartford's annuity business and to make new referrals to Hartford and Hartford affiliates for regular product sales, defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire  promise exclusivity to outside brokers willing to handle their structured settlement contracts.

81.     In order to absorb the business cost of paying for these outside brokers, however, it is the practice of defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire to deceive unwitting claimants into paying for their outside broker network by not disclosing how brokers' commissions are deducted from structured settlement recoveries by the Hartford property & casualty affiliate insurers with which claimants settle.  Further, the Hartford property & casualty affiliates also fail to disclose that the "commissions" to In-House Brokers likewise are deducted from structured settlement recoveries.

82.     As a result of this short-change scheme, the settling Hartford property & casualty insurers not only avoid payment of brokerage fees by secretly shifting that cost onto the Class, but also save millions in "damage dollars" that would otherwise have to be paid on behalf of its liability insureds in settling personal injury claims.

83.     This scheme is engineered and maintained by defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire, through use of the Approved Brokers, who Hartford calculates would rather remain silent as to how they are being paid than disclose the truth and risk the loss of income they receive through their exclusive relationship with Hartford.  Though the Approved Brokers are not required to promote and market Hartford affiliate annuities, the benefit to do so through substantial commission earnings not only on Hartford structured settlement products but also on all Hartford products is clear and thus, the Approved Brokers, though independent, assist in perpetuating the unlawful conduct that corrupts the otherwise legitimate Structured Settlement Program.

84.     Further, because the Structured Settlement Program, and the ability to represent Hartford exclusively, is so lucrative to the outside brokers, there are long-standing discount agreements with the Approved Brokers, whereby Hartford Life, Hartford Life Insurance

Company or Hartford Fire retains one percent (1%) of the commission amount on each structured settlement transaction, and only three percent (3%) is paid to the Approved Broker. In addition to concealing and misrepresenting the fact that the annuity cost includes a four percent (4%) commission to the defense broker, improperly reducing value of the annuity by four percent (4%) in violation of the terms of the settlements with claimants, defendants also conceal the fact that a portion of that defense brokerage fee improperly deducted from claimant's settlement proceeds is actually being pocketed by Hartford Life, Hartford Life Insurance Company or Hartford Fire. In instances where the four percent (4%) commission is credited to an In-House Broker, defendants conceal the fact that they retain the entire four percent (4%) commission. Although the net injury to the claimant is the same in each and every structured settlement transaction with Hartford: the value of their settlement is improperly reduced by four percent (4%), the unlawful windfall reaped by defendants can vary, but always results in extraordinary gains. First, if the transaction were conducted properly, the settling Hartford property & casualty insurer would be obligated to pay 100% of the balance of the settlement with injury claimants – as agreed upon between the settling parties – to purchase the annuity. On top of that figure, the settling Hartford property & casualty insurer would have to pay the four percent (4%) brokerage commission. Second, in many instances, Hartford Life, Hartford Life Insurance Company and Hartford Fire (and thereby Hartford) "pockets" a portion of the purported brokerage commission, enhancing its ill-gotten gains. The significance of this additional windfall to the Hartford parent companies in the form of retained portions of brokerage commissions is reflected in the payment in excess of $3 million by Hartford Life to Hartford Fire in 1998 to assume partial control of the Structured Settlement Program and its agreement to make future payments based on production or some similar benchmark under the Hartford Life-Hartford Fire Sharing Agreement.

43

### b.  The RICO Enterprise

85.    Defendant corporations Hartford, Hartford Life, Hartford Life Insurance Company and Hartford Fire are all "persons" within the meaning of 18 U.S.C. § 1961(3), and are legally distinct from the enterprise, defined below.  In addition, each of the defendant corporations Hartford, Hartford Life, Hartford Life Insurance Company and Hartford Fire are distinct from every other person comprising the enterprise, defined below.

86.    Each Approved Broker is a "person" within the meaning of 18 U.S.C. §1961(3) and is legally distinct from the enterprise, defined below.  In addition, each Approved Broker is legally distinct from one another.

