# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| OSHONYA SPENCER, CHARLES STRICKLAND, and DOUGLAS McDUFFIE on behalf of themselves and all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | NO. 3:05cv1681 (JCH) |
| V. | : : | |
| THE HARTFORD FINANCIAL SERVICES GROUP, INC., et al | : : : | |
| Defendants. | : : | SEPTEMBER 1, 2010 |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

SILVER GOLUB & TEITELL LLP
David S. Golub
Jonathan M. Levine
184 Atlantic Street
P.O. Box 389
Stamford, Connecticut 06904
Tel. (203) 325-4491
Fax (203) 325-3769

RISK LAW FIRM
Richard B. Risk, Jr.
3417 East 76th Street
Tulsa, OK 74136
Tel. (918) 404-8025
Fax (918) 494-5819

BERGER & MONTAGUE, P.C.
Peter R. Kahana
Steven L. Bloch
1622 Locust Street
Philadelphia, PA 19103
Tel. (215) 875-3000
Fax (215) 875-4604

ZUCKERMAN SPAEDER LLP
Carl S. Kravitz
Ellen D. Marcus
Caroline E. Reynolds
1800 M Street, N.W.
Washington, DC 20036
Tel. (202) 778-1800
Fax (202) 822-8106

*Attorneys for the Named Plaintiffs and Class Counsel*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................... iii

I.    Introduction ........................................................ 1

II.   Factual Background .................................................. 3

      A.    History of the Proceedings ................................... 3

      B.    The Proposed Settlement ...................................... 9

III.  The Settlement Class Should Be Finally Certified ................... 12

      A.    Numerosity .................................................. 13

      B.    Commonality ................................................. 13

      C.    Typicality .................................................. 14

      D.    Adequacy .................................................... 15

      E.    Predominance and Superiority ................................ 16

IV.   The Notice Program Provided the Best Practical Notice to Settlement
      Class Members ...................................................... 18

V.    The Court Should Grant Final Approval Because the Settlement is Fair,
      Reasonable and Adequate ............................................ 21

      A.    The Standards for Assessing Whether a Class Action Settlement is Fair,
            Reasonable and Adequate ..................................... 21

      B.    The Settlement is Entitled to a Presumption of Fairness ..... 22

      C.    The Proposed Settlement Satisfies All of the *Grinnell* Factors .............. 24

            1.    The Complexity, Expense, and Likely Duration of the Litigation ...... 24

            2.    The Reaction of the Class to the Settlement ...................... 26

            3.    The Stage of the Proceedings and the Amount of
                  Discovery Completed ........................................ 27

4. The Risks of Establishing Liability ............................... 29

5. The Risks of Establishing Damages ............................... 31

6. The Risks of Maintaining the Class Action Through The Trial ....... 32

7. The Ability of the Defendants to Withstand a Greater Judgment ...... 33

8. The Reasonableness of the Settlement in Light of the Best Possible
   Recovery and the Attendant Risks of Litigation ................... 34

VI. The Court Should Grant Final Approval to the Plan of Allocation ................. 38

VII. Conclusion ........................................................ 41

# TABLE OF AUTHORITIES

CASES                                                                    Page

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17

*Aramburu v. Healthcare Financial Services, Inc.,*
  No. 02-CV-6535, 2009 WL 1086938 (E.D.N.Y. Apr. 22, 2009) . . . . . . . . . . . . . . . . . . 24

*Carson v. American Brands, Inc.,*
  450 U.S. 79 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Central States Southeast and Southwest Areas Health and Welfare Fund v.*
*Merck-Medco Managed Care, L.L.C.,*
  504 F.3d 229 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*City of Detroit v. Grinnell Corporation,*
  495 F.2d 448 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Chatelain v. Prudential-Bache Sec.,*
  805 F. Supp. 209 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 32

*Consol. Edison, Inc. v. Northeast Utils.,*
  332 F. Supp. 2d 639, 652 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cordes & Co. Financial Services, Inc. v. AG. Edwards & Sons, Inc.,*
  502 F.3d 91(2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*D'Amato v. Deutsche Bank,*
  236 F.3d 78 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*DeMarco v. National Collector's Mint, Inc.,*
  229 F.R.D. 73 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Georgine v. AmChem Prods.,*
  160 F.R.D. 478 (E.D. Pa. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hicks v. Stanley,*
  No. 01 CV 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) . . . . . . . . . . . 35

*Hoffman Elec., Inc. v. Emerson Elec. Inc.,*
  800 F. Supp. 1279 (W.D. Pa. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Alloy, Inc. Sec. Litig.,*
  03 Civ. 1597 (WHP), 2004 WL 27500895 (S.D.N.Y. Dec. 2, 2004) . . . . . . . . . . . . . . 22

*In re American Bank Note Holographics,*
    127 F. Supp. 2d 418 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 38

*In re Automotive Refinishing Paint Antitrust Litig.,*
    No. 1426, 2007 WL 4570918 (E.D. Pa. Dec. 28, 2007) . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Austrian & German Bank Holocaust Litig.,*
    80 F. Supp. 2d 164 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Blech Sec. Litig.,*
    No. 94-cv-7696, 2002 WL 31720381 (S.D.N.Y. Dec. 4, 2002) . . . . . . . . . . . . . . . . . . 32

*In re Chambers Dev. Sec. Litig.,*
    912 F. Supp. 822 (W.D. Pa. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Currency Conversion Sec. Litig.,*
    No. 01 MDL 1409, 2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006) . . . . . . . . . . . . . . . 18, 23

*In re Global Crossing Sec. & ERISA Litig.,*
    225 F.R.D. 436 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Gulf Oil/Cities Serv. Tender Offer Litig.,*
    142 F.R.D. 588 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Linerboard Antitrust Litig.,*
    292 F. Supp. 2d 631 (E.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Lloyd's Am. Trust Fund Litig.,*
    No. 96-cv-1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) . . . . . . . . . . . . . . . . . 32

*In re Luxottica Group S.p.A. Sec. Litig.,*
    233 F.R.D. 306 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*In re Marsh ERISA Litig.,*
    265 F.R.D. 128 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40

*In re Merrill Lynch Tyco Research Sec. Litig.,*
    249 F.R.D. 124 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Michael Milken & Assocs. Sec. Litig.,*
    150 F.R.D. 57 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*In re NASDAQ Mkt.-Makers Antitrust Litig.,*
    187 F.R.D. 465 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104, 125 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 38

*In re Prudential Secs. Ltd. Pshps. Litig.*,
    164 F.R.D. 362 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Remeron Direct Purchaser Antitrust Litig.*,
    No. Civ. 03-0085 FSH, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) . . . . . . . . . . . . 33, 40

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Visa Check/Mastermoney Antitrust Litigation*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Joel A. v. Giuliani*,
    218 F.3d 132 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Meijer, Inc. & Meijer Distrib., Inc. v. 3M*,
    No. 04-5871, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) . . . . . . . . . . . . . . . . . . . 32

*Reese v. Arrow Financial Services, LLC*,
    202 F.R.D. 83 (D. Conn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Robinson v. Metro North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Thompson v. Metro. Life Ins. Co.*,
    216 F.R.D. 55 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005), *cert. den. sub. nom.*, *Leonardo's Pizza
    by the Slice, Inc. v. Wal-Mart Stores, Inc.*, 544 U.S. 1044 (2005) . . . . . . . . . . . . . *passim*

*Weinberger, v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982), *cert. den.*, 464 U.S. 818 (1983) . . . . . . . . . . . . . . : 18, 20, 27

*West Virginia v. Chas. Pfizer & Co.*,
    314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd,* 440 F.2d 1079 (2d Cir. 1971) . . . . . . . . . . . 37

STATUTES:

18 U.S.C. §1962(c) ............................................................. 4

18 U.S.C. §1962(d) ............................................................. 4

OTHER AUTHORITIES:

Fed. R. Civ. P. 12(b) ........................................................... 4

Fed. R. Civ. P. 12(b)(6) ....................................................... 30

Fed. R. Civ. P. 15(a) ........................................................... 4

Fed. R. Civ. P. 23 ........................................................ 4, 7, 13

Fed. R. Civ. P. 23(a) ................................................... 12, 15, 17

Fed. R. Civ. P. 23(a)(1) ...................................................... 13

Fed. R. Civ. P. 23(a)(2) ...................................................... 13

Fed. R. Civ. P. 23(a)(3) ...................................................... 14

Fed. R. Civ. P. 23(a)(4) ...................................................... 15

Fed. R. Civ. P. 23(b)(3) ............................................... 12, 16, 17

Fed. R. Civ. P. 23(e) ................................................... 1, 20, 21

Fed. R. Civ. P. 23(f) ........................................................... 6

Fed. R. Civ. P. 23(g) ......................................................... 15

ARTICLES:

4 Alba Conte, Herbert B. Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ....... 22

Ellen M. Ryan, Laura E. Simmons, *Securities Class Action Settlements,
2009 Review and Analysis* (Cornerstone Research, Inc. 2010) .................... 35

Stephanie Plancich, Ph.D., Svetlana Starykh,
*2008 Trends in Securities Class Actions*, at 14
(National Economic Research Associates, Inc. 2008) .......................... 35

## I.    **Introduction**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Named Plaintiffs Oshonya Spencer, Charles Strickland, and Douglas McDuffie ("Named Plaintiffs") submit this memorandum in support of their Motion for Final Approval of Class Action Settlement pursuant to the proposed Settlement Agreement submitted to the Court on June 3, 2007. The Court preliminarily approved the proposed settlement (the "Settlement") at the Preliminary Approval hearing on June 7, 2010.[1]

The Settlement provides for a cash payment of $72.5 million by The Hartford for the benefit of the Settlement Class. The Settlement provides significant monetary relief to the Settlement Class in a case where the outcome, both on class certification and the merits, was of uncertain prospects. Class Counsel believe the Settlement is an outstanding result and strongly urge the Court to grant final approval to the Settlement and the Plan of Allocation.

