1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3    _____
     OSHONYA SPENCER, ET AL        )
4                     Plaintiffs. ) NO: 3:05cv1681(JCH)
                                   )
5    vs.                           ) September 21, 2010
                                   ) 10:00 a.m.
6    HARTFORD FINANCIAL SERVICES)
     GROUP, INC.,                  )
7                     Defendant.  )
     _____
8                                   915 Lafayette Boulevard
                                    Bridgeport, Connecticut
9
                          HEARING
10

11   B E F O R E:
                     THE HONORABLE JANET C. HALL, U.S.D.J.
12
     A P P E A R A N C E S:
13
     For the Plaintiffs  :         DAVID S. GOLUB
14                                 JONATHAN M. LEVINE
                                   Silver, Golub & Teitell
15                                 184 Atlantic Street
                                   Stamford, CT  06904
16
                                   PETER KAHANA
17                                 STEVEN L. BLOCH
                                   Berger & Montague
18                                 1622 Locust Street
                                   Philadelphia, PA  19103
19
                                   CARL S. KRAVITZ
20                                 Zuckerman Spaeder LLP-DC
                                   1800 M Street, N.W., Suite
21                                 1000
                                   Washington, DC 20036
22

23
     For the Defendant:           ROBERT S. HOFF
24                                Wiggin & Dana
                                  400 Atlantic Street
25                                Stamford, CT   06911

1

2      Court Reporter      :         Terri Fidanza, RPR

3

4      Proceedings recorded by mechanical stenography,
       transcript produced by computer.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Please be seated.  Good morning to

2     you.  We're here this morning in the matter of Oshanya

3     Spencer, et al versus The Hartford Financial Services

4     Group, 305cv1681.  If I can have appearances please.

5          MR. GOLUB:  David Golub and Jonathan Levine for

6     the plaintiffs.

7          MR. KRAVITZ:  Carl Kravitz from Zuckerman

8     Spaeder for the plaintiffs.

9          MR. BLOCH:  Steven Bloch, Berger and Montague,

10    for the plaintiffs and the class.

11         MR. KAHANA:  Peter Kahana from Berger and

12    Montague for the plaintiffs.

13         MR. HOFF: Robert Hoff from Wiggin and Dana for

14    the defendants.

15         THE COURT:  Good morning.

16         We're scheduled here this morning for a hearing

17    on the approval of a settlement in this class action.  In

18    addition, there are several other motions pending

19    including a motion for incentive award and for attorney

20    fees and costs.  Obviously the public has a right to be

21    here so I don't mean to inquire of them to make them feel

22    uncomfortable.  I wonder if counsel has anything to

23    report.

24         MR. GOLUB:  I do.  In the court today are two

25    class members.  Both reside in Bridgeport.  Elliot Perez

1    and Joseph Datman.  They are here in support of the

2    settlement to observe what happens.

3         THE COURT:  That's fine.  I'm glad to have them

4    here.  We don't have enough input from the public who are

5    interested in what we do.  I want to be certain if

6    someone had come to object even though it might be out of

7    time, I would want to give them an opportunity to do

8    that.  Unless somebody raises their hand, I will assume

9    that no one is here to object.  No one wishes to be heard

10   individually.

11        MR. GOLUB:  I spoke with both of them this

12   morning and they are in support.

13        THE COURT:  Okay.  I have a number of questions

14   I would like to address.  Not a number but a few before I

15   proceed to deciding the motions I guess and so Attorney

16   Golub, are you on for today?

17        MR. GOLUB:  I am.  Yes.  Would it be easier at

18   the podium?

19        THE COURT:  Yes, probably for me and the

20   reporter.  More particularly with respect to the notices,

21   I just -- I have checked this.  It appears everything is

22   in order but I had a question about what I will call late

23   notices.  As I understand it, you sent out notices on

24   July 7, give or take, to 21,000 plus people.

25        MR. GOLUB:  Correct.

1          THE COURT:  You then however received what you

2     described as updated address information on 64 people.

3     You sent that by overnight on August 31.  Were those 64

4     in the original mailing or were those new people?

5          MR. GOLUB:  Those were -- those were -- those

6     would have gotten publication notice originally.  I think

7     the issue with those, Judge, there were some people that

8     we did not have the correct address.  We weren't

9     furnished with correct addresses on them and so we

10    went -- part of the process behind the scenes, we with

11    the Hartford had continuing dialogue about getting

12    addresses.  When we got those addresses which the

13    Hartford was able to find right before we filed the

14    September 1, we sent it overnight.  We kind of did that

15    to put on suspenders and a belt.  They technically had

16    due notice by publication but we wanted to make sure that

17    everybody had it.  We actually included a note saying if

18    you have any questions, contact us and we did not hear

19    from anybody.

20         THE COURT:  The 47 that were re-sent in late

21    July were because you got better addresses from the Post

22    OFFICE?

23         MR. GOLUB:  Yes.

24         THE COURT:  They had originally been sent

25    notice?

MR. GOLUB:  Yes.

THE COURT:  The second area I would like to discuss are what I will broadly call objections.  My understanding is there are what I will call two possible objections by two class members.  People who had the ability to clearly object which I read to be concerns about their annuity as opposed to the settlement.

MR. GOLUB:  Yes.

THE COURT:  And I also understand you have recently reported to the court that both of them have represented through you, in effect, one in an e-mail.  The other through you, they do not have an objection to the settlement.

MR. GOLUB:  That's correct.  Let me put that on the record.  What we did, what I personally did so I can represent to the court I called up both of the individuals.  As I put in the papers originally, it did not appear to us they were really objections to the settlement.  But I explained to them they were not giving up any rights as affecting the underlying claim they had under the settlement.  They were both supportive of the settlement.  They both had issues in what happened in the underlying case but there's no -- both of them specifically authorized me to advise the court that they were not pursuing any objection to the settlement.

1          THE COURT:  Attorney Hoff, you agree with my

2     reading of the settlement papers that to the extent any

3     class member, anyone of the 22,000, not just these two,

4     who think they are not getting what their documents

5     called for, in other words the annuity like anybody off

6     the street bought an annuity, you say I get it on the

7     first of the month and I don't get it until the 10th of

8     the month, that anyone in the class has the right to

9     raise those claims with the Hartford.

10          MR. HOFF:  Yes.

11          THE COURT:  Obviously any claim about what they

12     paid for the annuity as raised in this case would be lost

13     to them by the settlement if it is approved.

14          MR. HOFF:  Any claim based on what they were

15     told?

16          THE COURT:  Yes, told about that.

17          MR. HOFF:  Absolutely.

18          THE COURT:  That's two of them.  The third comes

19     to us from courtesy of the Bureau of Prisons mail system.

20     I'm not sure I remember the names of the gentlemen.

21     Riches is one of them, Wyatt is another and Simpson is a

22     third.  My reading of this is that they are not class

23     members.

24          MR. GOLUB:  Correct.

25          THE COURT:  They are indeed federal inmates.

That they seek to intervene. There's a motion to
intervene. Bern that has to be addressed. They claim an
interest in, quote, property or the transaction but they
set forth no basis to suggest they have such an interest.
They vaguely refer to, quote, policy but there's no basis
to believe that it's any policies at issue in this case.
They make no allegation that their interests are
impaired. They effectively seek time perhaps to try to
blackmail somebody or hold them up but more time to
analyze it. My view of the notice period, the
availability of the website and the 800 number and the
notices themselves was more than an adequate notice and
more than adequate time for anyone including a federal
inmate to determine whether, in fact, they had an
interest in this case or not. If they truly had an
interest in this case, they had more than sufficient time
to identify that interest. Even though the pleading is
pro se and I need to read it generously, I can't read
something that isn't there by any stretch of the
imagination. My view would be that their motion to
intervene should be denied. That they have no standing
to object as they are not members of the class. Anything
that I have said that you disagree with?

     MR. GOLUB: No. I think it should be properly
noted they were serial filers.

1          THE COURT:  I saw that.  I gather they

2    intervened in some proceeding down the hall with Judge

3    Underhill as well as 50 other federal courts.  There was

4    an action by the Department of Justice.

5          MR. GOLUB:  I didn't know this when we filed the

6    objection.  We had the list of cases they had done.

7    There's a Wikipedia site on Mr. Riches based upon his

8    filing of frivolous so.

9          THE COURT:  Bern, that's document number 240 is

10   denied on the record for the reasons stated.  There's a

11   fourth.

12         MR. GOLUB:  240 and 241 for the record.

13         THE COURT:  Thank you.  One was a motion to

14   object which I said there's nothing to suggest they are

15   members of the class and the second to the intervene and

16   there's no showing that they have any interest in the

17   proceeding.

18         The last person -- this is attached to the

19   Exhibit D on your papers.  One of your papers,

20   Ms. Silver.  And I think you have suggested that she be

21   categorized as an untimely opt out.  The date of being

22   August 1, 2010.  I'm not sure why you characterize it

23   that way.  Isn't she more like the first two we spoke

24   about?

25         MR. GOLUB:  She is.  And I think her problem is

1    a challenge to the fairness of her underlying settlement.

2    I just -- I think -- I think she'll be happy to get some

3    money.

4         THE COURT:  What was the cut off of the

5    objection?

6         MR. GOLUB:  May 1 I believe.  I didn't try to

7    call her because I just didn't think -- I didn't think

8    her letter raised an issue that was cognizable at this

9    point in this proceeding.  I continue to think that.

10        THE COURT:  She clearly says in her second

11   paragraph she doesn't want to be included in the current

12   case because it may cause problems for her own case.  If

13   your response to that I would likely agree with you to

14   the extent with other prior conversation with Attorney

15   Hoff.  If she feels she was harmed in her underlying case

16   either by her lawyer or the settlement, that shouldn't be

17   affected by this case.

18        MR. GOLUB:  Correct.  Our position and this

19   would be subject to the defendant's agreement, I'm happy

20   to call her and give her the option of opting out or

21   opting in and notifying the court.  I'm fairly certain

22   that she'll want the money.

23        THE COURT:  I think she's like the first two.

24        MR. GOLUB:  Exactly right.

25        THE COURT:  I could rule untimely opt out.

1    Therefore she's in.  It could be said we all think that's

2    what's good for her.  Maybe it is better to let her

3    knowingly make that choice.

4         MR. HOFF:  I have no objection to what Attorney

5    Golub proposed.  Obviously if she has an issue with her

6    settlement that's unrelated to the claims in the case,

7    she's at liberty to bring those.  To the extent she's

8    concerned about something that's raised in the

9    settlement, we rather she knowingly make the decision.

10   If she's going to opt in the class, all the better for

11   the Hartford I think.

12        THE COURT:  I will leave it that way.  Just so

13   the record is clear if you can file a short pleading that

14   indicates you can refer to her by initials and the

15   Exhibit D after your conversation has elected to opt out

16   to which counsel for plaintiff and defendant have no

17   objection or has opted to remain in to which neither side

18   has an objection.