87.    Defendant corporations Hartford, Hartford Life, Hartford Life Insurance Company and Hartford Fire, together with its defendant Hartford Property & Casualty affiliates and non-defendant Hartford Property & Casualty affiliates and the Approved Brokers, formed an association-in-fact, for the purpose of conducting the Hartford' Structured Settlement program and enhancing its other business (and sharing the goal of maximizing profits) and used this association-in-fact to defraud the Named Plaintiffs and other members of the Class.  This association-in-fact constitutes an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

88.    This enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C § 1962(c).

89.    Defendants Hartford, Hartford Life, Hartford Life Insurance Company and Hartford Fire unlawfully, knowingly and intentionally conducted and participated, directly or indirectly, in the conduct of the enterprise's affairs though a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

44

c. <u>Racketeering Activity and Predicate Acts</u>

90.     Defendants Hartford, Hartford Life, Hartford Life Insurance Company and Hartford Fire engaged in "racketeering activity" within the meaning of 18 U.S.C § 1961(1) by engaging in acts that constitute a violation of one or both of the following statutes: 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C § 1343 (wire fraud).

91.     Defendants Hartford, Hartford Life, Hartford Life Insurance Company and Hartford Fire and other members of the enterprise each committed and/or aided and abetted the commission of significantly more than two of these acts of "racketeering activity," and such acts are continuing and threaten to continue indefinitely.  These predicate acts are chargeable and indictable, as required under 18 U.S.C. § 1961(1).

92.     Defendants Hartford, Hartford Life, Hartford Life Insurance Company and Hartford Fire did, through the use of interstate mails (including courier services, within the meaning of 18 U.S.C. § 1341) and interstate wires (including the Internet, within the meaning of 18 U.S.C. § 1343), knowingly participate in misrepresenting the amount to be invested in acquiring the annuities in structured settlements with the Named Plaintiffs and the Class.  As previously stated, the amount to be invested in these annuities was a material element in the formation of the settlement agreements between Hartford and the Class, and the Class reasonably relied upon the misrepresentations of defendant.

93.     Hartford's misrepresentation of the annuity's true cost was made by a member of the Hartford defense team, either an employee or associate of Hartford (including its In-House Brokers), the Approved Brokers, or by counsel hired by Hartford to defend its insured tortfeasor. This misrepresentation occurred in every case, and was documented either in letters sent to

claimants or their attorneys, annuity quotes, structured settlement illustrations, or even court documents.

94.    Because of the geographic dispersion of Hartford, including its In-House Brokers, the Approved Brokers, and Class members, defendant has necessarily made extensive use of interstate mails and wires within the framework of the RICO enterprise to, *inter alia*:

    a.    form and maintain the RICO enterprise;

    b.    distribute annuity quoting and marketing materials from Hartford and affiliates to Approved Brokers, each time the annuity quoting software changed and when new marketing materials were produced;

    c.    distribute annuity rate updates between Hartford and affiliates and the Approved Brokers (usually at least monthly);

    d.    assign cases to specific Approved Brokers each time a case was determined to be a structured settlement candidate by the responsible Hartford and Hartford affiliate employee;

    e.    discuss structured settlement strategies between Hartford and Hartford affiliate employees and employees or associates of Approved Brokers, while each case is being negotiated for settlement;

    f.    present annuity quotes to claimants through a claim adjuster or defense counsel, or between Hartford and Hartford affiliate employees and employees or associates of Approved Brokers, while each case is being negotiated for settlement;

    g.    transmit case information between employees and associates of Approved Brokers and Hartford and Hartford affiliate employees, when medical information is supplied to

the life insurance underwriters for determination of a "rated age" based on impaired life expectancy of the intended annuitant;

        h.    transmit funds between Approved Brokers and Hartford and Hartford affiliate employees when money is used to fund the annuity; and,

        i.    transmit settlement documents between employees and associates of Approved Brokers and Hartford and Hardtford affiliate employees, at the time executed settlement documents are completed.

    95.    Other examples of specific predicate acts of mail and wire fraud furthering defendant's short-changing scheme in the case of plaintiff Oshonya Spencer include, but are not limited to, the following:

        a.    telephonic communications across state lines occurred on or about November 11, 2004 between Hartford Midwest's agent, Catherine Gleason, and Ms. Spencer's attorney, Scott Stapelton, in which Ms. Gleason misrepresented that cost of the annuity portion of the settlement between Hartford Midwest and Ms. Spencer would be $52,000.  Ms. Gleason also communicated with Christine Gonzalez Hoadley of Ringler Associates Incorporated by similar means, also on or about November 11, 2004, so that Ringler could proceed to contact Mr. Stapelton to obtain information necessary to prepare the settlement documents.