In deciding to settle, Class Counsel have carefully considered the significant risks and obstacles to achieving a better result through continued litigation. As discussed herein, trial of this case presented numerous factual and legal obstacles, including proving that all elements of the RICO claim were satisfied, that defendants made misrepresentations concerning "cost" or "value," and that class members were financially injured by defendants' practice of retaining 15% of the economic value of each structured settlement. Although Class Counsel believe that they had developed substantial evidence to prove their claims and establish significant damages

---

[1] A copy of the Settlement Agreement is attached as Exhibit 1 to the Declaration of David S. Golub dated September 1, 2010 ("Golub Sep. 1 Dec.") submitted, in conjunction with this Memorandum, in support of Named Plaintiffs' Motion for Final Approval of the Settlement Agreement. The Declaration of David S. Golub dated August 16, 2010, submitted in support of Class Counsel's Application for Award of Attorneys' Fees and Reimbursement of Litigation Expenses, is cited herein as "Golub Aug. 16 Dec.".

at trial, they were aware that defendants had plausible legal arguments, different explanations of the meaning of the key evidence, and expert witnesses who supported their defenses.

Indeed, as the Court noted at the Preliminary Approval hearing, there was a real risk that the jury might favor defendants' arguments and interpretations of the evidence and absolve them of liability. There was further the risk that even if liability were established, the jury would accept the opinions of defendants' experts that the Class Members did not suffer any damages. And even after losing their appeal to the Second Circuit Court of Appeals, defendants maintained that they would ultimately prevail on a motion to decertify the class.

Class Counsel, who have extensive experience in the prosecution of complex class action litigation, have made a considered judgment that the proposed Settlement is an outstanding result and clearly in the best interests of the Settlement Class. This conclusion is based on a complete analysis of the evidence, expert testimony, the legal and factual issues presented, the risk, expense and delay of continuing this litigation through summary judgment, trial and appeals, counsel's past experience in litigation of other complex class actions, and the serious disputes concerning the merits, damages and the likelihood of maintaining class certification. Class Counsel's judgment on the Settlement was formed on a full record, after the close of fact and expert discovery, extensive motions practice, numerous hearings and rulings by the Court, and multiple days of mediation with a well-respected mediator.

Members of the Settlement Class apparently agree with Class Counsel's conclusion that the Settlement is in the best interests of the Settlement Class. Pursuant to the Court-approved notice program set forth in Court's June 7, 2010 Preliminary Approval Order, notices of the Settlement were mailed to 21,697 Class Members on July 7-8, 2010, and notice of the Settlement

2

was published, nationally, in *USA Today* on July 8, 2010.[2] As of the date of this filing

(September 1, 2010) – nearly two months after mail notice and 6 days before the September 7,

2010 deadline for Settlement Class Members to object – only one Class Member has filed an

Objection to the Settlement.[3] Moreover, to date, 14 of the 51 people who had previously opted

out of the class have elected to opt back in after receiving the settlement notice.

For all the reasons discussed herein, the Settlement clearly satisfies the standards for

approval set forth by the Second Circuit in *City of Detroit v. Grinnell Corporation*, 495 F.2d 448,

463 (2d Cir. 1974). The Settlement is eminently fair, reasonable and adequate and should be

approved by the Court.

## II.    Factual Background

### A.    History of the Proceedings

The three Named Plaintiffs commenced this action on October 31, 2005. The original

Complaint was brought against one defendant, The Hartford Financial Services Group, Inc.

(together, with its subsidiaries, "The Hartford"), and challenged The Hartford's practices in

connection with structured settlements that The Hartford's property & casualty ("p&c")

---

[2] *See* Declaration of Jose C. Fraga dated September 1, 2010 ["Fraga Dec." (attached to Golub Sep. 1 Dec. as Exhibit B)] at ¶¶ 3-4.

[3] That Objection (Dkt. 249) is a one page handwritten letter from a nineteen year old Class member who is, apparently, unhappy with the amount of her underlying settlement with The Hartford. The sole basis for the Objection is: "I depend on my structure[d] settlement but it doesn't pay for much. So I object. [H]ow do I know they didn't cheat me out of a lot more money." (A copy of the Objection is attached to Golub Sep. 1. Dec as Exhibit C.)
    One other class member has written to the Court and Class Counsel advising that she feels she was tricked into settling her underlying personal injury claim with defendants' insured and does not wish to participate in the settlement. That letter (which might properly be construed as an untimely request to opt-out of the Class) does not express any objection to the fairness of the proposed Settlement. (A copy of the letter is attached to Golub Sep. 1. Dec as Exhibit D.)
    In addition, three non-class members – inmates at a federal prison in Lexington, KY– have filed frivolous motions to intervene and object. [Dkt. 240, 241]. As documented in the Opposition to these motions [Dkt. 242], the movants are serial litigants who have no standing to be heard with respect to the proposed Settlement.

subsidiaries entered into with personal injury and workers' compensation claimants. The initial Complaint alleged that The Hartford defrauded claimants by deducting, without disclosure, a 4% brokerage commission from the amounts used to obtain the annuities that funded the stream of payments provided to claimants in their structures. The Complaint set forth claims for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) & 1962(d), as well as common-law claims for fraud, breach of contract and unjust enrichment. The Named Plaintiffs sought relief for themselves and for others who had been similarly injured as a result of The Hartford's alleged improper structured settlement practices.

The Hartford moved to dismiss the original Complaint pursuant to Rule 12(b), and the Named Plaintiffs responded by filing an Amended Complaint, pursuant to Rule 15(a). The Amended Complaint, *inter alia*, added a number of The Hartford's p&c and life insurance subsidiaries as defendants and clarified aspects of the factual claims with respect to defendants' enterprise and wrongdoing.

The Hartford again moved to dismiss pursuant to Rule 12(b). After briefing and oral argument, the Court denied defendants' Motion to Dismiss by order dated October 24, 2006.

Thereafter, the parties engaged in extensive discovery relating both to class certification and the merits of the claims. With respect to class certification, counsel for the Named Plaintiffs ("Class Counsel")[4] sought – and were, with the Court's intervention, ultimately able to obtain – documents, interrogatory responses and deposition testimony to provide evidentiary support for the factual requirements of Rule 23.

---

[4] Counsel for the Named Plaintiffs were designated by the Court as Class Counsel in the Court's March 10, 2010 Ruling and Order (Dkt. 197-198) granting class certification.

4

During class and merits discovery, Class Counsel obtained, reviewed and analyzed over 540,000 pages of documents and data from The Hartford and from third party brokers, including The Hartford's annuity pricing methodologies and the quoting software it employed in conjunction with negotiating structured settlement transactions with claimants. Included in the more than 25 depositions conducted in this case, Class Counsel took the depositions of executives from the p&c and life insurance sides of The Hartford's business, both of which were involved in implementing The Hartford's structured settlement practices. From those documents and depositions, Class Counsel learned that pursuant to The Hartford's policy, The Hartford's p&c companies funded the structured settlements exclusively with annuities from their sister company, Hartford Life Insurance Co. ("Hartford Life"). Class Counsel further learned that, in order to achieve a targeted return on equity for The Hartford's shareholders, Hartford Life's annuities were "priced" so that The Hartford retained 15% of the economic value of the structured portion of the settlements agreed upon with personal injury and workers' compensation claimants. The Hartford's internal documents, which Class Counsel obtained in discovery, showed that it allocated the 15% of economic value it retained to profit, costs and taxes (on the profit it retained). These documents also established that Hartford Life annually "rebated" a portion of the 15% back to The Hartford's p&c companies.

After confirming this uniform practice through depositions, Named Plaintiffs moved, on February 6, 2008, to amend their Complaint in order to assert claims (for themselves and the class) based on The Hartford's practice of retaining 15% of the value of structured settlements, rather than just the 4% on which the suit was originally based. The Hartford opposed the Motion to Amend.

5

Named Plaintiffs also moved for class certification on February 6, 2008. The Hartford also vigorously opposed the Motion for Class Certification. Defendants asserted numerous arguments against class certification, including, by way of example, that individual issues of reliance predominated for the RICO and fraud claims; that individual issues predominated because the defendants' alleged misrepresentations of "cost" and "value" were not uniform; and that individual issues predominated on all state-law claims because of variations in state law.

The parties completed fact discovery while the motions for leave to amend and for class certification were pending. On May 1, 2008, the Court issued a ruling granting the Motion for Leave to Amend, allowing a Second Amended Complaint that asserted the 15% theory Class Counsel had learned of and confirmed through discovery. (Dkt. 169). By ruling and order dated March 10, 2009, the Court granted certification of the RICO and fraud claims, but denied certification of the breach of contract and unjust enrichment claims. (Dkt. 197, 198).