19        MR. GOLUB:  The first option is I can't reach

20   her.

21        THE COURT:  Then we'll keep her in.

22        MR. GOLUB:  I would hope that wouldn't delay the

23   approval.

24        THE COURT:  No.  No.  No.  That's not my

25   intention.  It might delay your distribution of monies,

1    not the approval.  I had a couple of questions about the

2    settlement.  First of all, are there any cases like this

3    pending in the country, in other words, against other

4    annuity companies?

5                MR. GOLUB:  No.  This is the only -- there was a

6    case that was brought, the McCumber case that's been

7    referred to in some of the pleadings which had a theory

8    of rebates on annuities but not our theory and certainly

9    not a claim that a RICO claim wasn't a RICO claim and

10   didn't go into the pricing issue that we ended up going

11   into.

12               THE COURT:  If you will refresh my recollection

13   because as you pointed out, the docket is very long, the

14   defendant sought to take an interlocutory appeal on a

15   certain occasion and obviously they briefed that.  So you

16   had to brief it but the appeal itself was not allowed to

17   go forward the substance of the appeal.

18               MR. GOLUB:  That's correct but what's

19   interesting is that the Second Circuit when it issued its

20   denial or reached the merits.  You have to understand in

21   terms of what the Second Circuit said.  Second Circuit

22   did not say application for -- it didn't say application

23   denied.  What it said was application denied.  The

24   certification here is not an abuse of the court's

25   discretion which is the merits of so.

1     THE COURT:  I don't remember seeing that.  That

2 makes me feel better.

3     MR. HOFF:  Your Honor, I don't remember exactly

4 what the language was that was used.  I think there was

5 some reference to the court's discretion unquestionably.

6 Needless to say, we'll let the Second Circuit order speak

7 for itself.

8     THE COURT:  There's some reference in the

9 papers. I read this very carefully last week.  I looked

10 again last night and this morning.  I have a lasting

11 impression that somewhere in the papers is a reference to

12 the fact that obviously we didn't have a trial but also

13 there might be a motion for summary judgment and a motion

14 to decertify.  I also don't have a recollection that I

15 have a scheduling order and we'll have a pretrial memo in

16 September right around now.  Was the defendant intending

17 to do a summary judgment motion and or a motion to

18 decertify?

19     MR. HOFF:  We were, your Honor.  At the time

20 that we reached an agreement to settle the case, the

21 deadline for those motions had not yet come and gone.

22 There was still time that we were in the mediation to

23 file those motions.

24     THE COURT:  The pretrial was due the end of

25 September but I was going to get a summary judgment done

1    in three days.

2         MR. HOFF:  It was very tight schedule.

3         MR. GOLUB:  I think we gave you 36 hours now.

4         THE COURT:  The last question is I looked for

5    this morning but I don't remember.  I understand the

6    whole concept of your formula in terms of the payment of

7    the claims what I would call pro rata which is to take a

8    gross settlement less any award I give of fees and costs,

9    gives a net settlement, takes a proposition of someone's

10   annuity to the total annuity of all the class members

11   that gives you a percentage.  You multiply that times the

12   net.

13        MR. GOLUB:  Right.

14        THE COURT:  What happens if there's checks not

15   cashed, funds not obtained by a class member, somebody

16   moves and you can't catch up to them and somebody dies,

17   their family doesn't know they are part of this?

18        MR. GOLUB:  That will happen.  First of all,

19   none of it reverts to the Hartford.  That's part of the

20   agreement.  What will happen is we will come back to the

21   court at that point and seek an additional order.  It is

22   our current intention to suggest to the court that any

23   funds that cannot be distributed be redistributed

24   pro rata to the remaining class members.

25        THE COURT:  We'll have to see how much it is and

whether that makes sense or it is so small, it should go
to a charity.

MR. GOLUB:  We'll come back to you.

THE COURT:  I don't know why I didn't remember
that.

MR. GOLUB:  We'll come back twice assuming we're
approved.  We'll come back for an order of distribution
that the claims administrator will put together based
upon the numbers.

THE COURT:  In other words, you want me to bless
that $2700 is going to Mary Smith in Idaho?

MR. GOLUB:  Correct.

THE COURT:  You will come back at the end once
you know if you have funds left over?

MR. GOLUB:  Right.  We'll make a suggestion to
you when that should be to give us time to find people.

THE COURT:  Turning to the issue of fees.  I was
struck, I had been struck from the beginning of the case
that there are four firms involved and now I'm struck by
the fact there's 67 billers.  I understand how there came
to be four firms.  I understand how that can happen in
cases like this.  But I guess the fundamental question I
have is was it reasonable to have four firms with partner
level people doing a very substantial volume of the
work.

1              MR. GOLUB:  Let me give you a straight answer.
2      This was not an easy case and we worked as a team and we
3      worked.  If you look at the hours and the hours are
4      fairly similar among the three major firms that worked on
5      it because we were able to divide the responsibilities.
6      We were able to make it through the 500,000 discovery
7      documents.  We were able to make it through depositions
8      across the country.  It is not at all unusual to have
9      multi firms on a significant class action.  The
10     defendants had the right in this case to litigate
11     aggressively and they did and I don't think one firm.  I
12     don't think my firm could have done it alone.  I don't
13     think Berger and Montague could have done it alone or
14     Zuckerman Spaeder could have done it alone.  I'm actually
15     proud that we managed the three firms plus Attorney Risk
16     who basically also participated significantly.  We
17     managed to do this as a collegial team and I think we
18     managed to move the case quickly.  I think the court
19     pushed us appropriately and there were deadlines that
20     were met that required different firms to do different
21     things.  I think that the total time.  It could have been
22     one firm trying to do it but the time wouldn't have been
23     any different.  I don't think if you look at what was
24     done, there wasn't menial work done on this case.  The
25     reason that partners were involved, the reason that

senior level people at each one of the firms were
involved, that's because that's what this case required.
It's a result I think that the court might be surprised
by the result in this case but I think it is the result
that the lawyers got.

THE COURT:  You can't stand there and tell me
there was no duplication.  No offense to anyone.  I
appreciate you all want to be here today.  We had a lot
of arguments.  Did I really need everybody here every
day?

MR. GOLUB:  You didn't have everybody here every
day.

THE COURT:  Most arguments.

MR. GOLUB:  Most arguments there was Mr. Levine
and I were here.  Mr. Bloch came for a number of the
arguments.  On the class certification which is a major
argument, I think the full team was here.  Those are de
minimis, Judge, in terms of the hours in this case.

THE COURT:  Let's turn to hourly rates.  Again
no offense to your team.  I don't mean in any way to
diminish the outcome.  I obviously recognize you and your
firm could not have done this alone.  I know that but I
also think this case wouldn't have succeeded if you had
not been involved.  At least not to the extent it did.
That may just be because you benefit from having been in

1    effect the face of the case and the other lawyers suffer

2    because they agreed.

3         MR. GOLUB:  I did it.  They didn't do anything.

4    I did the case.

5         THE COURT:  I'm not saying that at all.  All I'm

6    saying is that you have a rate I think of $600 an hour.

7    I'm not sure you charge that very often but be that as it

8    may, I think that's a high Connecticut rate but it is not

9    out of line.  Certainly not out of line for your years of

10   experience, your track record, I will call it, your

11   abilities so okay, that's a good rate but I have others

12   in the firm much less experienced than you who are

13   telling me to the extent I will look at lodestar and

14   multipliers that I should use an even higher rate.  I

15   understand that I can look at out-of-state rates and they

16   are acceptable if I can come to a conclusion that's what

17   a reasonable client would pay.  If I were a reasonable

18   client, I would pick the phone up and call David Golub

19   and ask him to charge me $600 an hour.  I don't think I

20   will call someone else and say I will pay 650.  This goes

21   only to the multiplier.  In my view, I will use it as a

22   check.  To the extent the lodestar is in my view slightly

23   inflated because of some duplication and some higher

24   rates than the multiplier, could look even larger.

25        MR. GOLUB:  Let me respond to that.

1    THE COURT:  I'm trying to layout what's on my

2    mind.  That's exactly what I want you to do is respond.

3    MR. GOLUB:  First of all, it is a national class

4    action.  It's a case that there's a number of people in

5    Connecticut who are probably de minimis of the nearly

6    22,000.  And so it was completely appropriate for other

7    law firms from outside of Connecticut to participate and

8    if you look at other actions, other class actions that

9    have been settled in Connecticut, including the recent

10   case against the Hartford that was settled by Judge

11   Droney's courtroom, including Judge Coviello's

12   settlement, including a settlement in front of Judge

13   Arterton class action.  The fees that are charged are

14   under, well within, well within the normal range of the

15   fees that were approved for lodestar cross-check purposes

16   in those cases.  Whatever my fee may be, 98 percent of my

17   work is contingency work.  I maintain a rate.

18   THE COURT:  But your rate -- I'm familiar with

19   rates charged by senior partners at firms that aren't

20   typically contingent billers.  I could ask Attorney Hoff

21   what certain people at his firm charge but I won't.  I

22   have an idea.  I know what the Robinson & Cole the top

23   people bill and I know Day Pitney what the top people

24   bill.  Again takes my breath away.  I haven't billed in

25   13 years.  Maybe I should try to bill again but it is not

1   out of line.  In fact, I would say it is quite

2   comfortably reasonable.

3            MR. GOLUB:  Thank you.

4            THE COURT:  As you say, it is just a number you

5   pick.  I appreciate that you didn't pick a higher number

6   because I think if you picked 700, I would begin to say

7   there might be somebody at 700.

8            MR. GOLUB:  The article that I attached to my

9   declaration that did a survey of the defense law firms

10  and talk about which do have hourly rates that are higher

11  but all that goes to show you is it is within an

12  acceptable range.

13           THE COURT:  That's exactly right.

14           MR. GOLUB:  That's the significance of the

15  lodestar check in general.  The lodestar check is not and

16  I need to say this to you, Judge.  I tried to express

17  this in the papers.  You are not supposed to say I don't

18  believe.  This rate should it be 650.

19           THE COURT:  No, I agree.

20           MR. GOLUB:  You are not supposed to say should I

21  cut off 10.  What you are supposed to do is make sure

22  there's not a windfall.

23           THE COURT:  I thank God the circuits have

24  decided that lodestar is not really a preferred method.

25  I have spent way too many of my hours on this bench

1   plowing through time records and cutting off point three

2   because somebody had a conference with four people in an

3   office.  It is not a good way to spend my time.  However,

4   it is a check and your 3.7 is in my view on the high side

5   and for the size of the award, et cetera, from looking at

6   all the factors I will go through in a minute.  I still I

7   can't just accept the lodestar number.  It seems to me

8   without going through every entry for five years, I can

9   take sort of a broad brush review.  That's mixing

10  metaphors of what makes it up and one big chunk in hourly

11  rates and another is number of billers.  There's a few

12  things I can look at that won't cause me to say oh,

13  instead of being 5. whatever, it should have been

14  4.769,286.837.  I'm just raising questions about have we

15  moved the left field line.