        b.    On November 11, 2004, Christine Gonzalez Hoadley of Ringler Associates Incorporated, sent a letter via fax to Ms. Spencer's attorney which specifically confirmed the terms of the settlement, including that the cost of the annuity would be $52,000:

I am writing to confirm the settlement of the above-noted case.  It is our understanding that the agreed upon terms of settlement are as follows:

| | |
|---|---|
| Cash Up Front: | $48,000 |
| Monthly Income | $499.58/month of 10 years certain, begins 1/1/2005 |
| Cost of Annuity: | $52,000 |
| Total Settlement Cost: | $100,000 |

c.      Hartford Midwest also made use of the U.S. mail when issuing the annuity contract and subsequently mailing it to the Ringler agent, Christie Gonzalez Hoadley, in or about late November/early December 2004 who, in turn, as Hartford Midwest's agent, again mailed the annuity contract mailed to Scott Stapleton, who was plaintiff Spencer's attorney. The annuity contract showed only "Paid in Full" as the single premium amount, and was intended to keep plaintiff Spencer from knowing that the full $52,000.00 promised by Hartford was not fully invested for her benefit.

d.      Hartford Midwest also made use of the U.S. mail when it mailed the commission check for the annuity sale to Ringler, and Hartford Life Insurance has made use of the U.S. mail and/or instate wires through wires through wire transfers of funds each and every time it has made a monthly annuity payment to Ms. Spencer beginning in January 2005.  (Ms. Spencer has entered into a court-approved "factoring" transaction with another company which is not a part of these proceedings, per 26 U.S.C. § 5891 and applicable state statutes, so that some payments or parts of payments are being made on her behalf to another party.)

96.      Other examples of specific predicate acts of mail and wire fraud furthering defendant's short-changing scheme in the case of plaintiff Charles Strickland include, but are not limited to, the following:

a.      On December 10, 2003, Julie Dengler, on behalf of "Hartford Insurance Group" signed a General Release in Mr. Strickland's underlying litigation which represented the

cost of the annuity purchased on his behalf as $50,071.00 and which was mailed to Mr.

Strickland's attorney in or about early January 2004, along with the contract specifications for

the annuity purchased for Mr. Strickland and related materials, including a guarantee of payment

on the annuity by, among others, defendants Hartford, Hartford Life and Hartford Life Insurance.

       b.     On December 10, 2003, Ken Clemmens of Ringler Associates

Incorporated sent via U.S. mail a written presentation ("Plan C") for Mr. Strickland that the cost

of the annuity purchased on Mr. Strickland's behalf was $50,071.

       c.     A letter dated July 28, 2005, signed by Richard Hurey, Service Specialist,

Annuity Service Center, of Hartford, was mailed to plaintiff Strickland, itemizing the benefits

payable under the structured settlement annuity contract, No. CCX 0531816, again implying that

these benefits were all that could be purchased with the $50,071.00 stated in the settlement

agreement as the amount to be invested by Hartford on plaintiff Strickland's behalf. The letter

was issued in response to plaintiff Strickland's query, well after the annuity was issued, and

represents Hartford's continuing efforts to hide the earlier fraud from plaintiff Strickland.

       d.     Upon information and belief, the commission check for the annuity sale to

fund plaintiff Strickland's future payments was mailed by Hartford Life to Ringler approximately

one month after the premium check, annuity quotes and annuity application were received by

Hartford Life, in or about mid-January 2004.

       97.     Other examples of specific predicate acts of mail and wire fraud furthering

defendant's short-changing scheme in the case of plaintiff Douglas McDuffie include, but are not

limited to, the following:

       a.     Jamie M. Adams, CSSC, EPS Settlements Group, sent a fax to Tommy

Vermillion, the uncle and "next friend" of Douglas McDuffie, on November 29, 2001,

transmitting several annuity proposals, each of which purported to cost $36,768, the amount to be invested in acquiring the annuity. In fact, because Hartford was going to benefit directly by keeping four percent (4%) of this amount in order to pay the fee of EPS Settlements Group, the actual investment by Hartford was only 96 percent (96%) of the represented amount, or $35,297.28. This act was a deliberate misrepresentation of the amount to be invested in the annuity by $1,470.72.

       b.      On September 7, 2001, Tami Wolfe, who represented herself to be from the "San Antonio Personal Lines Claims Office" of "The Hartford," wrote a letter to the "next friend" of Mr. McDuffie representing that the total value of defendants' offer to settle the claim of Mr. McDuffie's underlying litigation was $50,000.