On March 24, 2009, The Hartford filed a petition pursuant to Rule 23(f) for an immediate interlocutory appeal of the class certification ruling, retaining former Solicitor General Seth Waxman to represent them in seeking interlocutory relief. Named Plaintiffs filed a brief in opposition to defendants' petition. On October 14, 2009, the Court of Appeals for the Second Circuit denied The Hartford's Rule 23(f) petition.

After the Second Circuit's ruling, discovery (which had been put on hold pending a ruling on the petition) resumed. Class Counsel also pressed for an early trial date on the issue of liability. On November 6, 2009, the Court issued orders providing for class notice to be given by March 1, 2010 (with an opportunity for Class members to opt-out by May 3, 2010), for the completion of expert discovery, and for jury selection and a trial on liability in September of

6

2010. Notice of pendency was provided to nearly 22,000 potential class members, by direct mail and publication, in accordance with the Court's Order. Only 51 class members – less than one-quarter of one percent of the entire Class – chose to opt out.[5]

The parties completed merits expert discovery in early 2010, including exchange of expert reports, rebuttal reports and depositions of multiple experts on each side.

In late 2009, the parties agreed to mediate the case. As discussed more fully below, over a two month period, and after two full days of mediation in February and April 2010, the parties reached agreement on the Settlement that is presently pending before the Court.

The parties reported the tentative settlement to the Court in mid-April 2010, and thereafter engaged in extensive negotiation of the terms of a formal written agreement. The final Settlement Agreement was reached on June 3, 2010 and submitted to the Court on that date, along with a proposed Plan of Allocation of the Settlement proceeds.

The Court conducted a Preliminary Approval hearing on June 7, 2010 and granted preliminary approval of the Settlement, the Settlement Agreement and proposed Plan of Allocation on that date. The Court issued an Order on June 7, 2010, granting preliminary approval to the proposed Settlement. The Court's Order found, in addition, that the requirements of Rule 23 were satisfied with respect to the Settlement Class and, on that basis, certified a Settlement Class that was identical to the trial class previously certified on March 10, 2009. The Court directed that notice of the proposed Settlement be given to the Settlement Class and that all class members be afforded an opportunity to object to the Settlement, to the Plan of Allocation, to Class Counsel's anticipated application for awards fees and costs, and to an anticipated

---

[5] As discussed below, 14 of the 51 opt outs have, upon being apprised of the proposed Settlement, chosen to rejoin the Class. Fraga Dec. at ¶ 12.

motion for incentive awards of the Named Plaintiffs. The Court scheduled a fairness and final approval hearing ("Fairness Hearing") for September 21, 2010.

Notice, as directed, was provided to class members by mail on July 7-8, 2010, and by national publication in *USA Today* a day later. (Fraga Dec. at ¶¶ 3-4). On August 16, 2010, in accordance with the Court's June 7, 2010 Order, Class Counsel filed an Application for Award of Attorneys' Fees and Reimbursement of Litigation Expenses. On that same date, Class Counsel also filed a Motion seeking incentive awards of $25,000 each for the three Named Plaintiffs.

Pursuant to the Court's June 7, 2010 Order, a toll-free call-in number and a public website (www.HartfordStructuredSettlementClassAction.com) were established by the Claims Administrator so that all members of the Settlement Class would have access to information concerning the Settlement. The website contains information about the case and the proposed Settlement, including the Notice and all pleadings filed since June 7, 2010. The Settlement Class was advised of the call-in number and website in the Notice of the proposed Settlement. The Claims Administrator has advised that, as of September 1, 2010, there have been more than 15,200 visits to the website and 2,600 calls to the helpline. (Fraga Dec. at ¶¶ 7-8).

Pursuant to the Notice, Class Members were provided ninety days (to September 7, 2010) to object to any aspect of the Settlement. To date (56 days post-notice), only one Class Member has filed an Objection to the Settlement.[6] Moreover, fourteen of the fifty-one individuals who had opted out of the class before the Settlement was reached – over 25% of those who opted out – have now elected to opt back into the class. (*Id.* at ¶ 12).

---

[6] *See* Golub Sep. 1 Dec., Exhibit C.

## B.    The Proposed Settlement

The parties reached the proposed Settlement as a result of a lengthy mediation conducted by David Geronemus, Esq. of JAMS. Mr. Geronemus is a highly respected mediator who has long experience in resolving complex litigation and class actions. As the Court noted at the Preliminary Approval hearing, Mr, Geronemus is "one of the most successful mediators" to have come before the Court recently.[7]

In accordance with his customary practice, Mr. Geronemus had the parties exchange mediation statements in advance of the first session of the mediation, setting forth each side's evaluation of the strengths and weaknesses of the case. Class Counsel submitted a detailed mediation statement that included a full discussion of the merits of the case as well as several damages analyses. Defendants submitted their counter-statement of the case, including their list of arguments as to why class certification was incorrect; why they would prevail on liability; and, if reached, why the class members suffered no damages.

The parties were represented at the mediation sessions by their respective counsel, who are highly experienced and skilled and who, by then, commanded a full understanding of their respective claims and defenses, based on their own investigations, the extensive factual and legal record developed in the case, and the arguments advanced by the other side. The first day of mediation was February 16, 2010. Mr. Geronemus conducted a number of telephone conferences, before and after the first session. At the all-day session on February 16, Class Counsel did not accept defendants' settlement proposal, believing it was not adequate.

---

[7]  Tr., June 7, 2010, at 29.

A second, day-long session was conducted by Mr. Geronemus on April 16, 2010. At the end of the second session, the parties reached the proposed Settlement, which was reduced to writing in a term sheet signed by The Hartford's corporate representative and by Class Counsel. The parties thereafter negotiated the terms of the Settlement, ultimately reaching agreement on June 3, 2010 on the formal Settlement Agreement.

The Settlement provides for significant monetary relief for the benefit of the members of the Settlement Class. It provides for a cash payment by The Hartford of $72,500,000. The Hartford deposited that sum into a segregated, interest-bearing escrow account (the "Settlement Fund") on July 7, 2010.[8] Notice and administrative costs, tax payments, attorneys' fees and expenses, any incentive awards to the Named Plaintiffs, interest earned for The Hartford's benefit between July 7, 2010 and final approval, and any additional costs for the benefit of the Settlement Class and approved by the Court, will be paid from the Settlement Fund. The remaining amount (the "Net Settlement Fund") will be distributed to the Settlement Class pursuant to the Plan of Allocation preliminarily approved by the Court on June 7, 2010.

Pursuant to the Plan of Allocation, each class member will receive an amount in proportion to the size of his or her structured settlement (measured by the premium used to purchase the annuity funding each class member's structured settlement), and all settlement funds (net of attorneys' fees, litigation expenses, incentive awards and costs of administration) will go to Class Members. No portion of the settlement funds reverts to The Hartford.

---

[8] Interest earned on the Settlement Fund beginning from the date of its deposit into the escrow account through the date of the Court's entry of the Settlement Order and Final Judgment will be for the benefit of The Hartford. Following entry of the Settlement Order and Final Judgment, the account will become a Qualified Settlement Fund ("QSF") and any interest earned on the Settlement Fund will be for the QSF and, therefore, for the benefit of the Settlement Class.

The Settlement is an exceptionally favorable result for the Settlement Class Members, who each stand to recover, on average, thousands of dollars in additional compensation arising out of their structured settlements with The Hartford. The $72.5 million payment equates to approximately 5.1% of each dollar of premium used for annuities funding the Settlement Class Members' structured settlements.[9] The 5.1% figure exceeds the 4% sought in the initial Complaint filed in this action and represents an outstanding 34% of the claimed losses under the expanded 15% theory in the Second Amended Complaint. Even after deduction of fees (assuming that Class Counsel is awarded the 30% fee requested), costs and incentive awards (assuming they are ordered), the net amount for distribution will equate to approximately 24% of the alleged losses under the 15% theory. This means that a Settlement Class Member who structured $100,000 of his or her personal injury or worker's compensation settlement will receive approximately $3,600. On average, each Class Member stands to recover a net distribution in excess of $2,200.

The Settlement provides significant compensation to nearly 22,000 Class Members. Indeed, if approved, it will provide monetary benefits many multiples higher than the average figures for class action settlements of commercial suits. *See* pp. 35-36, *infra*. As further explained below, given the risk, uncertainty and expense of continued litigation through summary judgment, trial and appeal, the proposed Settlement is an exceptional result and should be approved by the Court.

---

[9] A final analysis of the structured settlements provided to the Settlement Class establishes that The Hartford wrote structured settlements to Class members over the entire class period with aggregate annuity premiums of approximately $1.422 billion. At 4%, the total Class actual losses recoverable would be $56.88 million. At 15%, the total actual losses recoverable would be $213 million.

## III. The Settlement Class Should Be Finally Certified.

Pursuant to the June 7, 2010 Preliminary Approval Order, the Court certified the

Settlement Class for purposes of the Settlement.