16          MR. GOLUB:  I want to talk to you about that.

17  There's two aspects to the lodestar cross-check.  One is

18  lodestar.  One is the multiplier.

19          THE COURT:  Correct.

20          MR. GOLUB:  I think what sometimes happens in

21  the cases is courts, I'm not saying you, courts

22  understand they don't want to do a perusal endeavor of

23  the lodestar, just a general but the same issue applies

24  to the multiplier.  You go to cases and this is why the

25  memo sets forth all the multiplier cases.  There's a

range that's deemed acceptable.  It is not the 3.7.  The
precise number.  There's a range.  There's a range that
goes as high as five or six but the range.  You can look
at the authorities, the texts on class action
settlements.  You can look at the summaries of class
action settlements from the 2003 to 2009.  You can look
at the cases.  What the cases say is the range of 3.5 to
5 is the normal range.  That doesn't mean 3.7 is a
precise number.  What it means is for lodestar
cross-check purposes, we're within an acceptable range.

          THE COURT:  I'm looking at an article recently
published in the Journal of Empirical Legal Studies by a
professor from Cornell and another professor from
New York University and they tell me that the mean and
mediate fee percentages for settlements from 69.6 million
to less than 175 million is 19.4 and 19.9 percent as a
percentage multiplier -- as a percentage of the recovery
and the mean multiplier for the Second Circuit for all
cases which is misleading is 1.58.  That's all.  If I
look at -- I don't know how we characterize this as a
consumer, tort or other.

          MR. GOLUB:  Consumer.

          THE COURT:  Consumer is high in this chart but
it is still slightly less than two.  So I understand
there's cases out there with higher multipliers but

1    there's also cases with lower multipliers.

2          MR. GOLUB:  What you have in that survey you

3    just cited you have small cases where --

4          THE COURT:  That's true.

5          MR. GOLUB:  You have cases where the risk is

6    different and the multiplier has to reflect the risk and

7    what this case -- what this case involved more than

8    anything else was a new theory, a new theory that evolved

9    as we determined discovery with incredible risk.  Judge

10   Mukasey's line in the Gulf Oil Cases about the jackal

11   circling the lions when class action lawyers simply come

12   in.  That's not what this is.  This is the opposite of

13   this.

14         THE COURT:  You are not on the tail of the

15   government.

16         MR. GOLUB:  I remember arguing the Motion to

17   Dismiss in front of you where when you denied and

18   Mr. Tebbe was so upset that you denied it at the time but

19   you said I'm only denying the Motion to Dismiss. These

20   are very be substantive legal issues.  I'm not saying

21   anything about what ultimately happens on the merits.

22   That's before we got to the class certification issue.

23   You should have heard the conversations opposing counsel

24   had with each other about the merits, about whether there

25   would be class certification granted.  When you asked

Mr. Hoff today if there was going to be another motion to decertify, both my firm and the other firms involved had to make decisions about what kind of commitment to make to the case in terms of staffing it. You can't do a lot of these cases. You have to choose ones you believe in. I thought that this was an important case to do as a class action because I thought people had been injured and I thought there was an opportunity to get -- I thought this wasn't going to be a 36 cents check in the mail on a securities fraud case. I thought it was impossible to do individual claims. So I thought this was a case that I was willing to devote Mr. Levine's and my time to because I thought it made sense as a public policy. This was a class action that made sense to do.

THE COURT: You didn't need to convince me that this was a very risky case. I have to be honest with you. I'm convinced it was risky. I would love to ask the defendants which I'm not going to do, why they settled. I don't mean to say it was wrong. It could be an issue unrelated to this case why. I represented many a defendant who might have nothing to do with how good or bad the case is. That's one huge possibility I can't know about.

The second is as risky as it appears, you talk about the team arrayed against you. They look at the

1    team arrayed against them and realized you weren't going

2    to go away, and it would be expensive to prosecute the

3    case.  If you were successful, I don't think it's a

4    bet-the-company case but it is pretty pricey.

5              MR. GOLUB:  No.  Also I think that we had put

6    the case in as good a posture for winning as possible.

7    Not only after your ruling on class certification which

8    was obviously an important and significant ruling but

9    the --

10             THE COURT:  You think I got it wrong.

11             MR. GOLUB:  They do.

12             THE COURT:  You do.  You don't like the sub

13   classes.  You wouldn't have got a class, if we did the

14   sub.  You don't have to spend time convincing me the case

15   was risky.

16             MR. GOLUB:  What happened we also convinced you,

17   fortunately, to proceed with the liability trial before

18   we got to class membership issues, and I think that was a

19   strategic decision that had an impact on the settlement.

20   I think we would have, one, the liability trial and then

21   the class members would have come out of the woodwork at

22   that point.

23             THE COURT:  In thinking about the risk in

24   preparation for today, a question occurred to me.  I

25   think it is fair to ask you.  If you don't think so, you

1    should tell me.  That's how many cases have you taken,

2    Attorney Golub, in the last 10 years that you didn't

3    recover by way of fees your lodestar?  Zero?

4              MR. GOLUB:  I'm going to answer that question.

5              THE COURT:  This goes to the concept of risk.

6              MR. GOLUB:  I'm going to answer that question.

7    I'm going to tell a story.

8              THE COURT:  If you tell a story, by the time you

9    are done, you will answer the question.

10             MR. GOLUB:  I won't tell a story.  I take a

11   number of cases.  I have taken a number of cases where

12   other lawyers have disagreed with me on whether there's a

13   case and whether it is a winnable case, if there is a

14   case.  It happens to be the kind of case that comes to me

15   unfortunately for me.  Many of them I say unfortunately,

16   there must be the equivalent of the rear end collision

17   case.  They don't call me up.  They go to Mr. Hoff.  So a

18   lot of cases that I take are cases where I think that I

19   perceive an injury or perceive a wrong and try to develop

20   a theory, and I have been successful at doing that.  I'm

21   pleased about that.  I'm pleased for my client and for my

22   firm.  Many of the cases are very, very difficult long

23   cases and it is impossible for me.  I had a case that I

24   litigated in federal court and state court for 20 years

25   before I got a judgment from the Connecticut Supreme

Court and had to bring another suit over to win that. I have a case that's a class action case that's been pending since the early 2000 in front of Judge Coviello not because I haven't been pushing. We were up and down interlocutory appeal, interlocutory appeal. I have a lot of cases that are hard cases. Have I succeeded? I generally have succeeded in them. Have I succeeded in every one of them? I haven't succeeded in every one of them. That doesn't mean that in my mind, I don't calibrate the risk and take the case saying if I can do this case, if I can bring it in, the reward will be in the fee that I get and here's the flip side of it. I can only do so many at one time. I have to do a case and this is true for everybody at the table here. I'm speaking for myself but it turns out bother Zuckerman Spaeder, Berger Montague have the same issues. They have to make a decision is this the court to devote Carl Kravitz's time to and cases to Peter Kahana and Steve Bloch's time to. This is not the mammoth law firms. These are cases where lawyers who know what they were doing make a commitment of their time so that's what happened in this case. For whatever reason, we made the decision knowing it was going to knock off the ability to spend time on other things and thinking the case made sense because of it but we won. So but that's. But the

1    fact that we won doesn't mean that the risk wasn't

2    there.

3         THE COURT:  That's why I asked my question.  But

4    you didn't answer it.

5         MR. GOLUB:  In terms of lodestar.

6         THE COURT:  In the last 10 years, have you using

7    your clearly outstanding judgment in this case, I can

8    comment on the good judgment of the other counsel as well

9    to decide that this was a case that might have looked.

10   At the time I have to bear in mind this case had an

11   upside recovery, 100 percent recovery of about 70 or so

12   million dollars.  Your theory was a four-percent theory.

13   I'm trying to analyze if I were going to take this case,

14   what would I negotiate.  I wasn't going to get paid out

15   of the fund.  My client was going to pay me.  I have a

16   case that appears to be worth 70 million dollars when I

17   make the commitment to it.  It ended up you have

18   developed a different theory but you could have just as

19   well changed your theory to two percent.

20        MR. GOLUB:  Four percent was 56 million.

21        THE COURT:  The time spent with all counsel

22   is.

23        MR. GOLUB:  5.8 million dollars.

24        THE COURT:  What percentage recovery would I put

25   on this case.  My view was in litigation you cut out the

1    top and bottom 20 percent.  The worst case in the world

2    has a 20 percent chance because it has to be decided by

3    people like me and jurors.  I don't want to be quoted as

4    saying anything can happen but cases develop.  And the

5    case that looked lousy can become a great case.  The case

6    that looked great becomes lousy.  Going into a case, I

7    would never say you have a 90 percent or 10 percent

8    chance of recovery.  So I think what would I have looked

9    at this case and said, what was the chance of the

10   plaintiffs prevailing.  I probably would have only put it

11   in 30 percent somewhere.

12              MR. GOLUB:  What about the parol evidence rule?

13   The parole evidence rule was an absolute barrier.

14              THE COURT:  You have a million barriers.

15              MR. GOLUB:  You couldn't put 30 percent on this

16   case.

17              THE COURT:  Yes, you could.

18              MR. GOLUB:  You had two issues.  One was the

19   parol evidence rule and the second was how do you get

20   class certification with individual reliance issues.  You

21   want to be blunt this case isn't worth anything without

22   class certification.

23              THE COURT:  Why did you take it?

24              MR. GOLUB:  It's what I said to you the first

25   time.  This is terrible what happened here.  As someone

1    who does --

2         THE COURT:  There's a lot of injuries in the

3    world.  They are all not recoverable.

4         MR. GOLUB:  I didn't like the fact.  I

5    understand there's a different view of liability.  I

6    didn't like the fact there was a concealed cost in the

7    structured settlements.  I didn't realize it was

8    15 percent.  I didn't like four percent and we did an

9    analysis.  And we said there's no -- we said this is a

10   very tough case.  It stayed tough start to finish but it

11   was tough because not only tough on the liability, not

12   only tough on class certification but there was no real

13   damages of the four-percent theory.  The problem with the

14   four-percent theory, it wasn't four percent.  They paid

15   someone the broker's commission.  There was an equitable

16   argument here on the four-percent theory that it was

17   really a one-percent theory because they paid three

18   percent.  They were billing four percent, then it turned

19   out a small amount of cases they didn't pay any percent.

20   Four percent was 56 million.  One percent was 5 million.

21   There were discussions about is this case worth more than

22   five to ten million dollars full value and okay then

23   we're going through the discovery documents.  We find the

24   famous pie chart but that was significantly into this

25   case.

1          THE COURT:  What would a client and a lawyer

2     reasonably agree as a fee in this case?

3          MR. GOLUB:  I'm sorry.  You couldn't do that.

4     The fee was the only way a lawyer could do this case on a

5     third.