       c.      By letter dated September 17, 2001, Ann C. Fries, Esquire, as an employee of "The Hartford Affiliated Insurance Companies", followed up Tami Wolfe's letter soliciting the possibility of placing a portion of Mr. McDuffie's settlement proceeds in a Hartford structured settlement.

       d.      Between December 3, 2001, when Tommy Vermillion approved the annuity quote on behalf of his nephew, as "next friend," and February 12, 2002, the date of the Court hearing to approve the settlement on behalf of the minor, Attorney Ann C. Fries, an agent of Hartford, sent by e-mail or facsimile to Attorney Velma Boodt, representing plaintiff McDuffie, a complete set of documents intended to be executed by the parties and submitted to the Court, including a Joint Petition for Approval of Settlement with Minor, an Order Approving Settlement Agreement with Minor, and an Order for Purchase of Annuity, collectively representing conclusively the amount Hartford promised to invest in acquiring the annuity, $36,768.82. This reinforced and repeated the misrepresentation made by Jamie M. Adams,

because Hartford intended to invest only 96 percent (96%) of that, or $35,297.28, using part of the $1,470.72 difference to pay EPS Settlements for its services to Hartford and keeping the rest for itself.

       e.      On February 12, 2002, Attorney Ann C. Fries, an agent of the defendants, filed a "Joint Petition for Court Approval of Settlement with Minor" with the Tulsa County District Court, representing that the "sum of $50,000.00" represented "full payment of the minor's and his guardian's claim." In the accompanying "Order Approving Settlement Agreement with Minor," Attorney Fries further represented that $13,231.18 was to be paid in cash and $36,768.82 was "to be used to fund an annuity." These documents were contemporaneously mailed.

       f.      On March 28, 2002, Angie Martinez, Case Manager, Assistant to Jamie M. Adams, CSSC, an agent of EPS, mailed a package to each Ms. Cheri Barrington, the court-appointed guardian for Douglas McDuffie, and Attorney Velma Boodt, containing *inter alia,* a "Single Premium Annuity Certain Contract" from Hartford Life Insurance Company, specifying the "Single Premium" amount paid for the annuity only as "Paid in Full," falsely confirming the previous misrepresentation that the annuity's cost was $36,768.82.

       g.      Another fraudulent misrepresentation was made by Hartford Life when issuing the annuity contract on March 20, 2002 and mailing it to the EPS agent, James "Jamie" Adams, in order to have it mailed again to Ms. Barrington and Attorney Boodt.

       h.      The commission check for the annuity sale to fund plaintiff McDuffie's future payments was mailed by Hartford Life to EPS as part of Hartford's fraud and racketeering scheme.

98.     All such communications constituting mail and/or wire fraud were undertaken by Defendants Hartford, Hartford Life, Hartford Life Insurance and/or Hartford Fire, or were caused to be done through the defendant Hartford Property & Casualty affiliates, non-defendant Hartford Property & Casualty affiliates and/or the Approved Brokers, for the purpose of executing the fraudulent scheme or have been incidental to that scheme, which is ongoing.

99.     The predicate acts perpetrated against plaintiffs are commonplace to the scheme used by defendant to conduct the affairs of the RICO enterprise, and were not merely isolated or sporadic.  These acts are, and were, related to one another and they pose a continuing threat of racketeering activity.

100.     The acts of "racketeering activity" were and are related to each other by virtue of common participants, common victims (the Named Plaintiffs and other members of the Class), a common method of commission, and the common purpose and common result of defrauding the Class and enriching defendants and its collaborators at the expense of the Named Plaintiffs and the Class while concealing the collaborators' activities.  The fraudulent scheme has continued since the inception of the Structured Settlement Program, and threatens to continue unless enjoined by this action.

101.     The "pattern of racketeering activity" as alleged above is distinct from the enterprise.  The enterprise, as an association-in-fact, was formed by defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire with the defendant Hartford Property & Casualty affiliates, non-defendant Hartford Property & Casualty affiliates and Approved Brokers to facilitate Hartford's Structured Settlement Program and enhance Hartford's other business. Further, it was accomplished by establishing a continuous outside broker network for alternative use (as opposed to using inside brokers), by outside brokers making referrals to Hartford and

Hartford affiliates for regular product sales, and by defendant providing guaranteed settlement annuity business to the Approved Brokers.