The Settlement Class consists of two subclasses:

> "Cost" Subclass: All persons who entered into a settlement with any of The
> Hartford Property & Casualty Companies between 1997 and the present in which
> some or all of the settlement amount was to be paid as a structured settlement
> funded with an annuity from one of The Hartford Life Companies, who had a
> written contract that, or before entering into the written contract had received a
> written representation that, made explicit or implicit reference to the "cost" of the
> settlement or the portion of the settlement being structured or the "cost" of an
> annuity being used to fund the structure. Excluded from this class are persons
> who were represented by a plaintiffs' broker in connection with the settlement.

> "Value" Subclass: All persons who entered into a settlement with any of The
> Hartford Property & Casualty Companies between 1997 and the present in which
> some or all of the settlement amount was to be paid as a structured settlement
> funded with an annuity from one of The Hartford Life Companies, who had a
> written contract that, or before entering into the written contract had received a
> written representation that, made explicit or implicit reference to the "value" of
> the settlement or the portion of the settlement being structured or the "value" of an
> annuity being used to fund the structure. Excluded from this class are persons who
> were represented by a plaintiffs" broker in connection with the settlement.

The Settlement Class is the same as the Trial Class (which was comprised of the same

two subclasses) that the Court certified on March 10, 2009. *See* Ruling Re: Plaintiffs' Motion

For Class Certification and Appointment of Class Counsel and Order (Dkt. 197-198) ("Class

Certification Order"). The Court previously held that these subclasses satisfy all of the

requirements of Federal Rules of Civil Procedure 23(a) and (b)(3), *see id*. at 53, *passim*, and on

that basis certified the Settlement Class in the June 7, 2010 Preliminary Approval Order.

For purposes of final approval of the Settlement, the Court should reaffirm its determination that the requirements of Rule 23 are fully satisfied with respect to certification of the Settlement Class.

## A. **Numerosity**

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable. " Joinder need not be impossible; nor is there a pre-set numerical threshold for determining "numerosity." Rather, the Court must look at the class as a whole and assess if "the difficulty or inconvenience of joining all members of the class makes use of the class action appropriate." *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). There are nearly 22,000 Settlement Class members, geographically dispersed across the United States. As counsel for the parties advised the Court at the preliminary approval hearing, further detailed review and analysis of the underlying documentation demonstrated that there were explicit or implicit representations of the "cost" or "value" of the structures provided to the Settlement Class members in the settlements at issue. Generally, "courts will find a class sufficiently numerous when it comprises 40 or more members." *DeMarco v. National Collector's Mint, Inc.*, 229 F.R.D. 73, 80 (S.D.N.Y. 2005). Clearly, and as the Court previously held in certifying the Trial Class, the numerosity requirement is readily satisfied in this case.

## B. **Commonality**

Rule 23(a)(2) requires that there be some question of law or fact common to the class. Rule 23(a)(2) does not require that all questions of law or fact be common; rather, the rule requires only that common questions exist "at the core of the cause of action alleged." *Reese v.*

*Arrow Financial Services, LLC*, 202 F.R.D. 83, 91 (D. Conn. 2001). Here, as the Court

previously held, the issue at the core of this case is whether The Hartford's alleged systematic

practice of deducting (*i.e.*, retaining for itself) 15% of the structured amount of the settlements

with class members violated RICO and constituted fraud, thereby inflicting an actionable injury

upon class members. *See* Class Certification Order at 11. The members of the Settlement Class,

which is comprised of the same two subclasses as the Trial Class, have all been subjected to The

Hartford's standardized practices. Accordingly, the commonality requirement is satisfied.

### C. **Typicality**

Rule 23(a)(3) requires that the "the claims or defenses of the representatives parties are

typical of the claims or defenses of the class." The requirement is satisfied "when each class

member's claim arises from the same course of events, and class members make similar legal

arguments to prove defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.

1997) (citation omitted); *Robinson v. Metro North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d

Cir. 2001) (same). As the Court previously held, the Named Plaintiffs and the class members

were all subjected to a common course of conduct by The Hartford that affected all members of

the Trial Class in a similar manner; in other words, their injuries all derived from The Hartford's

"unitary course of conduct." *See* Class Certification Order at 13. Further, as this Court

previously held, the Named Plaintiffs are typical of the members of the two subclasses, in that

each of the Named Plaintiffs received an explicit or implicit representation of either "cost" or

"value" in connection with their structured settlements. *See id.* at 91-92. Rule 23(a)(3)'s

typicality requirement, therefore, is satisfied.

14

## D.    **Adequacy**

Rules 23(a)(4) requires that the Named Plaintiffs "fairly and adequately protect the interests of the class." This requires a two-part inquiry: "whether (1) the plaintiffs' interests are antagonistic to the interest of other members of the class and (2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Financial Services, Inc. v. AG. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (citation omitted).

Again, the Named Plaintiffs' claims arise from the same course of conduct as the claims of the Settlement Class members. Far from conflicting in any way, and as the Court previously held, the interests of the Named Plaintiffs and the Settlement Class are aligned: to demonstrate that The Hartford retained 15% of the structured amount of their settlements and that, by doing so, violated RICO and committed fraud. *See* Class Certification Order at 11, 17.[10] With respect to Class Counsel, the Court previously held that Class Counsel are well qualified and experienced in complex class actions such as this. *See id.* at 18-19. Given the exceptional results achieved, Class Counsel have, without doubt, ably represented the interests of the Settlement Class in prosecuting this action and the negotiating the Settlement. Accordingly, the adequacy requirements of Rule 23(a)(4) and Rule 23(g) have been satisfied in this case.

---

[10] "The adequacy-of-representation requirement 'tends to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether ... maintenance of a class action is economical and whether the named plaintiffs' claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).

## E.  **Predominance and Superiority**

Rule 23(b)(3) requires "'[1] that common questions of law or fact predominate over individual questions and [2] that a class action is superior to other methods of adjudication.'" *In re Merrill Lynch & Co., Inc. Research Reports Litig.*, 246 F.R.D. 156, 164 (S.D.N.Y. 2007). The predominance inquiry "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Further, Rule 23(b)(3)'s superiority requirement, like predominance, ensures that resolution by class action will "achieve economies of time, effort and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about undesirable results." *Id.* at 615.[11]

For the reasons explained above, and as the Court held in its March 10, 2009 Class Certification Order, the core issue of whether The Hartford's alleged systematic practice of deducting (*i.e.*, retaining for itself) up to 15% of the structured amount of the settlements violated RICO and constituted fraud, and thereby inflicted an actionable injury upon class members, predominates over any individual issues, and is common to the Settlement Class. *See* Class Certification Order at 11; at 27-28 (addressing the RICO claim: the "core of the representations" to Settlement Class members by The Hartford concerning "cost" and "value" are "sufficiently similar to satisfy the uniformity requirement;" "the resolution of the factual and legal questions can largely be achieved through generalized proof, and these questions predominate over the handful of issues subject only to individualized proof"); at 29 ("The injury alleged ... [is] that plaintiffs received less than the total amount which they agreed to receive in release of their

---

[11] "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Id.* at 625.

claims. The cause of injury was defendants' alleged fraudulent misrepresentations as to the amount of the settlement funds being structured. ... For purposes of the predominance inquiry on the RICO claim ... plaintiffs have demonstrated the form and causation of the alleged injury was sufficiently uniform to be susceptible to class-wide proof."); at 40-41 (addressing the fraud claim: "the allegedly fraudulent misrepresentations ... were sufficiently uniform - once divided into 'cost' and 'value' subclasses - to be susceptible of class-wide proof; "common issues predominate with regard to the question of whether each plaintiff, in entering into a structured settlement, relied upon the defendants' written representations and assumed they would receive payments valued at, or costing, the total agreed amount.")

In addition, as the Court previously held, given these common issues, the interests of the Settlement Class members are better served through a class action, which is superior to other methods available for the fair and efficient adjudication of this controversy. *See id.* at 48-50. Moreover, settling this case as a class action will achieve economies for both the parties and the Court. Indeed, litigating similar issues in individual lawsuits around the country clearly would consume more in judicial resources than addressing them at once in this class action. And, in light of the size of their individual claims for damages, it is unlikely that Settlement Class members would endure the expense of bringing these claims in separate, individual actions.[12]

In sum, all of the requirements of Rules 23(a) and (b)(3) have been satisfied, and the Court should reaffirm the basis for certification of the Settlement Class in its Settlement Order and Final Judgment.

---

[12] Though the Court need not in the context of this Settlement assess whether the case, if tried, would present intractable management problems, *see Amchem*, 521 U.S. at 620, given this Court's prior certification of the Trial Class, no such manageability problems would have existed.

17

**IV.    The Notice Program Provided the Best Practical Notice to Settlement Class Members.**

"Due Process requires that the notice to class members fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Consol. Edison, Inc. v. Northeast Utils.*, 332 F. Supp. 2d 639, 652 (S.D.N.Y. 2004) (citation omitted); *see also Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982), *cert. den.*, 464 U.S. 818 (1983). The adequacy of a class action settlement notice is "measured by reasonableness." *Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 113 (2d Cir. 2005), *cert. den. sub. nom., Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.*, 544 U.S. 1044 (2005). Notice need not be perfect or received by every Settlement Class Member, but instead must be the best practicable notice in the circumstances. *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 133 (S.D.N.Y. 2008). Additionally, notice is adequate if the average Settlement Class Member understands the terms of the proposed settlement and the options they have. *Wal-Mart*, 396 F.3d at 114; *In re Merrill Lynch Tyco*, 249 F.R.D. at 133.