6          THE COURT:  You have gotten to the answer.  I'm

7     asking the question.

8          MR. GOLUB:  That's the only way.

9          THE COURT:  Would they take it on a third?

10          MR. GOLUB:  That's right.

11          THE COURT:  Slow down.  I can't be exactly right

12     they wouldn't take it on a third.

13          MR. GOLUB:  The only way a plaintiff's side

14     could take this case -- let me rephrase it.  A firm such

15     as the firms here.  I'm not sure how -- I'm not sure if

16     larger firms would take a class action on a

17     noncontingency basis.  The only way the firms that did

18     this case and firms likely to do cases on this is on

19     one-third contingency.  Even then what's the upside

20     there?  If you don't get class certification, if you are

21     spending a million dollars, $850,000 in costs, you are at

22     risk.  I will tell you this.  Every client in the world

23     would have agreed to a third.  There's not one class

24     member who wouldn't have agreed to a third if they

25     understood what the lawyers' time would have to be and

1    what the expenses would be.  I don't want to -- I do want

2    to say this.  It is really significant that there's no

3    objections.  There's nearly 22,000 class members and this

4    thing has been posted on the website, been over 18000

5    hits to the website, over 3600 phone calls.  Thank God

6    for the website.  Without the website, how would I ever

7    be able to say the class members knew but there's a

8    website with 18500 hits on a class of 22,000 people and

9    not one objection.  Not to the settlement but the

10   attorney fees and the notice said not 30 percent.  The

11   notice said 33 percent, not one objection.  That's

12   because everybody understands that's the only way this

13   case should have been done.

14           THE COURT:  Am I correct and my knowledge may be

15   old, but I have a recollection of many contingency

16   agreements that I saw in my day as a lawyer and I think

17   probably on the bench, too.  I'm also thinking of the

18   Connecticut statute that many contingent cases are not

19   straight one third.  That they are not one third if

20   settled before trial.  That they're 25 percent if settled

21   before trial.  Am I mistaken or is that old?

22           MR. GOLUB:  Lawyers do it different ways.  The

23   real and the Connecticut legislature has spoken on that.

24   The Connecticut legislature allows -- there's a fee

25   statute that can apply in personal injury actions but the

1   Connecticut legislature has not only said that fee

2   statute can be waived in personal injury actions but it

3   said what the basis for the waiver is.  There's two

4   criteria for the basis for the waiver.  One is the

5   complexity of the case and the other is the willingness

6   of the attorneys to advance the costs and not hold the

7   clients liable for the costs if the case is not

8   successful which is, of course, what we did in this

9   action.  Both of those would, under Connecticut personal

10  injury law, both of those would have warranted a

11  statutory waiver to a one-third.

12          THE COURT:  A minute ago you told me that you

13  and your co-counsel took this case, if I understood you

14  correctly, thinking that at best you might get a

15  $5 million recovery and a third of that would be

16  significantly less than what you are asking me to give

17  you.  Where does the windfall come from?

18          MR. GOLUB:  What I said to you was we talked

19  about the case.  We said what may happen in this case and

20  we said it may be it won't be a significant recovery.

21  Now, that doesn't mean that I was giving up any chance or

22  any arguments.  That doesn't mean that I didn't think.  I

23  cannot tell you that I envisioned a 15-percent theory but

24  by the end of the day, the four-percent theory which our

25  argument was that you couldn't charge the brokers -- when

we brought the case, we couldn't charge the broker's

commission without disclosure.  That was a four-percent

theory.  What we recognized was there were equitable

arguments to the contrary but I think our view was, of

course, we didn't have the benefit of Mr. Kravitz's

insight at that point in time.  But our view was that --

THE COURT:  I don't think Attorney Kravitz

appreciated that remark.

MR. KRAVITZ:  I did but I haven't got to defend

my fee, my hourly rate either.

MR. GOLUB:  I think that we thought that we

could -- we thought there was possibility for a

significant recovery.  I also don't know.  We didn't

necessarily know the extent that the Hartford did

defend.

THE COURT:  Could you turn to the proposed

order?  Paragraph 20 you cite me to Rule 54b.  I'm

confused.  What's left in this case?  Or do I not know

Rule 54?

MR. GOLUB:  May I have one moment?

THE COURT:  Sure.  What's partial about what I'm

going to do here today?  Is that so you can come back?

MR. GOLUB:  I think that was because there were

claims that were not closed, Judge.  There's a breach of

contract claim.

1          THE COURT:  When am I going to deal with those?

2          MR. GOLUB:  I'll withdraw them.

3          THE COURT:  Why don't you withdraw them, then

4     the clerk can enter judgment that is final.

5          MR. GOLUB:  I actually agree with that.

6          THE COURT:  Do you withdraw or wait until I

7     approve the class settlement?

8          MR. GOLUB:  We'll do that.

9          THE COURT:  Let's not forget.  So that part of

10    the order will have to be amended.  I will do the

11    withdrawal on the record and that will close it so it

12    will become moot.

13         MR. GOLUB:  If you enter the order approving the

14    settlement, we will immediately then file the withdrawal

15    of the other claims, be turned into a final judgment.

16         THE COURT:  There's an Exhibit A to the order if

17    I recall of the ones who opted out.  Wouldn't we want to

18    do some sort of redaction or maybe have initials?

19         MR. GOLUB:  That's fine.

20         THE COURT:  And file under seal.  Maybe it is

21    already on the docket.  I don't know what we want having

22    had criminal cases where people who commit frauds, target

23    their victims by people that have been part of class

24    actions.

25         Is it already on the docket?

1          MR. GOLUB:  It is.  We could make a motion to

2     seal that.

3          THE COURT:  Why don't you do that.  I would feel

4     better.  When I sign the order that I actually sign, I

5     will represent A is under seal and that you are going to

6     file a sealed version with the full names.

7          MR. GOLUB:  I want to point out one other thing

8     about the litigation expenses.  There will be additional

9     litigation expenses.  Not only for claims administration

10    expenses that will be incurred but there are some other

11    expert fees that will be reported.  We'll put that in

12    whatever we submit to you subsequently.

13          THE COURT:  Okay.  I should ask this question

14    because I'm going to do it.  I have to give you a chance

15    to tell me why I shouldn't.  I understand there are a lot

16    of expenses and you folks put on the expenses not knowing

17    that you will recover.  I appreciate that.  Again the

18    lodestar is just that but if in the lodestar, I have

19    billable rates as I have, is it really appropriate to

20    charge clients for telephone and postage.  Isn't there

21    something built into the billable rate or do people want

22    to go overhead free now and we have to charge clients for

23    the rent next?

24          MR. GOLUB:  We didn't make these things up.  We

25    didn't make up putting in for that.  There are categories

1    if you look at.

2              THE COURT:  I looked.  The Second Circuit

3    approved online research which I think for a long time

4    was not looked on favorably.  I appreciate that.

5              MR. GOLUB:  Online research my firm has standard

6    billing with Westlaw.  We don't charge that overhead in a

7    case you are making numerous mailings.

8              THE COURT:  I understand there's a photocopy.

9    This wasn't postage that reflected -- the claims

10   person.

11             MR. GOLUB:  I don't think those are significant

12   amounts, Judge.

13             THE COURT:  No, they aren't but maybe to show

14   that I read everything.  The last question I had was I

15   think you all represented in affidavits or elsewhere that

16   you agreed to take the named plaintiff cases even if it

17   wasn't a class?

18             MR. GOLUB:  Correct.

19             THE COURT:  But then you say in your memo at

20   footnote 11, it would be wholly infeasible for any named

21   plaintiff to retain counsel on an hourly rate.

22             MR. GOLUB:  We didn't retain on an hourly rate.

23   We took it on one-third contingency.  It would not have

24   been cost effective but we --

25             THE COURT:  You wouldn't have taken it on the

1    contingency either.

2          MR. GOLUB:  We committed to the three named

3    plaintiffs, whether we got class certification, we would

4    have had a speedy trial of three named plaintiffs claims

5    and would have tried to recover.

6          I want to make one other point.  This is in

7    fairness to my co-counsel.  You asked some questions at

8    the beginning about rates.  I don't believe their rates

9    are at all out of line either nationally or for

10    Connecticut.  It may be unique to hear from them but to

11    the extent you think the lodestar reflects an

12    inappropriate rate, the rates in both Philadelphia and

13    Washington for senior partners.

14          THE COURT:  I don't question that their rates

15    are like yours in line with the geographical location in

16    which they practice.  I'm not questioning that.

17          MR. GOLUB:  I have seen and I looked at them for

18    the purposes of the fee application in this case.  I went

19    to Pacer and printed out the fee application affidavits

20    where lawyers from New York or lawyers from other

21    jurisdictions.  In fact, lawyers from Connecticut were

22    charging $750, $800 an hour.

23          THE COURT:  I haven't seen any or much over 750.

24    I'm not sure I have seen an 800 in Connecticut.  There

25    might be tax lawyer at the 800 or higher number.  What do

1    you think Jim Wade is charging?

2          MR. GOLUB:  Who knows what Jim Wade charges.

3          THE COURT:  I don't need to know.  I know what

4    you charge.  I understand all the numbers aren't often

5    used.

6          MR. GOLUB:  That's not necessarily true.  Maybe

7    less, maybe more than other counsel.

8          THE COURT:  That's your number.  You represent

9    that's your number.

10         MR. GOLUB:  To the extent that I do charge

11   anyone an hourly rate, that's the number I charge.

12         THE COURT:  I know your abilities, your

13   reputation, your level of experience.  To me I'm not

14   saying no one could charge more than 600 in Connecticut

15   because I'm pretty sure some do.  Not a significant

16   amount but some more and not too many.  That seems to me

17   to be a reasonable hourly rate.

18         MR. GOLUB:  I will tell you I think if you look

19   at the fee application in the other Hartford financial

20   case, you would be surprised.

21         THE COURT:  What would I see?

22         MR. GOLUB:  Did we bring that?  In this case,

23   this is the case against the Hartford that just settled

24   in front of Judge Droney, rates of 675.

25         THE COURT:  Who is billing that?

1          MR. GOLUB:  Joyce Able (ph.).  There's 700 Eric

2     Isaacson.

3          THE COURT:  Who are these people?

4          MR. GOLUB:  They are from Coughlin Stoi Geller

5     Rudman & Robins.

6          THE COURT:  From where?

7          MR. GOLUB:  From San Diego.

8          THE COURT:  I thought you were going to tell me

9     Connecticut rates.

10          MR. GOLUB:  The Scott law firm.  Scott Scott is

11     a Connecticut law firm which had in Priceline which was

12     settled in 2007.  In 2007, Schatz Nobel & Izard was

13     charging 600, 600, 500, 400.  That's June 18, 2007.  So

14     that's over three years ago.  I don't know if we

15     brought -- I don't have the Scott and Scott time records,

16     from the Staehr case because by recollection they were

17     more than what I put in for and you asked me about my

18     track record with lodestar.  That's not necessarily true

19     for all of the law firms involved in this litigation.