102.    The racketeering activity described herein was (and is) made possible by the existence of the enterprise, and the cost savings to Hartford and Hartford affiliates that result from the racketeering activity enable the enterprise to profitably maintain its structure.

103.    As a direct and proximate result of the conduct of defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire and participation in the conduct of the affairs of the enterprise through the racketeering activity referred to above, plaintiffs and members of the Class were induced into entering into structured settlement agreements and were thereby injured in their property.

104.    The injuries to plaintiffs and the Class resulting from the acts of racketeering activity perpetrated by defendant involve both transaction causation and loss causation:

a.    <u>Transaction Causation</u>:  Ultimately, every personal injury plaintiff bargains for a specified present value of their settlement. While personal injury litigation defendants (and their insurers) historically have used the presentation of periodic payments in the form of a structure to show how the offer being presented can meet the future needs of the plaintiff (or sometimes for other reasons, i.e., to make the offer seem larger than it is), the actual monetary value of the settlement (including the amount to be invested in an annuity) is the crux of what is bargained for.  If defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire or any member of the enterprise (or their employees and agents) were to disclose to the plaintiff, before a pending offer was accepted by the plaintiff, "we're actually spending less on the annuity than we told you in our offer," the transaction would either not go forward at all or would only go forward on a re-negotiated basis.  Thus, the false representation as to the amount

to be invested in an annuity, and the affirmative omission of the fact that four percent (4%) of the amount represented will actually be used to reduce Hartford's and Hartford's affiliates' outlay, causes the transaction to be concluded when it otherwise would not be concluded "at all," or, concluded "as is."

       b.    <u>Loss Causation</u>:  Because of the commission by defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire (and/or by the members of the enterprise) of mail fraud and/or wire fraud in every case, the loss to the Named Plaintiffs and every Class member was anticipated as a natural consequence of the defendant's scheme, and was carried out through the RICO enterprise.

      105.    As a result of its misconduct, defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire are liable to the plaintiffs and other Class members for their losses in an amount to be determined at trial.

      106.    Pursuant to 18 U.S.C. § 1964(c), plaintiffs and other Class members are entitled to recover treble damages plus attorneys' fees from defendant.

      2.    <u>Violation of 18 U.S.C. § 1962(d)</u>

      107.    As detailed at length in this Second Claim for Relief in paragraphs 80 through 109 above, Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire agreed with the defendant Hartford Property & Casualty affiliates and the non-defendant Hartford Property & Casualty affiliates, as well as the Approved Brokers, to use the Hartford Structure Settlement Program to conduct the short-changing scheme, whereby defendants uniformly deducted the four percent (4%) commission from the annuity purchased on behalf of settling claimants in each structured settlement transaction.

108.    This conspiracy orchestrated by defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire was to facilitate the commission of a violation of Section 1962(c), which is, in and of itself, a violation of 18 U.S.C. § 1962(d).

109.    Pursuant to 18 U.S.C. § 1964(c), plaintiffs and other Class members are entitled to recover treble damages plus attorneys' fees from defendant.

C.    **THIRD CLAIM FOR RELIEF**    (Common Law Fraud on behalf of Sub-Class A as to Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company and Hartford Insurance Company of the Midwest)

1. - 90.    Plaintiffs incorporate paragraphs 1 - 77, 81 - 84 and 90 - 98 of the Second Claim for Relief  as paragraphs 1 - 90 of this Third Claim for Relief.

91.    The Named Plaintiffs and members of the Class reasonably relied upon the written representation of the relevant defendant Hartford property and casualty affiliate that such affiliate would invest a specific sum from each Class member's settlement proceeds to procure an annuity of equal present value, and as result thereof, plaintiffs and members of the Class each agreed to accept a "structured" income stream as part of the agreement to settle their underlying claim.  At all material times, however, the defendants Hartford Accident, Hartford Casualty and Hartford Midwest concealed their respective short-changing scheme and their respective intent to spend less than it promised to pay claimants for their annuities.