In this case, the Court-approved Notice of Class Action Settlement was written in plain language in order to ensure that it would be easily understood. The Notice described the litigation, summarized the terms of the Settlement Agreement, explained the scope of the release, described the requests for attorneys' fees and expenses and the incentive awards for the Named Plaintiffs, explained the deadline and procedure for filing objections to the Settlement and notices of intent to appear at the Fairness Hearing, and notified Settlement Class Members of the date of the fairness hearing. *See In re Currency Conversion Sec. Litig.*, No. 01 MDL 1409, 2006 WL 3247396, at *5 (S.D.N.Y. Nov. 8, 2006) (notice must inform class members of "the

18

certification of the settlement class, the proposed settlement and the date of the final fairness hearing") (quotations omitted).

The notice program outlined in the Settlement Agreement, and approved by the Court in its Preliminary Approval Order, was the best practicable notice under the circumstances and was reasonably calculated to reach substantially all members of the Settlement Class. The Claims Administrator complied fully with the Court-approved procedure. The Notice was sent via first-class mail to the last known address of all Settlement Class Members on July 7-8, 2010, as the Preliminary Approval Order directed. (Fraga Dec. at ¶¶ 3-4). Prior to mailing, the Claims Administrator ran all Class Members' addresses through the National Change of Address Database to ensure that the most up-to-date address was used. (*Id*. at ¶ 4). In those cases where notices were returned as undeliverable, advanced address searching was conducted to obtain additional address information. Additional copies of the notice were mailed to those alternative addresses. (*Id*. at ¶¶ 4, 9).[13] In addition, publication notice was published in *USA Today* on July 8, 2010, in accordance with the Court's Preliminary Approval Order. (*Id*. at ¶ 6). Both forms of the notice, along with the Settlement Agreement, the motion for preliminary approval, and the documents supporting the motion for preliminary approval have been available online since on or about July 7, 2010. (*Id*. at ¶ 8).[14] Finally, the Claims Administrator has maintained a toll-free telephone inquiry system for the purpose of providing information and answering questions

---

[13] On August 30, 2010, defendants provided Class Counsel with new address information for sixty-four class members. Class Counsel immediately caused the Claims Administrator to send notices by overnight delivery to these new addresses. (Fraga Dec. at ¶ 5).

[14] Class Counsel's application for fees and costs and the motion for incentive awards to the Named Plaintiffs were posted on the website on August 17, 2010. (*Id*. at ¶ 8).

pertaining to the Settlement, and for providing documents requested by Settlement Class Members. (*Id.* at ¶ 7).

Significantly, the website and toll free helpline have received heavy traffic. There have been, to date, over 15,200 visits to the website and over 2,600 calls to the helpline, (*id.* at ¶¶ 7-8), indicating class member interest and awareness of the Settlement.

The notice procedures implemented in this case far exceed the requirements of Rule 23(e) and the applicable due process standards. *See In re Prudential Secs. Ltd. Pshps. Litig.*, 164 F.R.D. 362, 369 (S.D.N.Y. 1996) ("notice by mail sent to the last known address ... meets the due process requirement of notice through reasonable effort even where numerous class members have since changed addresses and do not receive notice"); *Weinberger*, 698 F.2d at 71 (approving of mailing of individual notices to the last known address of all class members); *see also Georgine v. Amchem Prods.*, 160 F.R.D. 478 (E.D. Pa. 1995) (notice by U.S. mail satisfies Rule 23(e)); *Hoffman Elec., Inc. v. Emerson Elec. Inc.*, 800 F. Supp. 1279 (W.D. Pa. 1992) (notice by overnight U.S. mail or fax, where possible, satisfied Rule 23(e)).

## V. The Court Should Grant Final Approval Because the Settlement is Fair, Reasonable and Adequate.

### A. The Standards for Assessing Whether a Class Action Settlement is Fair, Reasonable and Adequate

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action may not be settled without the approval of the Court. The determination whether to approve a settlement is committed to the Court's discretion. *Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000); *In re Merrill Lynch Tyco*, 249 F.R.D. at 132. As a matter of public policy, federal courts favor the settlement of disputed claims, particularly in complex class actions. *Wal-Mart*, 396 F.3d at 116 ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'") (citation omitted); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004) ("[F]ederal courts favor settlement, especially in complex and large-scale disputes, so as to encourage compromise and conserve judicial and private resources. Accordingly, this Court will take into consideration such public policy concerns in exercising its discretion.") (citations omitted).

When reviewing a proposed settlement of a class action, the court must determine whether the proposed settlement is "fair, reasonable and adequate." *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006). The court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms. *See* Fed. R. Civ. P. 23(e); *see also Wal-Mart*, 396 F.3d at 116; *In re Merrill Lynch Tyco*, 249 F.R.D. at 133. Where, as here, the settlement was agreed to by experienced counsel after extensive arm's-length negotiations, a strong presumption of fairness attaches to the proposed settlement. *See, e.g., In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998). Great weight is

21

accorded to the recommendations of counsel, who are most closely acquainted with the facts of

the underlying litigation. *In re Luxottica*, 233 F.R.D. at 315; *see also In re Alloy, Inc. Sec. Litig.*,

03 Civ. 1597 (WHP), 2004 WL 2750089, at *5 (S.D.N.Y. Dec. 2, 2004); *In re Automotive

Refinishing Paint Antitrust Litig.*, No. 1426, 2007 WL 4570918, at *3 (E.D. Pa. Dec. 28, 2007).

The Second Circuit has identified nine substantive factors that courts should consider in

deciding whether to grant final approval of a proposed class-action settlement:

> (1) the complexity, expense and likely duration of the litigation, (2)
> the reaction of the class to the settlement, (3) the stage of the
> proceedings and the amount of discovery completed, (4) the risks of
> establishing liability, (5) the risks of establishing damages, (6) the
> risks of maintaining the class action through the trial, (7) the ability
> of the defendants to withstand a greater judgment, (8) the range of
> reasonableness of the settlement fund in light of the best possible
> recovery, [and] (9) the range of reasonableness of the settlement fund
> to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463. All nine factors need not weigh in favor of settlement. Instead, the

court should look at the totality of these factors in light of the specific circumstances involved.

*Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003); *In re Global Crossing*,

225 F.R.D. at 456.

**B.     The Settlement is Entitled to a Presumption of Fairness.**

A class action settlement is entitled to a presumption of fairness when it is the product of

extensive arm's-length negotiations. *See* 4 Alba Conte, Herbert B. Newberg, *Newberg on Class

Actions* § 11.41 (4th ed. 2002). "So long as the integrity of the arm's length negotiation process

is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement." *In

re NASDAQ*, 187 F.R.D. at 474. *See also In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.

Supp.2d 503, 510 (E.D.N.Y. 2003).

In this case, highly experienced counsel on both sides negotiated the Settlement. Class Counsel have extensive experience in the prosecution of complex commercial and class action litigation. The Hartford was represented by highly respected regional and national litigation counsel with an in-depth understanding of The Hartford's business. During the nearly five years that the case has been vigorously litigated, counsel for both sides have developed a comprehensive knowledge of the relevant facts and law by conducting extensive discovery and engaging in substantial motions practice before this Court and the Second Circuit. As a result, by the time the settlement was reached, counsel had "a thorough understanding of the complexity of the issues and the strengths and weaknesses of their respective claims, defenses and strategies." *In re Currency Conversion*, 2006 WL 3247396, at *5 (quotations omitted).

Furthermore, the Settlement was reached, in good faith, after lengthy and contested negotiations. These arm's-length negotiations took place over several months and included numerous telephonic meetings, the exchange of mediation statements (in which both sides aired their arguments), and two full-day mediation sessions with Mr. Geronemus. *See id.* (finding that the participation of a respected mediator "substantiates the parties' claim that the negotiations took place at arm's length"). Both sides zealously pressed their positions throughout the negotiation process, and continued to do so, even after the mediator's efforts had facilitated an agreement, through the process of negotiating the language for their formal written agreement. And, before accepting defendants' $72.5 million offer, Class Counsel rejected other offers that they believed were not adequate. Class Counsel made clear that, absent an acceptable settlement, they were prepared to try this case as scheduled in September of this year.

23

Class Counsel's considered judgment that the Settlement is not only fair, reasonable and adequate but an excellent result for the Settlement Class, is entitled to "great weight." *In re NASDAQ*, 187 F.R.D. at 474; *see also Aramburu v. Healthcare Financial Services, Inc.*, No. 02-CV-6535, 2009 WL 1086938, at *2 (E.D.N.Y. Apr. 22, 2009) ("[I]n appraising the fairness of a proposed settlement, the view of experienced counsel favoring the settlement is entitled to a great weight.") (quotations omitted). As a result, the Settlement is entitled to a strong presumption of fairness.

## C.     The Proposed Settlement Satisfies All of the *Grinnell* Factors.

Moreover, the Settlement fully satisfies all of the *Grinnell* factors, by which courts in the Second Circuit measure the fairness of a proposed class action settlement. *See Grinnell*, 495 F.2d at 463.