20          THE COURT:  I wasn't suggesting that it was.  On

21     the side of the equation of risk here, there's a lot in

22     this case.  You know, but there were a couple of things I

23     was trying to think my way through.

24          MR. GOLUB:  Here's where I come out.  I'm not

25     sure if I'm arguing against something that's already

decided.  If I am, you can tell me and I will stop.

THE COURT:  It's getting there.  I was not decided when I came on the bench.

MR. GOLUB:  Okay.  The way I looked at lodestar as a cross-check was that I thought that -- I thought the multipliers range.  I thought we were entitled to a pretty high multiplier if we had come in.  I thought the multiplier -- to the extent the multiplier reflects the risk of the case and implicitly, if not explicitly the contribution of the lawyers to achieve the settlement which isn't explicitly said, that's sort of what a multiplier involved in terms of the complexity of the case.  We could get, I think the Second Circuit in the Wal-Mart case said 3.5 to five.  So and then, you know, could you say well, maybe the hours are -- you can look at them but there's nothing significant.  No significant change in the hours so I didn't try to write a brief that said to you, Judge, here's the absolute formula, multiply this times this.

THE COURT:  That's not what I'm supposed to do.

MR. GOLUB:  The other thing was this.  We did this survey.  It wasn't just Judge Coviello's Priceline decision and Judge Rakoff's decision which I was very happy when we came in originally at 33 percent and went down to 30 because I thought those two decisions which

are the two most recent decisions of comparable cases in
this circuit.  Here in Connecticut and one in the
Southern District by judges that I know the court is
familiar with.  Neither one which is -- would be thought
of as being exorbitant in attorney fee awards.  I thought
those really provided a guide.  Then I said, let's see
what the other cases are.  When it turned out there are
30 cases around the nation, in the Southern District, in
the Eastern District, in Pennsylvania, in New Jersey, in
Texas, in Florida, and California, when there's 30 cases
all 30 to 35 percent.  I said, you know, okay, let's do
30 percent and the argument was we should do 33 percent
and let you knock us down to 30 percent.  I didn't want
to do that.

THE COURT:  I was sure that conversation took
place.  I wonder if there was another conversation.

MR. GOLUB:  I said I thought it was more
intellectually honest to say what we really wanted.  We
didn't come in at 30 percent as a negotiating number.  We
came in as 30 percent that I thought and persuaded my
co-counsel that was the number that's fair in the
circuit, in the district and given what other cases
showed, and I will say to you, Judge, if you look at
awards.  If you look at 30 cases, and if you look at the
other cases that are right around 30 percent, the

1    different is the risk.

2            THE COURT:  I understand.

3            MR. GOLUB:  I think you could come in at 33

4    percent and I could defend it.  I thought  -- I thought

5    that was and so I'm defending that position to you as I

6    don't want to say risk.  I'm urging that that 30 percent

7    is a fair number on this case, and it is fair from every

8    perspective and that the last measure of fairness is no

9    class member.  None of the 21,000 class members, 22,000

10   said a word about it.

11           THE COURT:  I haven't asked you any questions

12   about the incentive award, and I don't have any

13   questions.  Doesn't mean I will grant your motion but I

14   don't have any.  Obviously you briefed it.  I don't know

15   if there's anything you want to add.

16           MR. GOLUB:  I will say it is not a lot of money.

17   The people put their necks out.  They were available for

18   deposition and consultation.  I remember at one point in

19   the case, we were talking we needed an affidavit for

20   Mr. McDuffie for something on the statutory of

21   limitations. He was in Iraq.  The three named plaintiffs

22   participated and their individual recovery is under

23   $2500.  It is not as if there's any windfall to anybody

24   here.

25           THE COURT:  All right.  Was there anything

1    further?  I'm assuming defense counsel has contracted

2    away their ability to speak on these motions.

3            MR. HOFF:  We have.

4            THE COURT:  What is it known as clear sailing?

5            MR. HOFF:  I will ask for an opportunity to

6    speak for a few seconds to one thing.  You are right.  We

7    have agreed not to object to the application for

8    attorneys fees and some of the other motions but in your

9    discussion with Attorney Golub, understandably he

10   aggressively set forth his view of the case.  I

11   understand what his view has always been and understand

12   why he did that.  For the record, I would like to make

13   clear the Hartford, as set forth in the settlement

14   agreement has denied any liability and denied that any

15   plaintiffs were injured.  As your Honor recognized, there

16   are many reasons why cases settle and the decision was

17   made to settle this one and that's why we're here

18   today.

19           THE COURT:  I don't think Attorney Golub would

20   disagree with your comments.  Obviously we agree there's

21   no admission of liability.  That's given but in terms

22   of -- well, yeah.  We all agree on that.  There's

23   absolutely no admission of liability.  That you settled

24   for whatever motivated your client to settle and the

25   reasons of which don't need to be known to anyone as much

as we all might like to know.  But I think that -- I
don't know how to put this.  I don't want to muddy up
your position that you said for the record.  I don't mean
to.  What I'm trying to say is that not only is it clear
that you have not admitted liability but I think you had
a strong argument you had no liability.  Had it come to a
decision by a jury or a judge or an appellate court which
is in many ways going to influence -- the principal
influencer of what I'm about to do by way of ruling on
the various motions.  The bottom line is the defendants
admit no liability by the approval of the settlement.

MR. HOFF:  Thank you, your Honor.  The only
reason I raised it because of the discussion with
Mr. Golub.

MR. GOLUB:  Before I sit down, may I have one
moment just to check anything?

THE COURT:  To see if anyone wants to kill you?

MR. GOLUB:  No.  To see if there's other class
members in the audience.

THE COURT:  That was a joke.

MR. GOLUB:  Judge, there's a third class member
Jean Hill of Norwalk who is on your right.  She had
advised me she also supports the settlement.  She had a
couple of questions that I will deal with after the
proceeding.  Mr. Kravitz reminded me of a case he did in

which the law changed in the middle of the case and the

circuit changed the law.  That's a case where it goes

down the tube.  That's also part of the risk.  But I

understand the court is aware of where we are.

(Whereupon, a recess was taken.)

MR. GOLUB:  While you gave us time, I did want

to draw the Court's attention.  This is on page 36 of my

declaration, the August 16 declaration.  It addresses the

rates that have been approved from lodestar cross-check

purposes in three other cases in this district; two of

which involve life insurance companies.  One is Norflet

v. John Hancock Life Insurance Company, Staehr versus The

Hartford Financial Services Group Company and there's a

reference to the declaration of Arthur Shingler who puts

in the hourly rates for Scott and Scott in 2009 as 675

and 700.  Declaration of the Norflet case of Aaron Brody,

partner rate as high as 770.  Aaron Weiss partner rate of

745 of New York.  I want to remind the court it wasn't

just Wiggin and Dana defending this case.  It started out

with Morrison & Foerster, Seth Waxman and Baker & Botts,

all national law firms involved.

I also want to make it clear while I did say I

don't normally charge, that's not true of my co-counsel.

The rates, for example, Mr. Kravitz's rate of 750, 800 is

defense work, that's the rate that gets charged.  I think

the significant thing about what we put in Norflet,

Staehr and Priceline is it goes to the first question you

asked me, why were there four firms.  There's four firms.

That's the only practical way these cases can get done.

Now I know in some cases a Connecticut firm is the local

counsel.  That obviously wasn't the case here but the

idea of my office, Mr. Levine able to devote 11,000 hours

of time to do the case wouldn't be possible.  So that's

why there are four firms.  It's consistent with again for

this broad lodestar cross-check purpose these rates are

right in line not only for us in Connecticut.  I remember

when I say the 675 and 700, and people can put in

whatever they think is appropriate but certainly the

out-of-state rates are very comparable.

THE COURT:  Thank you.  I'm going to address

first the Motion for incentive award.  I don't know the

number of the motion.  Number 247.  Motion for order

authorizing incentive award.  Class counsel requested

incentive award of $25,000 each for each of the three

named plaintiffs in this action be awarded out of the

settlement funds.

The court recognizes that incentive awards for

class representatives are allowed, subject to the

discretion of the court.  Silver versus People Bank's

case, that the's Second Circuit unreported case in 2001.

23 Federal Appendix 46 at 48. In that case, there was an affirmance of a denial of a request for incentive awards. "Incentive awards are appropriate if compensation would be necessary to induce an individual to become a named plaintiff in a suit." Montgomery versus Aetna Plywood, 231 F.3d, 399, 410. (Second Circuit 2000).

The courts in this circuit and others have in my cases granted incentive awards to class representatives out of common funds. Indeed I have done it in prior class actions before me. However, historic data or studies show such awards are not made as a matter of course. A study Of 374 settled class actions from the '93 to 2002 found incentive awards were given in about 28 percent of the cases. Eisenberg and Miller Incentive Awards to Class Action Plaintiffs: Empirical Study. 53 UCLA Law Review, 1303 in 2006. They are more frequently used, for example, in employment discrimination cases when there's risk of retaliation, negative attention, particularly unpleasant deposition and relatively rare cases like securities litigation, there's likely to be fewer and greater number of class members willing to serve were awarded in the Eisenberg Miller sample they took. They constituted .16 percent of the class recovery. Here the three requested would total $75,000 and constitute by my math .1 percent of the settlement

1    fund.

2         Where courts grant incentive awards, they are

3    typically justified by the time expended by the class

4    representatives such as preparing for and submitting to

5    the deposition or to compensate for the risk, including

6    the risk of retaliation, unfavorable press or delay in

7    recovering from a claim.  "An incentive award is meant to

8    compensate a named plaintiff for any personal risk

9    incurred by the individual or any additional effort

10   extended by the individual for the benefit of the class."

11   Dornberger v. Metlife, 203 F.R.D. 118, 125 (SDNY 2001).

12   In Dornberger, they approved incentive awards ranging

13   from 1500 to $10,000.

14        See also in re: Conversion Fee Antitrust

15   Litigation, 263 F.R.D. 110, 131, (SDNY 2009) which held

16   that the risk and the "substantial time and effort the

17   class representative incurred" warranted an incentive

18   award of 1,000 to $15,000 but not of the 35 to $45,000

19   requested.  In addition, the case of Norflet versus John

20   Hancock Life Insurance Co., 658 F.Supp 2d, 350, 354,

21   (D.Conn 2009), the court awarded $20,000 for the time the

22   class representative spent in deposition responding to

23   discovery and/or otherwise working with the class

24   counsel.".

25        In this case, the court does not find there was

a significant risk to the plaintiffs.  Not in the sense

of risk of recovery.  I'm talking about risk of being the

representative of this class.  I don't think that the

class representatives had much of a risk of finding

themselves in the center of public controversy that would

cast them in an unfavorable light or subject them to

retaliation or being embarrassed that might happen in an

employment discrimination case.