92.    Defendant Hartford Midwest made both a knowing misrepresentation of material fact and engaged in the concealment of that fact to induce Named Plaintiff Spencer to rely on its misrepresentations.  In addition to the misrepresentations set forth above, such acts of misrepresentation and concealment also included:

a.      During the negotiations in advance of the settlement of Ms. Spencer's underlying claim, defendant Hartford Midwest, by its agent, Catherine Gleasen, made repeated representations to Ms. Spencer, through her attorney, that the cost of the annuity portion of the settlement would be $52,000.

b.      On November 11, 2004, Christine Gonzalez Hoadley of Rigler Associates Incorporated, sent a letter via fax to Ms. Spencer's attorney which specifically confirmed the terms of the settlement, including that the cost of the annuity would be $52,000:

> I am writing to confirm the settlement of the above-noted case.  It is our understanding that the agreed upon terms of settlement are as follows:
>
> Cash Up Front:           $48,000
> Monthly Income          $499.58/month of 10 years certain, begins 1/1/2005
> Cost of Annuity:          $52,000
> Total Settlement Cost:$100,000

93.      Defendant Hartford Casualty made both a knowing misrepresentation of material fact and engaged in the concealment of that fact to induce Named Plaintiff Strickland to rely on its  misrepresentations.  In addition to the misrepresentations set forth above, such acts of misrepresentation and concealment also included:

a.      On December 10, 2003, Julie Dengler, on behalf of "Hartford Insurance Group" signed a General Release in Mr. Strickland's underlying litigation which represented the cost of the annuity purchased on his behalf as $50,071.00.

b.      On December 10, 2003, Ken Clemmens of Ringler Associates Incorporated stated in a written presentation ("Plan C") for Mr. Strickland that the cost of the annuity purchased on Mr. Strickland's behalf was $50,071.

94.      Defendant Hartford Accident made both a knowing misrepresentation of material fact and engaged in the concealment of that fact to induce Named Plaintiff McDuffie to rely on

its  misrepresentations.  In addition to the misrepresentations set forth above, such acts of misrepresentation and concealment also included:

      a.      On September 7, 2001, Tami Wolfe, who represented herself to be from the "San Antonio Personal Lines Claims Office" of "The Hartford," wrote a letter to the "next friend" of Mr. McDuffie representing that the total value of defendants' offer to settle the claim of Mr. McDuffie's underlying litigation was $50,000.

      b.      On February 12, 2002, Attorney Ann C. Fries, an agent of the defendants, filed a "Joint Petition for Court Approval of Settlement with Minor" with the Tulsa County District Court, representing that the "sum of $50,000.00" represented "full payment of the minor's and his guardian's claim."  In the accompanying "Order Approving Settlement Agreement with Minor," Attorney Fries further represented that $13,231.18 was to be paid in cash and $36,768.82 was "to be used to fund an annuity."

      95.      The fraudulent misrepresentations by Hartford Accident, Hartford Casualty and Hartford Midwest, to the other Class members were the same as the fraudulent misrepresentations made to the Named Plaintiffs: one number representing the dollar amount to be fully invested in purchasing and funding an annuity of equal present value, coupled with the omission that the broker commission bundled into the annuity's cost would be retained by the defendant Hartford Property & Casualty affiliate and/or paid to an Approved Broker or In-House Broker or another Hartford affiliate (avoiding the cost to Hartford of paying the consultant as a defense cost, as it was obligated to do).  The effect was always to reduce the defendant Hartford Property & Casualty affiliates's represented investment amount by four percent (4%), causing injury to property of the plaintiffs and other Class members.

96.     Defendants' material misstatement regarding the amount each would pay, made during settlement negotiations and subsequently documented in writing, induced Class members – who were plaintiffs in the underlying claims --  to agree to a structured settlement under which they ultimately received payments from an annuity with a lower value than had been promised to them.  Had the Named Plaintiffs and other Class members known that the money spent to acquire their annuities would be less than what defendant had promised, they either would have attempted to negotiate for a better overall settlement value, demanded to receive cash, or refused to proceed with the transaction.

97.     As a result of defendants' conduct as aforesaid, the Named Plaintiffs and other members of the Class have been damaged in an amount to be determined at trial.

98.     By their intentional fraudulent conduct, defendants Hartford Accident, Hartford Casualty and Hartford Midwest wrongfully obtained by false pretenses and false promises and withheld money rightfully belonging to the Named Plaintiffs and the other members of the Class, entitling the Named Plaintiffs and the other members of the Class to statutory treble damages for theft pursuant to Conn. Gen. Stats. § 52-564.

99.     Defendant's conduct as aforesaid was wanton and willful and in reckless disregard of the rights of the plaintiffs and the other members of the Class, further entitling plaintiffs and the other members of the Class to common law punitive damages.