### 1.     The Complexity, Expense, and Likely Duration of the Litigation

The trial of this action would have been extremely complex. The claims involve annuities and complex pricing models. Annuities are complicated financial instruments whose intricacies are not well understood by anyone outside the insurance industry, let alone by the average juror. The case would also require the jury to master complex accounting issues relevant to how The Hartford priced its annuities in order to obtain a particular return on equity, and how those pricing practices resulted in The Hartford's retaining 15% of the economic value of the structured portions of the settlements. The Class would have the burden of proving their case on these arcane subjects and would have made their case largely through expert testimony and adverse examinations of The Hartford's witnesses. There was a substantial risk of confusion and that the case would be viewed as a "battle of the experts."

24

The Class would also have faced the difficulty of overcoming The Hartford's argument that, notwithstanding The Hartford's annuity pricing strategies, it had in fact paid them the precise stream of annuity payments it had promised to pay in each class member's settlement documents. The distinction between class members claiming misrepresentations as to "cost" versus those claiming misrepresentations as to "value" would have added to the complexity of the trial. Moreover, The Hartford argued that, even if liability were established, the class members did not suffer any damages, because they received the return that was available in the market and their settlements were funds with annuities equivalent in value and cost to similar annuities that could have been purchased through a third party insurance company. The Hartford had experts supporting their positions. All of this created substantial risk of an unfavorable outcome at trial. *See* Golub Aug. 16 Dec., ¶¶ 9, 20, 30; Golub Sep. 1 Dec. ¶¶ 22-28.

Continuing the case through trial would also have resulted in substantial expense in addition to that incurred so far. While the case settled with only a few months left before trial, Defendants were prepared to file a summary judgment motion, a motion to de-certify the class, and *Daubert* motions with respect to experts. Class Counsel likewise intended to file *Daubert* motions. This extensive motions practice – which does not even include motions *in limine* – would have required hundreds of attorney hours to complete and would have added to the risk and uncertainty of proceeding to trial. The expense would continue to mount through trial, during which both sides intended to rely on extensive expert testimony. Even if the Class was successful at trial, The Hartford's inevitable appeal would have been extremely costly not only in terms of Class Counsel's fees and expenses, but also in terms of the protracted delay it would cause.

## 2. The Reaction of the Class to the Settlement

The overwhelmingly positive reaction of the Settlement Class also constitutes "strong evidence" of the fairness of the Settlement and supports judicial approval. *Grinnell*, 495 F.2d at 462; *see also Wal-Mart*, 396 F.3d at 119 ("Indeed, the favorable reaction of the overwhelming majority of class members to the Settlement is perhaps the most significant factor in our *Grinnell* inquiry.").

Notice of the Settlement was mailed to nearly 22,000 Class Members on July 7-8, 2010, and nationwide publication of notice of the settlement was effectuated on July 8, 2010. There have been over 2,600 calls to the Claims Administrator's toll-free helpline and over 15,200 visitors to the Settlement website, which contains full information about the terms of the Settlement, the application for attorneys' fees and costs, the motion for incentive awards, and the Plan of Allocation.

To date, only one Class Member has filed an objection to the Settlement.[15] Moreover, fourteen of the fifty-one individuals who had opted out of the class before the Settlement was reached – over 25% of those who opted out – have now elected to opt back into the class.[16]

The sole Objection (Dkt. 249) is from Ms. Ashley DeLaCruz, a nineteen year old who is apparently unhappy with the amount of her underlying settlement with The Hartford.[17] As the sole basis for her challenge to the Settlement, Ms. DeLaCruz states, "I depend on my structure[d]

---

[15] *See* Golub Sep. 1 Dec., Exhibit C.

[16] *See* Fraga Dec. at ¶ 12. Attached to the proposed Settlement Order and Final Judgment submitted with the Motion for Final Approval of Class Action Settlement is a list of the thirty-seven individuals who previously elected to opt out of the action and have not elected to opt back in. The proposed Settlement Order and Final Judgment provide that such opt-outs are not bound by the Judgment to be entered in these proceedings.

[17] *See* Golub Sep. 1 Dec., Exhibit C.

settlement but it doesn't pay for much. So I object."[18] Ms. DeLaCruz speculates, "[H]ow do I

know they didn't cheat me out of a lot more money."[19] While Class Counsel appreciate Ms.

DeLaCruz's concern, where, as here, the Settlement is reached after full investigation and

litigation of the Class members' potential claims and after arm's length mediation of settlement,

the Objection provides no substantial basis for disapproving the Settlement.

Equally important, the absence of a significant number of objections from Class

members, especially when coupled with the heavy traffic to the Settlement website, is "strong

evidence" of the fairness of the Settlement. *See Grinnell*, 495 F.2d at 462; *Wal-Mart Stores, Inc.*,

396 F.3d at 119.[20]

### 3. The Stage of the Proceedings and the Amount of Discovery Completed

In determining whether a class action settlement is fair, reasonable and adequate, courts

consider the stage of the proceedings and the amount of discovery completed to ensure that class

counsel had access to sufficient information to evaluate their case properly and to assess the

adequacy of any settlement proposal. *See Weinberger*, 698 F.2d at 74; *Chatelain v. Prudential-

Bache Sec., Inc.*, 805 F. Supp. 209, 213-14 (S.D.N.Y. 1992); *In re Global Crossing*, 225 F.R.D.

at 458 (this requirement "is intended to assure the Court 'that counsel for plaintiffs have weighed

their position based on a full consideration of the possibilities facing them'") (citation omitted).

Here, fact and expert discovery were completed, with the final expert depositions occurring just

---

[18]  *Id.*

[19]  *Id.*

[20]  No Class Member has filed an objection to the proposed Plan of Allocation, to Class
Counsel's Application for Award of Attorneys' Fees and Reimbursement of Litigation Expenses, or to
the Motion  for Order Authorizing Incentive Award for Class Representatives.

before the Settlement was achieved. Given the late stage of the proceedings and the extensive

discovery taken before the Settlement was negotiated, the extensive motions practice, and the

multiple hearings and rulings of the Court, Class Counsel unquestionably had sufficient

information – indeed, a full record – to evaluate the strengths and weaknesses of the claims and

defenses asserted and the propriety of settlement.

As this Court is well aware from its active involvement in the management of this case,

this action was heavily litigated for nearly five years. Defendants continuously asserted

aggressive defenses, vigorously resisted discovery, and argued that the class would not prevail on

the claims asserted. By the time the Settlement was reached, Class Counsel had reviewed and

analyzed more than 540,000 pages of documents produced by Defendants and third parties,

including more than 96,000 pages of claims files, developed and implemented a sampling

protocol that served as the basis for class certification, taken or defended more than 25 fact and

expert depositions, exchanged expert reports on class certification, liability and damages,

engaged in extensive motions practice (including a petition for appeal to the Second Circuit), and

completed arduous settlement negotiations (including the exchange of mediation statements). As

a result, Class Counsel had a full understanding of the strength and weaknesses of the claims, as

well as the difficulties they would face in obtaining a favorable jury verdict and surviving the

inevitable appeal. *See Chatelain*, 805 F. Supp. at 213-14 ("Given that document discovery and

extensive discussions have already been conducted and resulted in the Stipulation of Settlement,

all counsel are undoubtedly acting with a firm grasp of the strengths and weaknesses of the

case.").

As the Court – which was particularly involved in pressing this litigation forward through extensive discovery disputes, motions practice, and numerous hearings and status conferences – observed at the Preliminary Approval hearing:

> . . . [T]here was more than sufficient discovery for both sides to understand what the record looked like or might look like in front of the jury. There was more than sufficient opportunity for the lawyers to have a sense of what the legal issues were, what the strengths and weaknesses of the case were from both sides and only after that, I must say somewhat to the court's surprise, the parties were able to reach an agreement.

Prelim. App. Hearing Tr. at 25.

### 4. The Risks of Establishing Liability

In assessing this factor, the Court is not required to "decide the merits of the case or resolve unsettled legal questions," *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 (1981), or to "foresee with absolute certainty the outcome of the case." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000). "[R]ather, the court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *In re Global Crossing*, 225 F.R.D. at 459.

The Class was by no means guaranteed a successful outcome to a trial of this case. Indeed, there was substantial factual and legal risk that the Class might not prevail on their asserted causes of action. Defendants argued that

- the RICO claims would fail because they could not establish the predicate acts, causation or a RICO enterprise;

- the claims for fraud would fail because defendants had no duty to disclose their retention of 15%, there were no misrepresentations of "cost" or "value" because each Class Member received market value and the funding annuities "cost" the amount represented, and defendants had no intent to defraud.

29

Even though the Named Plaintiffs defeated defendants' Rule 12(b)(6) motion, there were

substantial risks that defendants might prevail on summary judgment, trial or on appeal. One

factor identified by the Second Circuit to assess risk in the context of settlement is whether a

prior governmental action succeeded in establishing defendants' *prima facie* liability. *See*

*Grinnell*, 495 F.2d at 455 ("[T]he only truly objective measurement of the strength of plaintiffs'

case is found by asking: 'Was defendants' liability *prima facie* established by the government's

successful action?"); *see also In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 641 (E.D.