It is conceivable that the class representatives

had they been able to retain counsel on the assumption of

proceeding individually, that they would have recovered

faster if they had prevailed but it strikes me that

that's not great significant value even if you were to

say that they would be delayed by three years even if you

took 18 percent interest, I believe the class members are

getting roughly between two or $4000 say, maybe more, but

I think some of them are in the $2000 range.  It is not a

insignificant amount of money, certainly not the amount

sought for in the motion.

It is also worth noting that by agreeing to

serve as class representative, the individuals secure the

benefit of what the court will state and I will go into

more detail later but are clearly top notch contingency

representation without regard to the class certification.

On the point I just asked Attorney Golub as to

the class representative at the firm, the class counsel

agreed to take the individual claims on a contingency

basis if they were not successful on certification.  As

class counsel has also pointed out, it's highly unlikely

class members would have found it feasible to pursue the

claim on an individual basis and certainly not with the

type of counsel that they obtained.

As a result, it strikes this court that an

incentive award can be justified with compensation for

the time, the effort, and service to the class rendered

by the named plaintiffs and there are before the court

affidavits which form a record to support the conclusion

that the plaintiffs did contribute their time to the

action besides becoming generally familiar with the case

and staying informed of it.  They reviewed documents with

counsel.  They participated in preparing affidavits.

They secured other witnesses or solicited other

witnesses.  They assisted counsel in responding to

discovery and they prepared for and submitted to what are

described as extensive depositions.  Albeit, I don't know

how many hours long they were.

It does bear noting that during the course of

the litigation, Plaintiff McDuffie was a resident of

Oklahoma but was deployed during this time to Iraq with

the U.S. Marine Corps and traveled to Connecticut for the

1   deposition.

2          Plaintiff Spencer was a resident of Ohio and

3   traveled to West Virginia for a deposition.

4          Strickland affidavit doesn't indicate he had to

5   travel for his deposition.

6          None of the affidavits indicate that the class

7   representatives incurred any significant expense

8   themselves or lost significant periods of time from work

9   in performing any of the class-related tasks.

10          In light of what the court views as the lack of

11  risk and also the not unduly burdensome duties associated

12  with the class, the court finds that the motion seeking a

13  $25,000 incentive award is excessive.  However, the court

14  will grant the motion and make an award to each of the

15  individual class members reflective of their time and

16  effort and involvement in pressing the case of $10,000

17  each which the court finds to be reasonable and adequate.

18          With respect to the motion for class

19  certification, final approval of the class action

20  settlement, that's document number 250, the court will

21  address that motion.

22          In a ruling the court made in 2009, I believe on

23  March 10, I granted certification to two subclasses that

24  I described as cost subclass and value subclass.  The

25  court's finding of fact and conclusions of law, the class

certification order applying equally to the settlement
class. The court finds that the settlement class
satisfies all of the requirements for class certification
under Rule 23a and B3 of the Federal Rules.

In sum and without repeating at length my
earlier findings that remain, the court finds that, one,
nearly 22,000 members of the settlement class are so
numerous that joinder of all members would be
impractical.

Two, that while the parties have agreed that the
settlement agreement does not constitute any admission of
liability or waiver of any defenses which the court notes
that's the position of defense counsel and the agreement
of plaintiffs on that issue, there are questions of law;
in fact, common to the claims of the named plaintiffs and
all class member, settlement class members. In the
court's view, those common questions despite some of the
challenges in the case that are raised by this case
factually, those common questions still predominate over
any questions or issues affecting only the individual
members of the settlement class.

Three, claims of the named plaintiffs are
typical of the claims of the settlement class.

Four, the named plaintiffs' interests are
coincident with and not antagonistic to the interest of

1     other settlement class members.

2          In prosecuting this action, negotiating and

3     entering into the settlement, named plaintiffs and class

4     counsel have demonstrated the requisite skill and the

5     experience and have fairly and adequately protected the

6     interest of the settlement class.

7          Finally, class treatment is clearly superior

8     than for adjudicating the settlement of all the claims

9     raised in this action and best serves the interest of the

10    nearly 22,000 class members.

11         Therefore, the court grants final certification

12    to the settlement class.

13         With respect to notice in the court's order

14    preliminarily approving the settlement, the court set out

15    various notice requirements which were designed by the

16    parties and then finally by the court to satisfy the

17    requirements of due process, the Federal Rules and the

18    Class Action Fairness Act.  The court also reviewed and

19    approved the Notice of Class Action Settlement.

20         The court finds that the parties have met their

21    obligations and the notice requirements are satisfied.

22    In particular, with the respect to the mail notice of the

23    proposed class action settlement was sent by first class

24    mail to the last known address of 21,697 settlement class

25    members.  That mailing included an election to opt in

form for those persons who previously requested exclusion from the action. Additional copies were sent at a better address as information became available.

With respect to the court's order for publication requirements were satisfied by the publication of an adequate summary notice in USA Today on July 8, 2010. The plaintiff also established and maintained a settlement website which I don't have the numbers in front of me but which had quite a few hits from presumably class members and that was a means of providing information to class members.

Lastly, the plaintiffs caused a tollfree line to be established and that, in turn, received frequent use during the course of the time period from the preliminary approval. Such notice to the members of the class that I have just outlined is hereby determined by the court to satisfy the requirement of the Federal Rule 23E and due process of the law and found to be practicable under the circumstances and constitute due and adequate and sufficient notice to all persons entitled to notice and to apprise them of their rights.

In addition, under the Class Action Fairness Act of 2005, otherwise known as CAFA, it is required by the court's order with CAFA, the defendants were required to serve notice of their proposed settlement together with

1    other information upon appropriate state and federal

2    officials.

3            On June 16, 2010, the defendants in this case

4    filed a Certificate of Service with a notice attached

5    which demonstrated they timely served as required and

6    provided in the preliminary approval and by law.  The

7    court reviewed the notification that accompanied the

8    material and found the defendant's notification to comply

9    with the applicable requirements of CAFA.  In particular,

10   the court would note that CAFA requires ninety days to

11   pass upon service of the information before I can approve

12   the settlement.  By my count, the 90 days of the notice

13   passed approximately a week ago, on or about September

14   16.

15           Finally, the court will address the issue of, in

16   effect, the substantive fairness of this settlement.  The

17   substantive terms of the settlement.  The court finds

18   that the settlement in this case was not a product of

19   collusion between plaintiffs and the defendant or their

20   counsel but rather was the result of a bona fide vigorous

21   and arm-length's negotiation conducted in good faith

22   between class counsel and the defendant counsel with the

23   assistance of a very able mediator.

24           With respect to the Grinnell cases guidance of

25   providing nine factors that I should consider, I will not

1  reiterate them but I will address them.

2  First, the court finds that the case has been

3  complex, expensive to litigate and time consuming and

4  would have continued, if the case had not settled.

5  There's no question in my mind that the defendant was

6  mounting and have mounted throughout the course of the

7  five years the case pended, an extremely vigorous

8  defense, and the plaintiff counsel likewise were pressing

9  the case vigorously.  It would be very reasonable for

10  this court to expect -- I'm sort of overusing the word

11  very in my comments in the next few minutes but I have no

12  other way to communicate the court's feelings.  But it is

13  to this court, it would be quite reasonable to expect

14  very difficult issues of proof as to the liability and

15  damages and that the continued litigation on appeal if a

16  plaintiff judgment was obtained.

17  Second, in terms of the court's conclusion that

18  the settlement is fair, reasonable and adequate, the

19  court finds that the reaction or should I say the

20  nonreaction of the class weighs heavily in favor of

21  approval.  I have gone over with counsel in detail every

22  reaction with respect to the class.  I won't call them

23  objections but I don't really think any of them were

24  objections to the merits of the class or the fee

25  application and certainly none of them provide any basis

1    for the court to disapprove the settlement.

2         In sum, in my view, the court has received no

3    objection.  And therefore, there is no class member who

4    has stated any reason to disapprove the settlement.

5         With respect to the stage of the proceedings

6    under Grinnell as to how that informs whether this is a

7    good substantive settlement of this case settled after

8    the parties had completed discovery.  We had been through

9    class certification as well a Motion to Dismiss but more

10   importantly, it was after discovery if I'm recalling the

11   detailing, there's more than half a million documents

12   and roughly 25 depositions were taken.  And so in this

13   court's view, given the experience level of the counsel

14   involved on both sides, both sides had a full

15   appreciation of the strengths and weaknesses of the case

16   before negotiating the settlement.

17        As far as risk of continued litigation, I have

18   already said it a couple of times but I will say it yet

19   again in this context.  Class counsel and the settlement

20   class would have faced numerous and very significant

21   risks in establishing both liability and proving up, I

22   was going to say the full measure of the damages they now

23   were seeking but even part of the measure of that damage

24   they were seeking if they had decided to continue to

25   litigate through trial prep then settle.  Obviously the

defense vigorously contests that there was any case here
at all. If there was any kind of claim that the damages
were not there because, in effect, the plaintiffs got
what they bargained for among other defense as I recall
correctly. Lastly, the counsel was highly competent.

In sum, the risk of continued litigation I think
for the plaintiffs in this case was extraordinarily high.

As far as the reasonableness of the settlement,
it strikes this court and again this is a very difficult
exercise for the court to engage in. But it strikes the
court that the settlement is well within the range of
reasonableness. In fact, more than well within the range
of reasonableness. In light of first that the best
possible recovery, start with that. It's just taking
that alone, it's a very big settlement at approximately
30 something percent of what could have been the best
case if the plaintiff won on every issue and got all the
evidence in they wanted and got the jury to vote for them
down the line on every claim, every theory and every
class member and every penny of damages sought. This
settlement represents 30 percent of that. I can't say I
have much experience in class settlement of what I will
call consumer cases. That strikes the court as quite
high. When you layer on top of that the risk that I have
alluded to that I think are quite substantial. In other

1    words, but for the presence of extremely competent

2    counsel, this is the sort of case that I think as a

3    defense lawyer, I would have looked at and thought

4    there's some risk here for us but there's so many bridges

5    that the plaintiff has to cross to prove up their case,

6    their theory of liability but more important in damages

7    in which the plaintiff lawyers often forget.  I didn't

8    mention the battle of the experts.  The sampling

9    techniques and how the jury would have reacted.  There's

10    just so many places here where a plaintiff in presenting

11    this case, could have tripped so I think but for the

12    presence of the counsel who were in the case, now I'm

13    slipping over the fees issue.  I'm really talking about

14    whether this is a reasonable settlement.  Given all of

15    the risks, given all of the steps at which risk could

16    have translated into failure, this is an extremely

17    reasonable settlement.  I understand that the plaintiff

18    through discovery and other analysis developed a new

19    theory that 15 percent of the premium dollars is what

20    they would seek and should be entitled to.  The fact of

21    the matter is that this recovery represents more than

22    what a plaintiff going into this case thought they could

23    recover and as I have said already several times, it

24    strikes this court there was a very real risk that the

25    plaintiffs would have recovered nothing even with the

1    counsel that represented them.