**D.**     <u>**FOURTH CLAIM FOR RELIEF**</u>     (Civil Conspiracy/Aiding and Abetting on behalf of Sub-Class A as to all defendants and on behalf of Sub-Class B as to defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire)

1.- 99.    Plaintiffs incorporate paragraphs 1 - 99 of the Third Claim for Relief as paragraphs 1 - 99 of this Fourth Claim for Relief.

100.    Each of the defendants knew of the practice to fail to disclose to plaintiffs and their representatives settling with individuals insured by Hartford Property & Casualty affiliates that four percent (4%) of the annuity investment amount was being subtracted by the Hartford Property & Casualty affiliates to pay for their brokerage costs (or to be kept by or paid to Hartford Life, Hartford Life Insurance or Hartford Fire when not paid to the broker), and that defendants' uniform representation of the actual monetary value of each annuity settlement – a single number represented to the claimant -- was materially false, misleading, and deceptive.

101.    Each of the defendants knew that, because the annuity software and quoting system includes the broker's commission as part of the premium charge, defendants' uniform representation that the illustrated payments are reflective of the true monetary value of the settlement agreement is also false, misleading and deceptive.

102.    Each of the defendants knew that the defendant Hartford Property & Casualty affiliates' conduct as set forth herein, in concealing the four percent (4%) brokerage cost, was intended and had the effect of preventing plaintiffs and other claimants with whom the defendant Hartford Property & Casualty affiliates were settling from learning of defendants' wrongful conduct and of the causes of action against defendants for such wrongful conduct.

103.    Each of the defendants knew that the defendant Hartford Property & Casualty affiliates breached the terms of the settlements entered into with plaintiffs and the other members

of the Class by failing to pay the agreed-upon amounts which were to be used by defendants to purchase an annuity of equal present value.

104.    Each of the defendants knew that in representing to the Named Plaintiffs and each Class Member that would invest a specific sum from each Class member's settlement proceeds to procure an annuity of equal present value, the defendant Hartford Property & Casualty affiliates made a knowing misrepresentation of material fact and engaged in concealment of that fact in order to induce the Named Plaintiffs and members of the Class to agree to accept a "structured" income stream as part of the agreement to settle their underlying claim.

105.    Each of the defendants knew that, at all material times, the defendants Hartford Accident, Hartford Casualty and  Hartford Midwest concealed their respective short-changing scheme and their respective intent to spend less than it promised to pay claimants for their annuities.

106.    The losses suffered by Named Plaintiffs and the members of the Class were foreseeable to all defendants.

107.    Each such defendant, having such knowledge:

a.    acted in concert with one or more of the defendant Hartford Property & Casualty affiliates or one conspiring with one or more of the defendant Hartford Property & Casualty affiliates, or pursuant to a common design with it/them; or

b.    knew that the conduct of one or more of said defendant Hartford Property & Casualty affiliates constituted a breach of contract or wrongful conduct and gave substantial assistance or encouragement to it/them to so conduct itself/themselves.

108.    As a result of the above, each of the defendants is liable for the monetary damages suffered by the Named Plaintiffs and the members of the Class.

109.    Each of the defendants acted wantonly, willfully, recklessly or and/or with intentional disregard of the rights of the Named Plaintiffs and the members of the Class.

**E.    FIFTH CLAIM FOR RELIEF**    (Unjust Enrichment on behalf of Sub-Class A as to all defendants and on behalf of Sub-Class B as to defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire)

1.- 103.   Plaintiffs incorporate paragraphs 1 - 71 of this Complaint and paragraphs 78 - 109 of the Fourth Claim for Relief as paragraphs 1 - 103 of this Fifth Claim for Relief.

104.    At no time did any of the Named Plaintiffs or any Class member agree to bear the cost of the annuity brokerage services which one or more of the defendants received for their sole benefit in settling the underlying personal injury claim by means of a structured settlement utilizing products sold by the defendants and their affiliates.

105.    As a direct result of the deceptive practices of the defendant Hartford property and casualty affiliates, undertaken with the knowledge and assistance of the other defendants, the Named Plaintiffs and other Class members unwittingly paid for services rendered exclusively to one or more of the defendants by the Approved Brokers or In-House Brokers.

106.    Since one or more of the defendants benefitted from those services but did not pay for that benefit, defendants' failure to pay has damaged the Named Plaintiffs and other Class members.