Pa. 2003) (citing *Grinnell*). Here, there was no government investigation, let alone a government

action, that has already established defendants' *prima facie* liability. The facts and legal theories

were developed by Class Counsel without the benefit of any government investigation,

indictment or discovery.[21]

At the time of settlement, defendants had already notified Class Counsel and the Court of

their intention to move for summary judgment. Defendants also advised Class Counsel of their

intention to seek reconsideration of the Court's ruling granting class certification on the basis of

the deposition testimony of Named Plaintiffs' and defendants' experts, which defendants asserted

established that the premises underlying the Court's grant of class certification were flawed.

While Class Counsel believe that they would have defeated these likely motions by defendants,

the substantial risks presented by these motions were real and cannot be disregarded.

As the Court observed late in the litigation at the Preliminary Approval hearing in June

2010:

---

[21] "[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill. They did all the work on their own." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992).

30

. . . I will note that The Hartford has from the beginning clearly and
vigorously asserted their view that they did nothing wrong. That
they gave to each of the settling plaintiffs a product which is what
it would have cost that settling plaintiff if they had gone out to buy
it from the Travelers or some other annuity company . . .
. . . It strikes me that the jury could have said at the end of the day
they got what they asked for. They wanted an annuity. This is what
the annuity cost and they got it. These are different companies.
They aren't the same and I think you could have walked away with
nothing.

Prelim. App. Hearing Tr. 27-28.

### 5. The Risks of Establishing Damages

The Class also faced substantial risk that it would not be able to prove the existence

and amount of damages. The Hartford argued that the Class Members suffered no damages and

it proffered experts supporting that theory. And as the Court said in its Class Certification Order,

if the case went to trial, the Class ultimately could recover some, all, or none of the 15% of the

value of the structured settlements at issue; further, either of the two subclasses the Court

certified could have faced significant difficulty proving its entitlement to damages. As the Court

explained:

Ultimately, defendants may . . . succeed in limiting the definition
of those damaged (on summary judgment or at trial) to those who
fall into one subclass or the other – for example, those whose
representations specified as 'value' as opposed to 'cost'. . . . Of
course, a jury may ultimately decide that plaintiffs received what
they bargained for and thus suffered no injury. Or they may decide
that the 'value' plaintiffs suffered an injury but the 'cost' plaintiffs
did not.

Class Certification Order at 27-28.

Assuming the case survived pretrial motions and that the Class proved liability, the issues

pertaining to loss causation and damages would have been both complex and hotly contested,

31

requiring expert testimony on sophisticated methodologies, with uncertain results. *See, e.g., In re Lloyd's American Trust Fund Litig.*, No. 96-cv-1262, 2002 WL 31663577, at *21 (S.D.N.Y. Nov. 26, 2002) ("The reaction of a jury to such complex expert testimony is highly unpredictable."); *In re Global Crossing*, 225 F.R.D. at 459; *In re Blech Sec. Litig.*, No. 94-cv-7696, 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002) (crediting plaintiffs' claim that establishing damages would have "degenerated into a 'battle of the experts' and thus posed a risk to plaintiffs"). The jury could have been convinced that damages were caused by factors other than Defendants' wrongdoing or, alternatively, that the amount of loss suffered by the Class Members was minimal. *See In re American Bank Note Holographics*, 127 F. Supp. 2d 418, 427 (S.D.N.Y. 2001).

In sum, while Class Counsel believe that the claims in this action are meritorious and that the Settlement Class suffered substantial damages, there were no guarantees that the Class would recover anything if the case went to trial.

### 6. The Risks of Maintaining the Class Action Through The Trial

"This factor allows the Court to weigh the possibility that, if a class were certified for trial in this case, it would be decertified prior to trial." *Meijer, Inc. & Meijer Distrib., Inc. v. 3M*, No. 04-5871, 2006 WL 2382718, at *8 (E.D. Pa. Aug. 14, 2006). While this Court granted class certification, absent settlement, there would be no assurance of maintaining class status through trial, since courts may always exercise their discretion to re-evaluate the appropriateness of class certification at any time. *See Chatelain*, 805 F.Supp. at 214 ("Even if certified, the class would face the risk of decertification."); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 284 (S.D.N.Y. 1999) (the risk of the class being decertified if potential conflicts were revealed during trial, in

32

which case the class members would recover nothing, favored approval of the proposed settlement); *In re NASDAQ*, 187 F.R.D. at 476-477 (risk of class being decertified at trial or risk of class certification being reversed on appeal supported approval of settlement); *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ. 03-0085 FSH, 2005 WL 3008808, at *8 (D.N.J. Nov. 9, 2005) (noting that "the risks faced by Plaintiffs with regard to class certification weigh in favor of approving the Settlement").

The Hartford vociferously argued against class certification. Even after it lost in this Court and in the Second Circuit, The Hartford said that it intended to move to de-certify the class prior to trial, based upon certain statements one of Named Plaintiffs' experts made in his expert report and in his deposition. Although Class Counsel did not believe The Hartford's argument for de-certification had merit, there was always a risk that the Court might re-evaluate its prior order and modify or entirely de-certify the class. And there is always a risk that a class determination may be overturned on an appeal following final judgment. Therefore, this factor, too, weighs in favor of approval of the Settlement.

### 7. The Ability of the Defendants to Withstand a Greater Judgment

The Court may also consider the Defendants' ability to withstand a judgment greater than that secured by the Settlement. While Class Counsel do not perceive this factor to weigh heavily in support of the Settlement, there is always a risk – underscored by the recent global financial crisis and its dire effect on many companies, including The Hartford – that a very substantial judgment might not be collectable years down the road. The Hartford's stock price fell precipitously from a high of over $100/share in mid 2007 to under $6.25/share in the fall of 2009, and the company needed $3.4 billion from the Troubled Asset Relief Program ("TARP"). The

33

Settlement provides a substantial, certain and immediate payment. In any event, even if a

defendant has both legal responsibility and the assets to withstand a greater judgment, that does

not necessarily render a settlement inadequate. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d

Cir. 2001). This factor, therefore, weighs in favor of the Settlement.

### 8. The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The final *Grinnell* factors focus on whether the settlement amount is reasonable in light

of the possible recovery and the risks of litigating the case on the merits.[22] When weighed

against the risks of continued litigation, the proposed Settlement compares favorably with the

result the Settlement Class could have obtained.

The $72.5 million all-cash recovery in this action is, by any measure, a substantial sum.

Further, in light of the unpredictability of dispositive motions practice followed by a complex

trial, the inevitable appellate process that would follow, and the risk of reversal, the $72.5 million

Settlement falls squarely within the "range of reasonableness." *See Wal-Mart*, 396 F.3d at 119

("there is a range of reasonableness with respect to a settlement—a range which recognizes the

uncertainties of law and fact in any particular case and the concomitant risks and costs

necessarily inherent in taking any litigation to completion") (citation omitted); *In re*

*PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("Fundamental to

analyzing a settlement's fairness is the need to compare the terms of the compromise with the

likely rewards of litigation. . . this determination is not susceptible of a mathematical equation

---

[22] Courts typically collapse the final two *Grinnell* factors – "the range of reasonableness of the settlement fund in light of the best possible recovery" and "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation," *Grinnell*, 495 F.2d at 463, into one factor. *See e.g.*, *In re Global Crossing*, 225 F.R.D. at 460.

yielding a particular sum but turns on whether the settlement falls within a range of reasonableness") (citations omitted).

The $72.5 million fund created for the benefit of the Settlement Class Members is a substantial recovery, both in the aggregate and for individual Settlement Class members—each of whom stands to recover, on average, thousands of dollars in additional compensation. Overall, the $72.5 million Settlement Fund recovers approximately 5.1% of the total annuity premium for the Settlement Class. As discussed above, this recovery exceeds the 4% recovery initially sought in this Action and, on a gross basis, amounts to 34% of the potential maximum recovery under the revised 15% theory.

This recovery is, at the very least, "well within the range of reasonableness." *See In re Michael Milken and Assoc. Sec. Litig.*, 150 F.R.D. 57, 67 (S.D.N.Y. 1993) (noting proposed settlement in *Grinnell* was 3.2% to 3.7% of the potential recovery); *see also In re Merrill Lynch*, 246 F.R.D. at 167 ("recovery of between approximately 3% and 7% of estimated damages is within the range of reasonableness for recovery in the settlement of large securities class actions.") (citations omitted); *Hicks v. Stanley*, No. 01 CV 10071 (RJH), 2005 WL 2757792, at *7 (S.D.N.Y. Oct. 24, 2005) (finding a settlement representing 3.8% of Plaintiffs' estimate to be within the range of reasonableness); *see* Ellen M. Ryan, Laura E. Simmons, *Securities Class Action Settlements, 2009 Review and Analysis*, at 5 (Cornerstone Research, Inc. 2010) (in securities class actions settling for between $50 and $124 million in 2009, the median settlement as a percentage of actual investor losses is 3.9%); Stephanie Plancich, Ph.D., Svetlana Starykh, *2008 Trends in Securities Class Actions*, at 14 (National Economic Research Associates, Inc. 2008) (median ratio of settlement to investor losses in cases settled in 2008 was 2.7%, and

35

ranged between 2.2% - 3.2% from 2002 and 2008).[23] Indeed, even after deduction of the attorneys' fees and costs requested by Class Counsel and the requested incentive awards to the Named Plaintiffs, each class member will still receive a net benefit from the settlement equal to approximately 24% of the actual losses under the 15% theory – more than six times the 2009 median. Moreover, *all* net settlement funds will go to class members. None of the settlement funds is subject to any reversion to the defendant. And, as discussed above, the Class was by no means assured of such a favorable result in the absence of this proposed Settlement.