2        Therefore, the court finds that the Grinnell

3    factors weigh very strongly in favor of approval and

4    therefore, grants approval to this settlement.

5        The only issue remaining then is the motion for

6    costs and fees by class counsel.  I will start with the

7    principle that always brings some comfort to the heart of

8    the district court judge that is "the fee award in the

9    common fund cases may not exceed what's reasonable under

10    the circumstances.  What constitutes a reasonable fee is

11    committed to the sound discretion of the district court"

12    Goldberger versus Integrated Resources 209 F.3d, 43,

13    (Second Circuit 2002).

14        As I understand the Second Circuit precedence, I

15    think counsel was in the same place and has argued so I

16    think in the briefs.  The district court has the

17    discretion to use a percentage of the fund approach or a

18    lodestar approach but that the circuit has in Goldberger

19    recommended a trend towards use or more favored use of

20    the percentage fund because it more closely aligns the

21    interest of the class and its counsel and that it has

22    encouraged the use of the lodestar as the sort of double

23    check or cross-check of the percentage award.

24        In my view and experience, the difficulty with

25    the lodestar was that the interest in the class and their

1    counsel may have misaligned.  In other words, there was

2    an interest in counsel billing more and more, more and

3    more hours even though they were not obtaining any better

4    result for their client whereas if counsel attacks a case

5    expecting as I think Goldberger suggests, that the

6    principal driver of the fee determinant will be the

7    recovery that they obtained for their client, their goal

8    will be to get the best result in terms of dollar amount

9    for their clients.  Whatever method the court uses.  I do

10   intend to use a percentage approach with the lodestar as

11   a check, but doing that, Goldberger also informs the

12   court that "a fee award should be assessed based on

13   scrutiny of the unique circumstances of each case" and "a

14   jealous regard to the rights of those who are interested

15   in the fund."  209 F.3d, at 53.  That's quoting the

16   Grinnell decision.  In effect, the circuit in another

17   case McDaniel versus Schenectady emphasizing the

18   importance of the district court's duty to act as a

19   fiduciary who must serve as a guardian of the rights of

20   absent class members.

21       The Goldberger case which set out a number of

22   factors some of which I already touched under the

23   analysis of the approval of the class settlement but the

24   WalMart decision of the Second Circuit post-Goldberg have

25   emphasized no matter what authority I should use, that I

should still look at those Goldberger factors to
determine the ultimate reasonableness of a common fund
fee.

Counsel in this case request an award of
$21,750,000 which equals 30 percent of the total
settlement fund.  Looking at the Goldberger factors
starting with the time and labor expended by counsel.
Obviously this case despite the court's best efforts,
pended for five years, not, of course, including the
prefiling investigation of counsel as to whether and how
to bring this case.  That's a very long time.  That's not
the longest for large class action.  In my view, it is a
long time for counsel to have labored with these
plaintiffs with not knowing whether it would ever obtain
any benefit for themselves.

Attorney Golub's declaration represents that
counsel over that time period have spent almost 12,000
hours of time with, of course, a potential for more time,
hopefully not too much for counsel but some more time to
wrap the case up.

There were a number of very intensive tasks that
were required in this case.  I mentioned prefiling
investigation.  The legal research in the case obviously
as reflected in the computer charges which don't include
Attorney Golub's charges in that respect.  Pleadings,

motion practice, a substantial motion to dismiss, a very

difficult, complex one.  There was obviously a very

complex class certification motion practice.  There was

the attempt to appeal.  There was extensive document

production, deposition discovery that I have mentioned as

well as discovery motion practice which I will try to

forget.  There was obviously substantial involvement of

experts in this case which I know takes a lot of time for

lawyers interacting with the experts, working with them,

understanding what they are doing and then, of course,

the discovery of that on both in this case the merits and

the damages and lastly, there were extensive efforts

placed as represented by counsel, invested in the

settlement that occurred over a several month period if

I'm recalling correctly.  Of course, the time and labor

factor of Goldberger, it is true that by settling at this

point which I think at this point there's a very high

level of knowledge by counsel as I have already

commented, so the plaintiffs have benefited I think in

that respect from all of the expenditure of effort.  But

clearly counsel avoided the burdens, let alone the risk

but the burden in the time of preparing for and getting

ready for trial, let alone what was suggested a summary

judgment motion and motions to decertify the class which

would have been substantial time and effort by counsel

and finally avoided assuming the plaintiff had prevailed
at trial, the time involved in defending appeals.

I have commented on in my questioning I guess,
there were questions but I suppose counsel views them as
comments.  They were really questions but the court does
note that class counsel involved four different law
firms, I believe 67 billers, attorneys and paralegals.
I'm always troubled by what would be suggested to be an
inefficiency of so many different billers.  I can't
believe there isn't some duplication in efficiency
resulting from this arrangement.  At the same time,
however, it is also fair to comment by adding that I
understand that this case could not be prosecuted by one
plaintiff's firm and second, given the time period, the
change in billers is not -- in many respects, I will say
the function of the fact the case pended for five years,
many of those billers do not have a substantial period of
time billed.

I will turn to the second factor which is the
magnitude and complexity of the litigation.  I mentioned
and apologize for repeating but I'm trying to make a
record in one place that the class, the nearly 22,000
members which in my view is a pretty big class and the
size of the settlement 72 million dollars both of those
demonstrate this was a very substantial undertaking.

Further, the case presented a number of complex issues. Including for this court challenging issues on class certification, issues surrounding the various standards for the different causes of action between and among the states and significant issues of proof relating to liability but probably more importantly to damages.

With respect to the risk of the litigation, this is probably the most singularly important factor in the court's decision on this motion. There are a number of factors present that demonstrate class. Counsel took a very significant risk in pursuing this action on a contingency basis. First, there was no prior investigation to rely on in establishing the facts or a legal basis for the case.

Second, it strikes me there are no other prior or even now similar cases involving parties like these plaintiffs and a party like these defendants.

Third, class certification was by no means assured at the outset and remained I think quite susceptible to attack before this court and clearly on appeal and further, the issue of damages' proof always struck me in this case as a very significant one. I'll not phrase this in a legal way but the sense the plaintiff got what they bargained for. Wouldn't they have paid the same amount and gotten what they got if

they had gone across the street to Traveler's instead of
staying inhouse, shall we say, with the Hartford that was
involved in the accident or whatever that led to these
settlements.  I'm not speaking as a legal theory.  I'm
talking about how this claim would sound to a jury, how a
defendant could make it sound to a jury, and that doesn't
begin to address issues such as structural assumptions
and samples and other things like that.  Suffice it to
say that these and other factors that I will not
reiterate, all contributed to extremely substantial risk
of little or no recovery in this case.

     With respect to the quality of the
representation, the quality of the representation
provided to the plaintiff's counsel in this case has been
consistently excellent.  Attorney Golub and his I will
call it team.  I hope no one is offended by this.  His
team has been the face of the overall team to the court
and their performance has always been outstanding.  The
court is less directly familiar with the individual work
by the other counsel.  That doesn't reflect badly on
them.  I can say overall the quality of the work that has
been presented to the court, the briefs and even the
arguments which I assume were the result of joint effort
in preparation has always been outstanding.  I would say
the same for defense counsel as well.

1    So with respect to plaintiff's counsel in

2  answering the fourth Goldberger factor, certainly the

3  quality of representation has been extremely high.  In

4  many respects is reflected in the outcome.

5    The requested fee in relation to the settlement,

6  this is where I have some pause.  Plaintiff's counsel

7  has -- class counsel has pointed to a considerable number

8  of cases which fees of 30 percent or more of a common

9  fund have been awarded.  Some of those cases are

10  comparable to this one in terms of the size of the

11  settlement and other factors.  Not all of them are,

12  however.  However, again I mean no criticism of

13  plaintiff's counsel.  They have not in any way done

14  anything.  There's been no misleading of the court or

15  anything like that.  I think as a result of the clear

16  sailing agreements in class action settlements that the

17  court suffers from what usually helps the court do a

18  better job which is vigorous advocacy.

19    In doing my own leg work in that respect, I look

20  not only at the cases cited.  There are many cited by

21  plaintiff's counsel and others in which the fees are

22  significantly less.  They are not all like this case.

23  They have different facts and factors but the Goldberger

24  case was four percent of a 54 million dollar fee.  A

25  Metlife settlement this year in the Eastern District of

1    New York was 21 percent of a 50 million dollar

2    settlement.  The in re: Elan Securities Litigation in

3    2005 in the Southern District was 12 percent of 75

4    million dollar settlement.  In re: Global Crossing in

5    2004 in the Southern District was 15 percent of the 78

6    million dollar fund.

7         As I say, they don't all present the same

8    factors presented in this case.  Probably risk would be

9    the number one difference but the same can be said about

10   the one cited by plaintiff's counsel.  They are all not

11   like this case.  Indeed I would reiterate what the

12   circuit exhorts me to consider that's particular

13   circumstances of the particular case in front of me.  I

14   believe I cited to the article I mentioned in the Journal

15   of Legal Empirical Studies I think it is called this year

16   of 30 percent would be above average as compared to all

17   class action that are 23 percent compared to the class

18   action settlements in this circuit which is also 23

19   percent.  Compared to class action settlements ranging

20   from 69 million to 150 million dollars which is 19

21   percent.

22        Clearly what this article includes that's

23   consistent with my own view percentages tend to decrease

24   as the size decreases.  The lower amount the larger

25   percentage is justified.  To the extent that last range

is 19 percent, clearly this settlement is at the low end

of the range and you would argue for higher than that.

What I said is really very generally speaking but that as

a settlement fund increase awarding the fixed amount,

tends to create the risk of a windfall.  Hicks versus

Stanley, 01cv110071, 2005 Westlaw, 2757792 at *9, the

Southern District of New York in 2005, noting the 30

percent of the $10 million "does not raise the windfall

issue the same way would be a hundred million dollar

settlement.".

Class counsel suggest that 30 percent is less

than the typical right of one-third in contingent

personal injury cases.  As I noted in the conversation

with counsel, not all contingencies are a third, not all

of them are a flat third.  By statute absent the waiver

counsel educated me on, they would been a third.  But in

any case, really the bottom line is that the court is

cognizant that none of these percentages really provided

a default or a benchmark for attorney fees.  In some

respects I think looking at other cases which is of

course what we all do as lawyers and judges, we want to

look at what somebody else said, how did somebody analyze

it, what percent did they award, what was the settlement

set.  I think Goldberger actually suggests, they don't

say quite so boldly but that's a very dangerous exercise

it tends to lull the decider, me, into thinking that I

can just borrow a benchmark from some one case that looks

like this or from some group of cases and what's the

average.  In doing that, it seems to me is an improper

substitute for the individual assessment that this court

needs to engage in which I hope I'm in the midst of

engaging in and have engaged in my earlier ruling on the

settlement in deciding what is a reasonable and fair

settlement.