107.    Defendants will be unjustly enriched if they are  allowed to retain the monies derived from their wrongful conduct.

108.    As a result of the foregoing, the Named Plaintiffs and other members of the Class have been damaged in an amount to be determined at trial.

**F.     SIXTH CLAIM FOR RELIEF**     (Constructive Trust on behalf of Sub-Class A as to all defendants and on behalf of Sub-Class B as to defendants Hartford, Hartford Life, Hartford Life Insurance and Hartford Fire)

1. - 133.    Plaintiffs incorporate paragraphs 1 - 77 of the First Claim for Relief, paragraphs 78 to 109 of the Second Claim for Relief, paragraphs 91 - 99 of the Third Claim for Relief, 100 - 109 of the Fourth Claim for Relief, and 104 - 108 of the Fifth Claim for Relief as paragraphs 1 - 133 of this Sixth Claim for Relief.

134.    By reason of the acts and conduct set forth herein, defendants have conspired to engage, have engaged, and are  engaged in deceptive, fraudulent, and wrongful conduct in retaining the property, in the form of funds owed but not allocated to investment in an annuity, of plaintiffs and other Class members.

135.    By virtue of their wrongful acts, one or more defendants hold illegal profits as a constructive trustee for the benefit of plaintiffs and other Class members.

136.    Plaintiffs are not currently aware of where defendants may have deposited all of the illegal profits they still retain from their wrongful acts against plaintiffs and other Class members.

137.    In order to avoid further injury and loss, however, plaintiffs and the Class require imposition of a constructive trust to preserve defendants' ill-gotten gains for the benefit of plaintiffs and the Class.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs pray the following relief:

1.     Entry of an Order determining that this action should be maintained as a class action pursuant to the Federal Rules of Civil Procedure, Rule 23 and certifying plaintiffs as proper representatives of the Class;

2.     Entry of a determination that defendant is liable for the violations alleged herein;

3.     An award of compensatory damages to plaintiffs and members of the Class for the violations alleged herein;

4.     An award of prejudgment interest;

5.     Entry of an Order enjoining defendants from further illegal and tortious conduct;

6.     An award of treble damages pursuant to 18 U.S.C. § 1964(c) to the Named Plaintiffs and the other members of the Class;

7.     An award of treble damages pursuant to Conn. Gen. Stats. §§ 52-564 to the Named Plaintiffs and the other members of the Class;

8.     An award of common law punitive damages to the Named Plaintiffs and the other members of the Class;

9.     Entry of an Order establishing a constructive trust over the wrongfully-obtained funds in defendants' possession on behalf of plaintiffs and other Class members and appropriate supplemental orders, including appointment of a receiver and restrictions on distribution of such funds by defendant; and,

10.     Such other and further relief as the Court deems just and proper.

PLAINTIFFS OSHONYA SPENCER,
CHARLES STRICKLAND, and
DOUGLAS McDUFFIE, on behalf of
themselves and all others similarly-situated,


BY____/s/_____
    DAVID S. GOLUB ct00145
    JONATHAN M. LEVINE ct07584
    SILVER GOLUB & TEITELL LLP
    184 ATLANTIC STREET
    P.O. BOX 389
    STAMFORD, CONNECTICUT 06904
    (203) 325-4491
    (203) 325-3769 (facsimile)
    dgolub@sgtlaw.com
    jlevine@sgtlaw.com

    PETER R. KAHANA, phv0784
    STEVEN L. BLOCH, phv0786
    BERGER & MONTAGUE, P.C.
    1622 LOCUST STREET
    PHILADELPHIA, PA  19103
    (215) 875-3000
    (215) 875-4604 (facsimile)
    pkahana@bm.net
    sbloch@bm.net

  and

    RICHARD B. RISK, JR., phv0785
    RISK LAW FIRM
    3417 EAST 76TH STREET
    TULSA, OK 74136-8064
    (918) 494-8025
    (918) 494-5819 (facsimile)
    dick@risklawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2006, a copy of foregoing Motion for Extension of Time was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_/s/_

JONATHAN M. LEVINE ct07584
SILVER GOLUB & TEITELL LLP
184 ATLANTIC STREET
P.O. BOX 389
STAMFORD, CONNECTICUT 06904
(203) 325-4491
(203) 325-3769 (facsimile)
jlevine@sgtlaw.com