Moreover, this proposed recovery is an excellent result in light of The Hartford's vigorous assertions that the Class could not satisfy the elements of RICO, prove any common-law fraud, or establish that any of the Class Members had suffered actual damages. At summary judgment and trial, The Hartford would have presented the testimony of multiple expert witnesses directly challenging the opinions of the experts offered on behalf of the Class. The Hartford also intended to move to decertify the trial subclasses and to file *Daubert* motions seeking to exclude the opinions of the expert witnesses. Finally, The Hartford has demonstrated—not least by appealing the Court's class certification order and retaining for that appeal the former Solicitor General of the United States—that it would certainly pursue an appeal if it were to lose at trial. *See, e.g., In re Michael Milken & Assocs.*, 150 F.R.D. at 65 (noting that "[i]t must also be recognized that victory even at the trial stage is not a guarantee of ultimate success" and citing a case where a "multimillion dollar judgment was reversed"); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) (approval granted where "[d]elay, not just at the trial stage but through post-trial motions and the appellate process, would

---

[23] Copies of the *Ryan* and *Plancich* articles are attached to Golub Aug. 16 Dec. as Exhibits D & E.

cause Class Members to wait for years for any recovery, further reducing its value"); *In re Visa Check*, 297 F. Supp. 2d at 510 (fact that the class faced a long trial and the additional time it would take to exhaust all appeals "weigh[ed] heavily in favor of approving Settlements").

At bottom, the Settlement is an excellent result for the Settlement Class in light of the range of possible recoveries and the attendant risks of continued litigation. In this context, "[a] very large bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995). As the court stated in *West Virginia v. Chas. Pfizer & Co.*:

> It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced. Merely by way of example, two instances in this Court may be cited where offers of settlement were rejected by some plaintiffs and were disapproved by this Court. The trial in each case then resulted unfavorably for plaintiffs, in one case they recovered nothing and in the other they recovered less than the amount which had been offered in settlement.

314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971).

\* \* \* \*

Accordingly, Class Counsel submit that this Court should find that the *Grinnell* factors, taken together, confirm that the Settlement is not only fair, reasonable and adequate but is an excellent resolution of this litigation and should be approved.

37

**VI.** **The Court Should Grant Final Approval to the Plan of Allocation.**

Pursuant to the Plan of Allocation, which the Court preliminarily approved on June 7, 2010, the Settlement Fund, net of notice and administrative costs, tax payments, any award of attorneys' fees and expenses, any incentive awards to the Named Plaintiffs and/or any additional costs incurred for the benefit of the Settlement Class and approved by the Court (*i.e.*, the Net Settlement Fund), will be distributed to the Settlement Class in proportion to the size of each Settlement Class Member's structured settlement, measured by the premium used to purchase the annuity funding each Class Member's structured settlement. Such a *pro rata* method of allocating the Net Settlement Fund among the Settlement Class Members is inherently reasonable and, likewise, the fairest and most equitable method given the facts and circumstances of this action.

"A district court has broad supervisory powers with respect to allocating a class action settlement and wide latitude in determining what to consider in approving a settlement allocation." *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010). "When formulated by competent and experienced class counsel, an allocation plan need only have a 'reasonable, rational basis.'" *In re Global Crossing*, 225 F.R.D. at 462, *quoting In re American Bank Note Holographics*, 127 F. Supp. 2d at 429-30; *In re Visa Check*, 297 F. Supp. 2d at 519 (same). "In determining whether a plan of allocation is fair, courts give substantial weight to the opinions of experienced counsel." *In re Marsh*, 265 F.R.D. at 145; *In re PaineWebber Partnerships*, 171 F.R.D. at 133.

The Settlement in this case treats the two subclasses identically for purposes of distributing the Net Settlement Fund. As Class Counsel advised the Court at the Preliminary

38

Approval Hearing on June 7, 2010, in counsel's view, there was no material difference in the strength of either sub-class's claims and each sub-class had a similar likelihood of prevailing. Moreover, even if the two subclasses had different probabilities of successfully proving liability, the damages theory for both subclasses was based upon The Hartford's retention of 15% of the economic value of the structured settlements. Because the measure of damages sought for the two subclasses was identical, there is no reason to differentiate between the subclasses for purposes of determining individual Settlement Class Members' recoveries.[24]

As discussed above, the entirety of the Settlement Fund, net of notice and administrative costs, tax payments, any award of attorneys' fees and expenses, and any incentive awards to the Named Plaintiffs, will be distributed to Settlement Class Members, without reversion to The Hartford. Further, there is no claims process; distributions will be made to all Settlement Class Members. Given the similarity of the strength of the claims and the measure of damages between the two subclasses, Class Counsel determined that the fairest method of distributing the Net Settlement Fund was to allocate the proceeds in proportion to the size of each Settlement Class Member's structured settlement with The Hartford, measured by the premium used to purchase the Class Member's structured settlement annuity. Accordingly, each Settlement Class Member's proportionate share shall be determined as follows. First, the amount of total premium paid by The Hartford p&c companies for structured settlement annuities for the benefit of all Settlement Class Members shall be calculated ("Total Premium Paid For Settlement Class Members"). Second, the amount of the Net Settlement Fund shall be divided by the Total

---

[24] Furthermore, requiring the two Subclasses to be treated differently for purposes of distributing the Net Settlement Fund would vastly increase the administrative expense associated with the Plan of Allocation, which would unnecessarily reduce the recovery actually going to Settlement.

Premium Paid For Settlement Class Members, in order to calculate the "Distribution Amount Per Premium Dollar". Third, the premium amount used to purchase the structured settlement annuity for the benefit of each individual Settlement Class Member shall be multiplied by the Distribution Amount Per Premium Dollar, in order to calculate each individual Settlement Class Member's share.

Courts consistently have approved plans of allocation that distribute settlement proceeds on a *pro rata* basis, or in proportion to class members' injuries. *See, e.g., In re Marsh*, 265 F.R.D. at 145 (net settlement fund allocated to class members on *pro rata* basis relative to the losses of the other class members); *In re Merrill Lynch Tyco*, 249 F.R.D. at 135 ("plan of allocation that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is presumptively reasonable."); *In re Remeron Direct*, 2005 WL 3008808 at *11 (plan to allocate settlement funds in proportion to overcharge incurred by each class members to be "inherently reasonable"); *In re Global Crossing*, 225 F.R.D. at 462-63 ("Pro-rata distribution of settlement funds based on investment loss is clearly a reasonable approach"); *In re Visa Check*, 297 F.Supp.2d at 519 (class members will received an award of money from the net settlement fund directly proportional to their debit and credit purchase volume).

Further, Settlement Class Members have been provided with notice of the proposed *pro rata* method of distributing the net settlement proceeds, as well as the Plan of Allocation, and not a single Settlement Class Member has objected to the Plan. Accordingly, the Plan of Allocation should be considered fair and reasonable and, further, should be finally approved.

## VII.  **Conclusion**

For the reasons set forth above, the Court should approve the Settlement, Settlement

Agreement and Plan of Allocation.

Dated: September 1, 2010                              Respectfully submitted,


                                                     /s/
                                                     DAVID S. GOLUB ct 00145
                                                     JONATHAN M. LEVINE ct07584
                                                     SILVER GOLUB & TEITELL LLP
                                                     184 ATLANTIC STREET
                                                     P.O. BOX 389
                                                     STAMFORD, CT 06904
                                                     Tel:  203 325-4491
                                                     Fac.  203 325-3869
                                                     Email: dgolub@sgtlaw.com

                                                     PETER R. KAHANA phv0784
                                                     STEVEN L. BLOCH phv0786
                                                     BERGER & MONTAGUE, P.C.
                                                     1622 LOCUST STREET
                                                     PHILADELPHIA, PA  19103
                                                     Tel.  (215) 875-3000
                                                     Fac.  (215) 875-4604

                                                     CARL S. KRAVITZ phv01826
                                                     CAROLINE E. REYNOLDS phv01825
                                                     ZUCKERMAN SPAEDER LLP-DC
                                                     1800 M STREET, N.W.
                                                     WASHINGTON, DC 20036
                                                     Tel.  (202) 822-8100
                                                     Fac.  (202) 822-8106

                                                     RICHARD B. RISK, JR. phv0785
                                                     RISK LAW FIRM
                                                     3417 EAST 76TH STREET
                                                     TULSA, OK 74136
                                                     Tel.  918 494 8025

                                                     Attorneys for the Named Plaintiffs and
                                                     Class Counsel

## CERTIFICATION

I hereby certify that on September 1, 2010, the foregoing Memorandum in Support of

Motion for Final Approval of Class Action Settlement was filed electronically and served by mail

on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all

parties by operation of the Court's electronic filing system or by mail to anyone unable to accept

electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing

through the Court's CM/ECF System.

/s/
DAVID S. GOLUB ct 00145
SILVER GOLUB & TEITELL LLP
184 ATLANTIC STREET
P.O. BOX 389
STAMFORD, CONNECTICUT 06904
Tel.  (203) 325-4491
Fac.  (203) 325-3769
dgolub@sgtlaw.com