On this factor as well, it seems to me I need to

consider the impact on the class.  Clearly this

settlement comes out of the class recovery.  Probably the

class members would be happier if they didn't have to pay

any fee and they received 100 percent of the settlement,

but the reality is but for counsel's outstanding work in

this case and substantial effort over five years, no

member of the class would have recovered a penny so I'm

tasked with deciding what's a fair amount for the class

members to pay to counsel to in effect compensate them

for their efforts in obtaining what I think is a quite

outstanding result.

The last factor I haven't touched is called

public policies.  I've wrestled with what that meant in

this case.  What it means that to the extent there's been

a private lawsuit here.  In effect, private attorney

generals, I know defense counsel wouldn't look at it this

way but in effect vindicating of the representation I

will call it for now.  The plaintiff's viewed as having

been engaged by the defendants that that does serve an

important public purpose and can advance the public's

interest.  And certainly as I have just mentioned a

moment ago, an appropriate fee award is necessary to

encourage that.

Lastly, I will note I'm not sure it comes in

under any particular factors.  I suppose under the

reasonableness of the settlement but is the fact that the

size of the class nearly 22,000 people.  The numbers of

the inquiries to the 800 numbers and hits to the website

which I can't recite off the top of my head but they are

in the thousands if I'm recalling correctly and the

absence of any objection to the settlement or to the

fees, I think Attorney Golub is correct to remind me of

those facts and suggest they are significant in

determining what's a reasonable award for plaintiff's

counsel in this case.  In sum, it is the court's view

that the size of the fee requested in relation to the

size of the award 30 percent is high and that causes the

court to pause to think that a lower fee would be

appropriate.  However, in trying to construct in my own

thinking what a reasonable client faced with these

circumstances would be willing to agree to counsel to get

them and what counsel would agree to do to be retained,

suggests that a significant award is appropriate.  As I

have said already, it was an extremely complex and

substantial class and case.  There was a significant

effort required, both anticipated I would imagine at the

onset of the case, the agreement to be retained in

actuality a very significant effort on behalf of both

counsel, the quality of the award was high and the public

was served but in the end, the most significant factor to

this court is the risk involved.  And many times during

this litigation, the court was extremely skeptical of the

plaintiff's ability to press a legally recognizable class

or to press a valid claim and finally probably most

importantly to prove any significant amount of damage on

the part of the class members.  So while the percentage

sought is high and I think normally I would be inclined

to reject the request when balanced against the risk

presented in this case, the court concludes that the

percentage is supportable, is reasonable.  Of course then

when I'm left with cross-checking it with the lodestar,

there were approximately 12,000 hours expended which

yielded a cost at the rates charged of nearly six million

dollars.  As I have -- counsel thinks I was suggesting by

my questions I thought some of rates were high.  They are

but I also agree with counsel that I will not be nit

picking here. I'm not sure if I went through and

lowered the hourly rate of some people somewhat, maybe

went through every line and cut out only duplication, I

don't think it would be significant, lower lodestar than

there is now. It would be lower, trust me, but it would

not I think be significant. So taking lodestar as

appropriate. In other words, assume I didn't tinker with

it which I won't because I don't think in a great sense

it is out of line with the effort expended. The

results of the case. It results in a multiplier of 3.7.

Now again Goldberger tells me I should be using

all of their factors in deciding about lodestar. I have

already talked about time and labor and complexity of

magnitude. I talked about the risk and quality of

representation. I have, again I'm relying on this one

article that counsel hasn't seen so I'm sure you will

some day come to me and point out what's wrong with this

argument. It does suggest that the multipliers across

the board are not at the level that you argue in your

memorandum. You argue with support. I'm not saying you

are pulling it out of the air. The average multiplier

for the range that the settlement falls is 2.7. Given it

is the low end of the range and that range is quite broad

and given that I believe that study and many others prove

that multipliers and percentages decrease as you go

higher up into a settlement range, that would suggest the

2.7 is probably on the low side for the settlement amount

but nonetheless, 3.7 strikes the court as a little bit

high but I'm still left with the feeling that the risk in

this case overwhelms my judgment on this motion, I guess

I'll say and informs me the risk associated with this

case is certainly of a much different quality.  I will

call it nature than any class action that I have seen

particularly in relation to the size of the settlement

achieved.  I had risky cases that settled for 10 cents on

the dollar but I wouldn't say those cases were as risky

as this one and this one is not 10 cents on the dollar.

While I pause somewhat over the fact this lodestar, the

cross-check seems high in relation to what I might

normally find to be comforting in concluding the

percentages was a reasonable one.  I'm informed by the

risk and difficulty of this case and the complexity of

it, the number of issues, the number of places where the

plaintiff's case could trip and fall which is how I would

view it as defense counsel.  And so, as I say, I find the

lodestar is a bit -- multiplier of the lodestar is a bit

high to what I would have expected to see to the 30

percent.  It is not out of line with particularly given

the factors that I have weighed in determining the 30

percent.  I think in the end on the bottom line, I think

this is what's supposed to be most important is the

assessment of the case as an individual case and a

consideration of what is a reasonable fee and than

relates to what would the hypothetical client and a

hypothetical lawyer sitting down at the beginning of the

case have agreed to.  I think that given the likelihood

of recovery was questionable, the likelihood of

certification was in doubt and lastly, that the best case

that they would have obtained when they did sit down to

reach this agreement was the 50 million dollars.  It

strikes this court that a contingency arrangement between

counsel and class of 30 percent is very well within the

range of what would have been agreed to, in effect, in

the market assuming what would have been agreed to at all

and therefore, having considered all the factors and

having weighed them, particularly weighing the risks and

looking at the lodestar as a check, the court concludes

that the 30 percent sought is a reasonable, fair and just

fee award in this case under the circumstances of this

case.  Therefore, grants number 247 with respect to

the -- not 250 with respect to the fee.

        That leaves the issue of the question of costs.

Counsel seek an additional 823,467.35 to compensate for

expenses.  While counsel are entitled to the reasonable

compensation for out-of-pocket expenses normally billed
to the client, the court finds that's not reasonable that
each and every in-house cost or out-of-pocket cost would
be passed onto clients particularly where the attorney
fee award is so significant.  The award, in effect, takes
into account a very large, in this court's view,
multiplier of a generous lodestar number.  All of those
are reasonable but they are on the high side.  The court
hates to nitpick but I must say that I don't think the
communication expenses of $1216.15 from the Golub
declaration at page 40 or the 1674.59 and the 67.93 for
telephone facsimile and postage from the Bloch
declaration or postage and messengers 1725.21 and the
other category of 1550.59 from the Kravtiz declaration at
four are reasonable additional, quote, out-of-pocket
expenses.  So the court will deduct this is probably in
the category of nitpicking but 6334.47 resulting in a
total reimbursement for costs 817,132.88.  And that makes
the motion for -- the motion for -- number 244 for class
counsel's award of fees is granted and reimbursement of
litigation expenses is granted in part.  It is number
244.  It should have been a two-part motion.  That leaves
me with just the form of order.  I have asked counsel to
send us a document that we could edit which I'm prepared
to issue this today.  I will make the following changes

1　at page 6 subparagraph B, I will say there are no

2　objections remaining to the settlement by settlement

3　class members instead of saying there were no objections.

4　Technically there were objections.  They weren't to the

5　settlement but I feel more comfortable saying it that

6　way.  Page 6 subpart B up at the top.  At page 11, I'm

7　going to and 12, I'm going to edit that a bit because it

8　reflects my ruling.  For example, in subpart F, I will

9　say there are comparable -- in some comparable cases.  I

10　will indicate an I that I'm using percent of the fund

11　that's customary measure with the lodestar as a

12　cross-check and that in l, I will say the requested 30

13　percent has been found by some courts to be within the

14　applicable range.

15　　　　In M, I'm going to say the examination of

16　summary approved multiples, the end of the sentence

17　instead here is within the acceptable range is what's

18　allowed in those cases and that obviously stays the same.

19　　　　The figure on page 13 of the cost will be what I

20　just announced.  Slightly reduce cost, requested cost and

21　I guess we're going to leave paragraph 20 the same and

22　you are going to move to withdraw any other pending

23　claims.

24　　　　MR. GOLUB:  Yes.  Is this going to be issued

25　today?

1        THE COURT:  I hope to.

2        MR. GOLUB:  As soon as we get the

3    notification.

4        THE COURT:  Do the withdrawal?

5        MR. GOLUB:  Right.

6        THE COURT:  My view I have done.  I granted your

7    motion.

8        MR. GOLUB:  As soon as we get back to the

9    office, we'll withdraw it.

10        THE COURT:  That way it will make Bernadette

11    happy she can close the case and you want to make

12    Bernadette happy.

13        MR. GOLUB:  I do.

14        THE COURT:  I think that's everything.  Is there

15    anything else that the court needs to do in the case?

16        MR. GOLUB:  I think you covered everything and

17    thank you for your consideration and for the depth of

18    your consideration as well.

19        THE COURT:  That's my job I guess.  I would like

20    to thank counsel and ask if Attorney Hoff would convey

21    these remarks to his co-counsel that the court has

22    appreciated the professional approach taken by all

23    counsel in this case.  I may have at times been

24    impatient, I think there was 255 plus docket entries.  I

25    really attempted if I had the time to go see to see how

many were motions were to extend the time so if I was
impatient at any of those times, I apologize but I
thought it was in the class's interest and the
defendants' interest to put the case behind them one way
or another.  That's my only consideration but having said
that, I would say that I do appreciate counsel's approach
to this case, their diligence most times and particularly
their competence on both sides of this case.  I would
hope that counsel who did not speak today don't read too
much into or misread what were if you listen carefully in
many cases questions, not comments of mine, to Attorney
Golub about your rates, things about that.  In the end I
was persuaded.  I obviously didn't adjust the lodestar
figure and accepted what I thought was on the high side
of the multiplier again for all the reasons I
articulated.  I obviously think that the outcome in this
case is quite favorable for the plaintiffs' class.  I
think Attorney Golub referred to pennies on the dollars
in settling class actions that's been the subject of many
headlines around the country.  I suspect the next time
such a story is written, they won't bother to mention
this case.  That's quite a substantial recovery by good
lawyering and good defense work, very good defense work
but which resulted in a very substantial settlement for
these class members.  So again my thanks to the everyone

1    and we'll stand in recess.

2              (Whereupon, the above proceeding adjourned at

3    12:22 p.m.)

4

5

6

7    COURT REPORTER'S TRANSCRIPT CERTIFICATE

8    I hereby certify that the within and foregoing is a true

9    and correct transcript taken from the proceedings in the

10   above-entitled matter.

11

12   /s/  Terri Fidanza

13   Terri Fidanza, RPR

14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25